GRELLAS SHAH LLP
DHAIVAT H. SHAH, ESQ. (SBN 196382)
(ds@grellas.com)
DAVID I. SIEGEL, ESQ. (SBN 264247)
(dsiegel@grellas.com)
JUSTIN L. SOWA, ESQ. (SBN 305002)
(jsowa@grellas.com)
550 California Street, Suite 1040
San Francisco, CA  94104
Telephone: (408) 255-6310
Facsimile: (408) 255-6350

Attorneys for Plaintiff DR. ANDREI GAFITA

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| DR. ANDREI GAFITA, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>NUCS AI, INC., a Delaware corporation, NIJAT AHMADOV, an individual, and FARID YAGUBBAYLI, an individual,<br><br>Defendants. | Case No.:  3:25-cv-10757<br><br>**COMPLAINT**<br><br><br>DEMAND FOR JURY TRIAL |

Plaintiff Dr. Andrei Gafita ("Gafita") brings this action against Defendants Nucs AI, Inc. ("Nucs AI"), Nijat Ahmadov ("Ahmadov"), and Farid Yagubbayli ("Yagubbayli") and alleges as follows:

**INTRODUCTION**

1.     Dr. Andrei Gafita brings this action against Nucs AI to enforce his entitlement to the substantial equity stake he was promised in exchange for his highly valuable ideas and intellectual property that constitute the core technology underlying Nucs AI's products, his business plan, and access to his professional network.

2.     Gafita is a respected and accomplished doctor and medical researcher currently practicing at Johns Hopkins Medicine. In 2023, Gafita developed the seed of a new technology that could revolutionize the diagnosis and treatment of prostate cancer using artificial intelligence.

3.     Gafita agreed to work with Farid Yagubbayli to develop his ideas into a marketable product. Yagubbayli introduced Gafita to his friend Nijat Ahmadov, and together the three agreed to start Nucs AI.

4.     In recognition of his substantial contributions at the enterprise's outset—without which Nucs AI could never have existed—Ahmadov and Yagubbayli agreed to issue Gafita 4,700,000 shares of common stock in the new company. Unlike Ahmadov and Yagubbayli's own shares, Gafita's would not be subject to vesting but would be issued in full upon Nucs AI's formation.

5.     But no sooner had Gafita received his shares than Ahmadov and Yagubbayli began working to undermine his ability to realize his ownership of them. At first falsely claiming it was necessary to secure initial investment, then falsely claiming it reflected the limited hours Gafita could contribute to daily operations at Nucs AI, and then again that it was necessary to secure additional investment, Ahmadov and Yagubbayli coerced Gafita into signing amendments to his stock purchase agreement that resulted in his shares first partially and then fully revesting. All this time, Ahmadov and Yagubbayli assured Gafita that he was a critical member of the Nucs AI team and would be compensated for his contributions, including with a

Grellas Shah LLP
550 California St., Suite 1040
San Francisco, CA 94104

seat on the board of directors. These reassurances were all false and intended to convince Gafita to sign away his right to his shares.

6. When Gafita confronted Ahmadov about the unfairness of his revesting agreements, Ahmadov and Yagubbayli began engineering a pretextual scheme to remove Gafita from the company. Ahmadov told Gafita that the Board of Directors was determined to terminate his consulting agreement immediately, and offered him the choice to either step down and relinquish most of his shares, or agree to a reduced role and vastly reduced equity share. But, unfortunately for defendants, Gafita and Nucs AI had a written agreement that if Gafita was terminated without cause his shares would immediately vest in full. To avoid this outcome, Ahmadov and Yagubbayli constructed a set of false and pretextual bases to terminate Gafita for "cause," which would allow Nucs AI to repurchase Gafita's shares for a fraction of their value.

7. Upon the termination of his consulting agreement, the defendants did not convey Gafita's 4,700,000 fully vested shares of Nucs AI common stock and have stated that they will not do so.

## PARTIES

8. Gafita is an individual and a resident of Baltimore, Maryland. Gafita is a medical doctor specializing in prostate cancer theranostics at Johns Hopkins Medicine.

9. Nucs AI is a corporation organized under the laws of the State of Delaware. Gafita is informed and believes that Nucs AI has a principal place of business at 368 9th Avenue, New York, New York, 10001, but at all times pertinent to the acts described in this Complaint had a principal place of business at 535 Mission Street, San Francisco, California, 94105. Nucs AI is a developer of AI tools for healthcare professionals to use in the detection, staging, and treatment of prostate cancer.

10. Ahmadov is an individual and a resident of Germany. Ahmadov is a Director, CEO, and Co-Founder of Nucs AI. Ahmadov has a business background.

11. Yagubbayli is an individual and a resident of Germany. Yagubbayli is a Director, CTO, and Co-Founder of Nucs AI. Yagubbayli is a software engineer.

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

2
COMPLAINT

**JURISDICTION**

12.     This Court has original jurisdiction over this action under 28 U.S.C. § 1332 because the amount in controversy exceeds the value of $75,000 and because this dispute is between Gafita, a citizen of Maryland, Nucs AI, a citizen of Delaware and/or California or New York, and Ahmadov and Yagubbayli, both foreign citizens.

13.     Defendant Nucs AI is subject to personal jurisdiction in the State of California because it submitted and consented to the exclusive jurisdiction of the state of California in the First and Second Amendments to the Common Stock Purchase Agreement between Gafita and Nucs AI, attached as **Exhibit B** and **Exhibit C** to this Complaint, and agreed that any litigation arising from said agreements shall be conducted only in the courts of California or the federal courts of the United States located in California and no other courts.

14.     Defendants Ahmadov and Yagubbayli are subject to personal jurisdiction in the State of California because they purposely availed themselves of California, and San Francisco specifically, by representing Nucs AI as having a presence in San Francisco on its website and LinkedIn profile, and by including a San Francisco mailing address on their Nucs AI email signature blocks. Ahmadov and Yagubbayli invoked the status and prestige of a San Francisco address for a technology start-up company to raise the profile of Nucs AI and themselves, and the majority of acts alleged in this complaint occurred while Nucs AI, Ahmadov, and Yagubbayli were deliberately creating an impression that they were present in the State of California and the City of San Francisco. Gafita's claims against Ahmadov and Yagubbayli arise out of his contacts with the forum state, namely, the fraudulent representations they made to Gafita were intended to induce his continued contracting and provision of services for a California entity, and Ahmadov and Yagubbayli were holding themselves out as situated in California at the time they made the fraudulent representations.

**VENUE**

15.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and (c) because Nucs AI consented to a California forum and its primary place of business is or was within this district. Furthermore, a substantial part of the breach of the contract and tortious conduct alleged

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

occurred in this district. Venue is also proper over Defendant Ahmadov and Yagubbayli pursuant to 28 U.S.C. § 1391(c)(3).

### INTRADISTRICT ASSIGNMENT

16.     Assignment to this division is proper because Nucs AI has or had its primary place of business in San Francisco.

### BACKGROUND

**A.     Gafita develops the core technology and business plan and founds Nucs AI with Ahmadov and Yagubbayli.**

17.     Starting in or around early 2023, Gafita began developing AI technology to be used in the diagnosis and treatment of prostate cancer. In support of these efforts, Gafita spent $7,000 of his own money on a powerful GPU-equipped computer to facilitate his development efforts. Gafita also developed a business plan based on the technology he had developed.

18.     Later in 2023, Gafita described his new technology to Yagubbayli, a software engineer with whom he previously collaborated at Technical University Munich in Germany. Gafita and Yagubbayli realized that Gafita's technology had commercial potential and began considering formation of a company to develop and commercialize it. In early 2024, Yagubbayli introduced Gafita to Ahmadov, a friend of Yagubbayli's who had business experience in e-commerce but no healthcare background. Ahmadov pitched Gafita and Yagubbayli to make him CEO of their contemplated company, and Gafita and Yagubbayli agreed. Gafita, Ahmadov, and Yagubbayli founded Nucs AI and incorporated it as a Delaware corporation in March 2024.

19.     Ahmadov and Yagubbayli appointed themselves directors of the new corporation and promised Gafita a seat on the Board in the future. On May 15, 2024, the Board of Directors of Nucs AI, by unanimous written consent (the "Board Consent"), authorized the issuance of 9,000,000 shares of common stock at a price of $0.0001 per share.

20.     Exhibit A to the Board Consent identified three recipients of shares. The Board approved an issuance of 1,850,000 shares to Ahmadov and 2,450,000 shares to Yagubbayli. The Board resolved that 100% of the shares issued to Ahmadov and Yagubbayli were subject to vesting, with the vesting start date of March 15, 2024. The Board resolved that 1/48th of

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

Ahmadov and Yagubbayli's shares would vest after 12 months of service, on March 15, 2025, and 1/48th of their shares would vest each month of their continued service for the next 4-year period.

21. The Board took a different approach to Gafita's shares. Recognizing that Gafita had developed the vision for the company, the business plan, and the technology at the core of Nucs AI's products, and that the new company could not have existed without him, the Board agreed to issue Gafita 4,700,000 shares—more than Ahmadov and Yagubbayli combined—which would vest immediately.

**B.**   **Nucs AI issues shares to Gafita but quickly begins a scheme to prevent him from retaining them.**

22. On or around May 17, 2024, Nucs AI and Gafita entered into a Common Stock Purchase Agreement. A true and correct copy of this Agreement is attached to this Complaint as **Exhibit A**. As authorized by the Board Consent, the Common Stock Purchase Agreement provided for the issuance of 4,700,000 shares of Nucs AI common stock to Gafita at a total purchase price of $470.00, of which $47 would be paid in cash and $423 in the form of IP assets assigned to Nucs AI by Gafita. The shares were not subject to vesting.

23. Only two months later, however, Ahmadov presented Gafita with an Amendment to the Common Stock Purchase Agreement ("First Amendment"). A true and correct copy of the First Amendment is attached to this Complaint as **Exhibit B**. The First Amendment deleted the section of the Common Stock Purchase Agreement providing Gafita with 4,700,000 shares free and clear and replaced it with a vesting schedule commencing on May 17, 2024 (the date of the original Agreement), with 25% of the shares to vest on June 17, 2024, and the remaining 75% vesting over the next three years at 1/48th per month. Ahmadov explained that the 25% vesting in June 2024 was intended to compensate Gafita for his substantial contributions to Nucs AI both before and in the first months of its incorporation.

24. The First Amendment added another requirement that Gafita enter into a written consulting agreement with Nucs AI by February 28, 2025, or Nucs AI would have the right to

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

repurchase Gafita's shares. It also required Gafita to enter into a Confidential Information and Invention Assignment Agreement.

25. Ahmadov and Yagubbayli told Gafita that revesting his shares was necessary to facilitate outside investment. However, Ahmadov and Yagubbayli did not change the vesting schedule for their own shares.

26. The reasons for revesting stated by Ahmadov were pretextual and false, and were part of a fraudulent scheme by Ahmadov and Yagubbayli to obtain Gafita's ideas, business plan, and intellectual property, and to gain entry to his professional network, without compensating him fairly.

27. Feeling pressured by Ahmadov and Yagubbayli, Gafita signed the First Amendment. He then continued providing valuable services to Nucs AI through development of the AI technologies, contribution to the company's patent applications, development of clinical studies, engagement with the FDA and reimbursement specialists, and development of clinical workflows, while also introducing the company to leading medical institutions and key opinion leaders and generally serving as Nucs AI's primary medical expert as the company got off the ground.

28. In December 2024, Ahmadov presented Gafita with a Second Amendment to Common Stock Purchase Agreement (the "Second Amendment"), a true and correct copy of which is attached to this Complaint as **Exhibit C**. The Second Amendment recites: "The Company and Stockholder recognize that, in order to provide the Company with an enhanced opportunity to raise additional capital for the benefit of all holders of capital stock of the Company, including Stockholder, it is necessary and appropriate for Stockholder to agree to subject the Shares to certain restrictions as set forth in this Agreement." Ahmadov reiterated that this amendment was necessary for additional fundraising.

29. The Second Amendment, which was effective as of January 10, 2025, subjected *all* of Gafita's shares to total revesting. It undid the 25% backdated vesting of the First Amendment and provided that all Gafita's 4,700,000 shares would vest 1/48th per month beginning February 1, 2025. As such, Gafita went from having 4,700,000 fully vested shares to

having zero vested shares and a four-year timeframe in which to receive them. Ahmadov and Yabubbayli's vesting schedules remained unchanged.

30.     When Gafita questioned the fairness of this new schedule in light of Ahmadov and Yagubbayli's earlier representations to Gafita that he would be compensated for his substantial contributions to Nucs AI at the time of its formation, Ahmadov told him that because Gafita could only commit 15 hours weekly to Nucs AI in his contemplated consulting agreement, he was not entitled to faster vesting. But Gafita, a full-time employee of Johns Hopkins Medicine, had always been clear with Ahmadov and Yagubbayli about the limitations imposed by his primary employer and always understood his deal with Nucs AI to be substantial equity in exchange for his critical ideas and technology that formed the core of the company's products. In practice, Gafita typically dedicated at least 30 hours per week to Nucs AI.

31.     These reasons for additional revesting, too, were pretextual and false, and were part of a fraudulent scheme by Ahmadov and Yagubbayli to obtain Gafita's ideas, business plan, and intellectual property without compensating him fairly. Nevertheless, reasonably relying on Ahmadov's representations that execution of the Second Amendment was essential to Nucs AI's ability to fundraise, Gafita signed it.

32.     At the same time as he executed the Second Amendment, Gafita also signed a Stock Restriction Agreement. A true and correct copy of the Stock Restriction Agreement is attached to this Complaint as **Exhibit D**. The Stock Restriction Agreement granted to Nucs AI a repurchase option to, should Gafita quit or be terminated for cause, acquire all his unvested shares at their original purchase price of $0.001.

33.     However, the Stock Restriction Agreement also provided that if Gafita was terminated *without* cause, then vesting of his unvested shares would accelerate and Nucs AI would lose its right to repurchase them.

34.     "Cause" is defined in the Stock Restriction Agreement as follows:

> (I) Stockholder's willful and continued failure to substantially perform Stockholder's duties to the Company after there has been delivered to Stockholder by the Company's Board of Directors a written demand for substantial performance and opportunity to cure which sets forth in detail the specific respects in which the Company's Board of Directors believes that Stockholder has not substantially performed Stockholder's duties;

(II) Stockholder having committed willful fraud, willful misconduct, dishonesty or other intentional action in any such case which is materially injurious to the Company; (III) Stockholder's having been convicted of, or having plead guilty or nolo contendere to, any crime that results in, or is reasonably expected to result in material harm to the business or reputation of the Company; or (IV) Stockholder's material breach of any material written agreement between Stockholder and the Company (including without limitation Stockholder's Confidential Information and Invention Assignment Agreement with the Company) and Stockholder's failure to cure such breach within 30 days after receiving written notice thereof.

35.     Gafita and Nucs AI also executed a Consulting Agreement and Confidential Information and Invention Assignment Agreement as required by the Second Amendment, both of which took effect in January 2025. The Consulting Agreement provided for compensation to Gafita of $2,000 per month in addition to his shares. Gafita has never received any payment from Nucs AI for his consulting work.

**C.     Nucs AI terminates Gafita without cause and attempts to manufacture a pretextual justification to avoid acceleration of Gafita's unvested shares.**

36.     Having induced Gafita, through successive revesting agreements purportedly for the good of Nucs AI, to substantially reduce his quantity of vested shares, Ahmadov, Yagubbayli and Nucs AI put into action their final plan to wipe out Gafita's now-unvested equity entirely.

37.     In early April 2025, after obtaining legal review of the amendments to the Common Stock Purchase Agreement, Gafita expressed concerns to Ahmadov about how his shares had been revested, and in particular the Second Amendment, which served to even take away the 25% of shares vested under the First Amendment and subjected Gafita's shares to complete revesting.

38.     Gafita expressed that he did not believe this arrangement was equitable and asked that vesting return to the original schedule in the First Amendment. Gafita's expressed concerns regarding the fairness of these terms caused a breakdown of the relationship between himself and Ahmadov and Yagubbayli.

39.     At a meeting in Baltimore, Maryland, in April 2025, Ahmadov and Gafita reached a verbal agreement to revert his vesting schedule to its original schedule and provide

8
COMPLAINT

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

him with 25% vesting on November 15, 2024, and 1/48th monthly vesting thereafter. Ahmadov also agreed to give Gafita his long-promised Board seat.

40.     Only one week later, Ahmadov reneged on his agreement, saying the offer of the Board seat was a "joke," and that he would only agree to the original vesting schedule if Gafita also agreed to substantially reduce his equity stake in the company by 33%. Gafita, who transferred valuable IP to Nucs AI in return for equity, was unwilling to do so.

41.     Despite the dispute about his shares, Gafita continued providing valuable services to Nucs AI as its chief medical advisor throughout this time period.

42.     In late May 2025, Gafita made an additional inquiry of Ahmadov as to the status of updating his vesting schedule. Ahmadov replied, "I don't know what you are talking about." Around this same time, Yagubbayli confirmed to Gafita that reverting the vesting schedule to its original terms was contingent on his agreement to a 33% reduction of his equity stake in Nucs AI, and said, "We are talking about a package and either take or leave it." Gafita expressed his concerns regarding his unfair treatment in light of his essential contributions in taking the company off the ground.

43.     Shortly thereafter, on May 23, 2025, Ahmadov told Gafita that the Board of Directors had decided to terminate Gafita's Consulting Agreement "as soon as possible." Prior to this announcement, none of Nucs AI, Ahmadov, of Yagubbayli had issued any prior warnings, complaints, performance reviews, or notice of breach of the Consulting Agreement with an opportunity to cure.

44.     Nucs AI offered Gafita two options: (1) step down from his role at the company and retain his vested shares (which at that point amounted to fewer than 500,000 shares); or (2) agree to a reduced role at Nucs AI as a scientific advisor with a reduction in his equity by 50% to 2,350,000 shares which would vest on the current schedule. Ahmadov told Gafita that if he did not elect one option or the other then Nucs AI would terminate the Consulting Agreement.

45.     But Nucs AI apparently recognized that terminating Gafita's Consulting Agreement without cause would trigger the acceleration provision and cause all his shares to vest, because, while Gafita never agreed to step down or to reduce his equity, Nucs AI did not

immediately terminate him, instead asking him to stop all "non-essential" work. Ahmadov and Yagubbayli needed this pause to give them time to determine how to steal the rest of Gafita's shares.

46. On June 20, 2025, Ahmadov sent Gafita a letter styled "Notice of Breach and Demand for Cure" ("Breach Notice") stating that Gafita was in breach of the Consulting Agreement and purporting to commence the 30-day cure period provided by the Agreement. The purported grounds for breach were fabricated and/or so vague as to be impossible to "cure" in any meaningful way. And as the Nucs AI Board of Directors had already made the decision to terminate the Consulting Agreement in May, the Breach Notice functioned solely as a pretextual attempt to manufacture "Cause" and avoid Gafita's accelerated vesting provision.

47. On June 27, 2025, Gafita sent a letter to Nucs AI reiterating his willingness to participate in a company investigation regarding his performance or conduct. Gafita requested additional information and documentation underlying the accusations listed in the Breach Notice so that he could respond to them. Nucs AI never responded to Gafita's letter, foreclosing any ability for him to cure any purported breach.

48. As a matter of fact, Nucs AI terminated Gafita's access to the company's computer systems on June 27, 2025, including email and Google Drive and requested that he return the workstation used for company-related activities, rendering it impossible for Gafita to perform his duties for the company. When he asked Ahmadov to restore his access, Ahmadov responded that all external contractors, advisors, and collaborators had temporarily had their access limited for security reasons, but that he still expected Gafita to provide services to Nucs AI, and he asked that Gafita provide a list of what he was currently working on. This justification was false and pretextual, and was intended to create "Cause" for termination of the Consulting Agreement.

49. While Gafita provided a list of his ongoing activities, Nucs AI still refused to restore his access to the company's online resources that Gafita required. Instead, Ahmadov sent another email requesting extensive details of everything Gafita had done or was doing for Nucs AI, again reiterating that he would not restore Gafita's access, but that locking Gafita out of all

Nucs AI resources "does not absolve you from your obligations or to deliver the work you initiated." Gafita perceived this email as a clear attempt to manufacture "Cause" to support a pretextual termination of the Consulting Agreement, and so he did not respond.

50.    Gafita, through counsel, sent a letter to Nucs AI on July 15, 2025, seeking assurance that Nucs AI would honor its agreement to provide him with his ownership rights and demanding full and immediate vesting should Nucs AI terminate Gafita without cause, as Gafita believed it was preparing to do.

51.    Gafita received a letter styled "Termination of Consulting Agreement" ("Termination Letter") signed by Ahmadov dated August 11, 2025. The letter purported to terminate Gafita for Cause, as defined in the Stock Restriction Agreement. The Termination Letter enumerated several false and pretextual bases that it purported to constitute Cause, including:

- Gafita's meeting on April 11, 2025, with an officer of an alleged competitor of the company, where he allegedly disclosed confidential Nucs AI information. Gafita in fact met with this officer with the full knowledge and approval of Ahmadov and did not share any confidential information with him. Nucs AI never produced any evidence or specifics regarding Gafita's supposed disclosures.

- A "sustained pattern" of conduct reflecting a "lack of professionalism, judgment, and loyalty, including: Repeated underperformance including failure to advance key medical initiatives, disengagement and lack of collaboration with team members and executive leadership, disrespectful behavior towards the leadership team of the Company including the Company's Chief Executive Officer (the 'CEO'); and on several occasions, undermined the CEO in internal communications and team meetings which has interfered with executive operations." These accusations were all untrue, pretextual, and unsupported by any evidence. They also, even if true, would not satisfy the definition of "Cause" in the Stock Restriction Agreement.

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

11
COMPLAINT

52.     Nucs AI has refused to convey Gafita's 4,700,000 shares that vested immediately upon his termination without Cause under the Stock Restriction Agreement and have indicated that they do not intend to do so.

## FIRST CAUSE OF ACTION

**Breach of Contract – Common Stock Purchase Agreement and
Stock Restriction Agreement
(Against Nucs AI)**

53.     Gafita incorporates by reference each of the allegations in paragraphs 1–52 of this Complaint as though fully set forth here.

54.     Gafita and Nucs AI entered into a series of contracts including the Common Stock Purchase Agreement, the First Amendment, the Second Amendment, the Stock Restriction Agreement, and the Consulting Agreement.

55.     The Common Stock Purchase Agreement, the First Amendment, the Second Amendment, the Stock Restriction Agreement, and the Consulting Agreement are binding and enforceable contracts that Nucs AI entered into knowingly and voluntarily.

56.     The Common Stock Purchase Agreement, as amended, obligated Nucs AI to issue Gafita 4,700,000 shares of Nucs AI common stock, subject to a vesting schedule. The Stock Restriction Agreement provided that, in the event the Consulting Agreement was terminated without Cause, as defined in the Stock Restriction Agreement, then all unvested shares of the 4,700,000 shares issued to Gafita under the Common Stock Purchase Agreement would vest immediately.

57.     On August 11, 2025, Nucs AI terminated the Consulting Agreement without Cause, as defined in the Stock Restriction Agreement.

58.     Gafita demanded all 4,700,000 shares of Nucs AI common stock be immediately issued to him. Nucs AI refused to issue and/or deliver Gafita's shares of Nucs AI common stock.

59.     The bases for Cause provided by Nucs AI were all false, pretextual, vague, and/or do not constitute bases for Cause as defined by the Stock Restriction Agreement. Gafita did not commit any act that would constitute Cause as defined by the Stock Restriction Agreement.

12
COMPLAINT

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

60. Nucs AI has breached the Common Stock Purchase Agreement, as amended, and the Stock Restriction Agreement by failing to issue 4,700,000 fully vested shares of Nucs AI common stock to Gafita.

61. Gafita has performed all obligations he owed to Nucs AI under the Common Stock Purchase Agreement, as amended, the Stock Restriction Agreement, and the Consulting Agreement, or his obligations have been terminated or excused.

62. As a result of Nucs AI's breach, Gafita has been harmed in an amount to be determined at trial but in excess of $75,000.

## SECOND CAUSE OF ACTION

**Breach of Contract – Consulting Agreement**
**(Against Nucs AI)**

63. Gafita incorporates by reference each of the allegations in paragraphs 1–62 of this Complaint as though fully set forth here.

64. Gafita and Nucs AI entered into the Consulting Agreement on or around January 10, 2025.

65. The Consulting Agreement is a binding and enforceable contract that both parties entered into knowingly and voluntarily.

66. Under the terms of the Consulting Agreement, Nucs AI was obligated to pay Gafita $2,000 per month in exchange for Gafita's provision of Services, as defined in the Agreement, related to medical operations of Nucs AI.

67. Gafita performed all obligations required of him under the Consulting Agreement, including the provision of all required Services, or his obligation to perform was excused or terminated.

68. Nucs AI terminated the Consulting Agreement without Cause, as defined in the Stock Restriction Agreement, on August 11, 2025.

69. In breach of the Consulting Agreement, Nucs AI has never tendered payment to Gafita for Services provided pursuant to the Consulting Agreement in any amount.

70. In total, Nucs AI failed to pay at least $16,000 in fees to Gafita for work performed under the Consulting Agreement.

71. As a result of Nucs AI's breach, Gafita has been harmed in the amount of the outstanding $16,000 in fees as well as interest in an amount to be determined at trial.

### THIRD CAUSE OF ACTION

**Unjust Enrichment**
**(Against Nucs AI)**

72. Gafita incorporates by reference each of the allegations in paragraphs 1–71 of this Complaint as though fully set forth here.

73. Nucs AI has been enriched through (a) Gafita's contribution of his ideas, business plan, and intellectual property to Nucs AI, as well as access to his professional network; and (b) Gafita's efforts and services provided to Nucs AI through his role as medical advisor to Nucs AI. Absent Gafita's contribution of intellectual property, ideas, know-how, and services, Nucs AI would have been unable to launch its business, raise funds, hire employees, develop products, or establish strategic partnerships with key opinion leaders, hospitals, and pharmaceutical companies.

74. Gafita has suffered an impoverishment in that Nucs AI has refused to provide him fair compensation for his contributions, in the form of equity or cash, and Gafita has exchanged his valuable ideas, intellectual property, and services for a small fraction of the equity shares he was promised, which represent a value far below the fair value of his contributions to Nucs AI.

75. Gafita's impoverishment is directly related to Nucs AI's enrichment in that Nucs AI has obtained Gafita's valuable ideas, business plan, intellectual property, professional network, and services in exchange for shares representing a value far below the fair value of Gafita's contributions.

76. Nucs AI's acts were not justified but represent a deliberate bad faith course of dealing by Nucs AI to obtain the benefit of Gafita's ideas, intellectual property, and services without providing fair compensation.

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

77. Gafita has been and continues to be damaged by Nucs AI's unjust enrichment.

78. Nucs AI is entitled to judgment in an amount to be proven at trial and imposition of a constructive trust over his vested but undelivered shares of Nucs AI common stock.

## FOURTH CAUSE OF ACTION

**Declaratory Judgment**
**(Against Nucs AI)**

79. Gafita incorporates by reference each of the allegations in paragraphs 1–78 of this Complaint as though fully set forth here.

80. An actual controversy exists between Gafita and Nucs AI in that Gafita claims ownership of 4,700,000 fully vested shares of Nucs AI common stock and Nucs AI has taken the position that Gafita is only entitled to at most 685,417 shares of Nucs AI common stock. Nucs AI has refused Gafita's demand that it convey the remaining shares to which Gafita is entitled.

81. The parties' interests are real and diverse in that each claims a legal right of ownership of a substantial quantity of Nucs AI common stock.

82. The question of ownership of Nucs AI common stock is ripe for judicial determination because Nucs AI has repeatedly refused to convey to Gafita the remainder of his fully vested shares and has indicated they will not do so despite multiple requests. Gafita's ownership of 4,700,000 fully vested shares of Nucs AI common stock is current and definite pursuant to the terms of the Common Stock Purchase Agreement, as amended, and the Stock Restriction Agreement.

83. Gafita is entitled to a judicial declaration that he is the owner of 4,700,000 fully vested shares of Nucs AI common stock.

## FIFTH CAUSE OF ACTION

**In the Alternative – Fraud in the Inducement**
**(Against Nucs AI, Ahmadov, and Yagubbayli)**

84. Gafita incorporates by reference each of the allegations in paragraphs 1–83 of this Complaint as though fully set forth here.

15
COMPLAINT

85.    Nucs AI, Ahmadov, and Yagubbayli induced Gafita to enter into the First and Second Amendments to the Common Stock Purchase Agreement which revested his 4,700,000 shares of Nucs AI common stock, which were fully vested under the original Common Stock Purchase Agreement.

86.    Nucs AI, Ahmadov, and Yagubbayli made numerous false statements and representations to Gafita to induce him to execute the First and Second Amendments, including:

- Ahmadov's statement to Gafita in or around July 2024 that revesting his shares was necessary to facilitate outside investment in Nucs AI;

- Treating and describing Gafita as a co-founder, internally and to outside investors, while omitting Gafita as a co-founder in company documentation and later denying his co-founder status;

- Ahmadov's statements to Gafita in or around March 2024 and April 2025 that Gafita would be given a seat on Nucs AI's Board of Directors; and

- Ahmadov and Yagubbayli's statements to Gafita beginning in or around March 2024 and continuing through May 2025 that he would be fairly compensated for his contribution of ideas and intellectual property and that they viewed him as a co-founder of Nucs AI.

Each of these statements was false at the time it was made, and Ahmadov and Yagubbayli knew they were false.

87.    Nucs AI, Ahmadov, and Yagubbayli made these false statements to fraudulently induce Gafita to sign the First and Second Amendments, which subjected his previously fully vested shares of Nucs AI common stock to a vesting schedule.

88.    Nucs AI, Ahmadov, and Yagubbayli made these false statements pursuant to a fraudulent scheme to obtain Gafita's ideas, business plan, intellectual property, professional network, and services without paying him adequate compensation. Nucs AI, Ahmadov, and Yagubbayli never intended to provide Gafita with 4,700,000 shares of Nucs AI common stock and induced him to execute the First and Second Amendment in furtherance of that fraudulent scheme.

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

89.     Gafita's reliance on the false statements of Nucs AI, Ahmadov, and Yagubbayli was reasonable.

90.     Had Gafita known that Nucs AI, Ahmadov, and Yagubbayli never intended to provide him with 4,700,000 shares of Nucs AI common stock, never intended to provide him with a seat on the Board, and did not need his shares to be fully revested in order to secure outside investment in Nucs AI, he would not have agreed to execute the First and Second Amendment and would have retained his 4,700,000 fully vested shares of Nucs AI common stock.

91.     Gafita has been injured by the fraudulent conduct of Nucs AI, Ahmadov, and Yagubbayli because instead of 4,700,000 fully vested shares of Nucs AI common stock, Nucs AI only admits to Gafita's ownership of 685,417 vested shares of Nucs AI common stock.

92.     Gafita is entitled to rescission of the First and Second Amendment and a declaration that he is the owner of 4,700,000 fully vested shares of Nucs AI common stock as authorized by the Common Stock Purchase Agreement. Gafita is willing to tender the return of any consideration received pursuant to the First and Second Amendment and gives notice of his intent to seek rescission.

93.     In the alternative, Gafita seeks rescissionary damages in an amount to be calculated at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Dr. Andrei Gafita respectfully prays for judgment against Defendants Nucs AI, Ahmadov, and Yagubbayli and in his favor as follows:

(1) For pre-judgment and post-judgment interest as provided for by law;

(2) For an award of all actual and compensatory damages in an amount to be proven at trial;

(3) In the alternative, for rescission of the First and Second Amendment and restoration of his rights under the Common Stock Purchase Agreement and/or rescissionary damages;

(4) For the disgorgement of any unjust benefit Nucs AI derived from its acceptance, retention, and use for Gafita's ideas, business plan, intellectual property, professional network, and services for which it did not compensate Gafita and for the imposition of a constructive trust, at an amount to be determined at trial and in any manner as the Court deems just and proper;

(5) For an award of costs of suit;

(6) For such other, further, and different relief as the Court deems just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all claims asserted herein.

Respectfully submitted,

Dated:  December 17, 2025          GRELLAS SHAH LLP

By:   _/s/ Dhaivat H. Shah_
      Dhaivat H. Shah, Esq.
      Attorneys for Plaintiff Dr. Andrei Gafita

GRELLAS SHAH LLP
550 CALIFORNIA ST., SUITE 1040
SAN FRANCISCO, CA 94104

18
COMPLAINT