IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ANDREI GAFITA,

          Plaintiff,

    v.

NUCS AI, INC., et al.,

          Defendants.

Case No. 25-cv-10757-CRB

**ORDER DENYING MOTION TO TRANSFER; GRANTING MOTION TO DISMISS IN PART**

Dr. Andrei Gafita brought an action against Nucs AI ("Nucs") and two of its executives stemming from a purported scheme to deny him equity in the company he helped develop. See Compl. (dkt. 1). Nucs now moves to dismiss three of Gafita's claims and transfer another. See MTD (dkt. 17); MTT (dkt. 18). The Court **DENIES** Nucs' motion to transfer and **GRANTS** its motion to dismiss in part.[1]

## I. BACKGROUND

Gafita is a doctor and researcher at Johns Hopkins Medicine. Compl. ¶ 2. In 2023, he developed the idea for an artificial intelligence technology that could aid in the diagnosis and treatment of prostate cancer. Id. As a result, he worked with Farid Yagubbayli and Nijat Ahmadov to start Nucs AI. Id. ¶ 3. Yagubbayli and Ahmadov agreed to grant Gafita 4,700,000 shares of common stock in their new venture, meant to be issued in full upon the company's formation. Id. ¶ 4.

But after Gafita received his shares on May 17, 2024, Yagubbayli and Ahmadov

---

[1] Pursuant to Civil Local Rule 7-1(b), the Court determines that this matter is suitable for resolution without oral argument.

proceeded to limit Gafita's ownership.  Compl. ¶ 5.  They convinced Gafita to twice amend his stock purchase agreement to get partial shares that would later fully revest, citing the need to secure outside investments and due to his limited work hours for the company.  Id.  They assured Gafita that he would be fully compensated for his contributions, which included a board seat.  Id.

Two months after the initial agreement, the first amendment gave Gafita 25% of his shares with the remaining vesting over the next three years.  Compl. ¶ 23.  Gafita also entered into a written consulting agreement with Nucs that included confidentiality and invention assignment provisions.  Id. ¶ 24.  After the first amendment, Gafita continued to work with Nucs as its medical expert.  Id. ¶ 27.

In December 2024, the second amendment went further.  In the name of raising additional capital, the amendment subjected all of Gafita's share to total revesting over four years, also undoing the backdated 25% vesting in the first amendment.  Id. ¶¶ 28–29.  Accordingly, Gafita ended up with zero vested shares while Yabubbayli's and Ahmadov's shares remained unchanged in their vesting schedules.  Id. ¶ 29.  When Gafita raised concerns with his vesting schedule, he was told that his low hour requirement pursuant to his consulting agreement meant he was not entitled to faster vesting.  Id. ¶ 30.  Despite the consulting agreement, Gafita was spending at least 30 hours a week on work for Nucs.  Id.

When he agreed to the second amendment, Gafita also signed a stock restriction agreement ("SRA").  Compl. ¶ 32.  The SRA gave Nucs the option to repurchase all of Gafita's shares for $0.001 per share if Gafita quit or was terminated for cause.  Id.  But the SRA also required the accelerated vesting of Gafita's shares—without Nucs' ability to repurchase them—if Gafita was terminated without cause.  Id. ¶ 33.

Gafita alleges that Yagubbayli and Ahmadov engaged in a fraudulent scheme to steal his ideas and labor without fair compensation and gave false representations that induced him to agree with the limitations on his vesting.  Id. ¶ 31.  He also alleges that he never received any of the $2,000 per month payment he was owed under his consulting agreement.  Id. ¶ 35.

2

United States District Court
Northern District of California

After having a lawyer review his contracts, Gafita voiced his issues to Ahmadov. Compl. ¶ 37. At a meeting in Baltimore, Maryland, the two reached a verbal agreement to revert to Gafita's vesting schedule under the first amendment and give Gafita the board seat he had been promised. Id. ¶ 39. Just a week later, however, Ahmadov reneged and said he was only joking about the board seat. Id. ¶ 40. Ahmadov insisted that he would only grant Gafita's original vesting schedule if Gafita reduced his equity by 33%. Id. Gafita refused and continued to work for Nucs. Id. ¶¶ 40–41. A month later, Ahmadov denied any knowledge of their discussions. Id. ¶ 42. On the other hand, Yagubbayli reiterated that Gafita would only get a changed vesting schedule if he reduced his equity stake. Id.

Soon after, Gafita was notified that the Board of Directors was going to terminate his consulting agreement. Id. ¶ 43. Gafita had not received any prior warnings or complaints about his services. Id. Nucs gave Gafita two choices. Gafita could either step down and keep the fewer than 500,000 shares that had already vested, or he could take a reduced role in the company and keep his existing vesting schedule with a 50% reduction in equity. Id. ¶ 44. Failure to reach a decision would result in the termination of his consulting agreement. Id.

Despite the ultimatum, Nucs did not terminate Gafita when he chose neither option—only having him stop all "non-essential" work. Compl. ¶ 45. But just a month later, Gafita received a letter notifying him that he was in breach of his consulting agreement and that he had 30 days to cure. Id. ¶ 46. Gafita alleges that the grounds for the breach were fabricated and vague, making a cure impossible. Id. He alleges that the breach was a pretext to avoid his accelerated vesting provision. Id. Accordingly, Gafita sent a letter to Nucs stating that he would fully comply with any company investigation and asked for the details of Nucs' accusations. Id. ¶ 47. While Nucs did not respond to Gafita's letter, it terminated his access to the company's computer systems. Id. ¶ 48. After telling Gafita that he was still expected to work without access, Ahmadov asked Gafita to list his current projects, ostensibly to create cause for termination. Id.

3

When Gafita provided a list, Nucs continued to deny online access and demanded that he prove what services he was providing despite his inability to functionally work. Compl. ¶ 49. Concerned, Gafita sent a letter, via counsel, to Nucs to verify that it would provide him with immediate vesting if it were to terminate him without cause. Id. ¶ 50. Instead, Nucs sent Gafita a letter of termination for cause. Id. ¶ 51. Among the reasons for termination, Nucs stated that Gafita had met with a competitor and disclosed confidential information, despite Gafita alleging that Nucs had knowledge of the meeting and no confidential information was disclosed. Id. Nucs also asserted that Gafita had a pattern of poor professionalism and judgment, which included failure to meet objectives and disrespectful behavior. Id. Gafita alleges that these reasons were false and do not satisfy the definition of cause pursuant to the SRA. Id. Nucs has refused to convey Gafita the shares he is owed. Id. ¶ 52.

Consequently, Gafita filed suit. He brings five causes of actions:

- Breach of contract pursuant to the stock purchase agreement and subsequent amendments, as well as the SRA. Compl. ¶¶ 53–62.

- Breach of contract pursuant to his consulting agreement. Id. ¶¶ 63–71.

- Unjust enrichment by Nucs through the alleged scheme to obtain his ideas and labor without compensation. Id. ¶¶ 72–78.

- Declaratory judgment to clarify that he is the owner of 4,700,000 shares of Nucs common stock. Id. ¶¶ 79–83.

- Fraud in the inducement for the misrepresentations leading Gafita to agree to the stock purchase agreement and its subsequent amendments. Id. ¶¶ 84–93.

Nucs seeks to dismiss Gafita's third, fourth, and fifth causes of action. MTD at 6. Nucs also asks this Court to transfer Gafita's first cause of action for breach of contract, as it relates to the SRA, to the District of Delaware, based on the contract's forum selection clause designating the courts of Delaware as the appropriate venues. MTT at 4. In the alternative to its motion to transfer, Nucs requests that the Court order Gafita to separately plead counts for each agreement in his first breach of contract claim. Id. at 9–10.

4

## II. MOTION TO TRANSFER

Both parties agree that the SRA is a valid and enforceable contract with a Delaware forum selection clause. See MTT Opp'n (dkt. 23) at 3; MTT Reply (dkt. 28). Nucs also argues that transfer of a single claim serves the public interest. MTT at 7–9. The Court disagrees. Having another court handle a single, factually related claim would result in piecemeal litigation and waste judicial resources.

### A. Legal Standard

A forum selection clause "may be enforced through a motion to transfer under [28 U.S.C.] § 1404(a)." Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas, 571 U.S. 49, 59 (2013). Section 1404(a) provides that a case may be transferred "[f]or the convenience of parties and witnesses, in the interest of justice," to "any other district . . . where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). "[A] proper application of § 1404(a) requires that a forum-selection clause be given controlling weight in all but the most exceptional cases." Atl. Marine, 571 U.S. at 59–60 (internal quotation marks omitted).

Defendants bear the burden of demonstrating the existence of a contract and the inclusion of the forum selection clause in that contract. Kedkad v. Microsoft Corp., No. 13-cv-0141, 2013 WL 4734022, at *3 (N.D.Cal. Sept. 3, 2013). The presence of a valid forum-selection clause requires district courts to adjust their usual § 1404(a) analysis in three ways." Atl. Marine, 571 U.S. at 62. "First, the plaintiff's choice of forum merits no weight." Id. at 63. "Second, a court evaluating a defendant's § 1404(a) motion to transfer based on a forum-selection clause should not consider arguments about the parties' private interests." Id. at 64. Third, only public interest factors remain, and those rarely override the parties' agreement. Id. Therefore, "[w]here there is a forum-selection clause . . . the plaintiff bears the burden of showing why the court should not transfer the case to the agreed-upon forum, and the court "should not consider arguments about the parties' private interests." Id. at 64. Under a forum selection clause, the court "may consider arguments about public-interest factors only." Id. "Because public-interest factors will

rarely defeat a transfer motion, the practical result is that forum-selection clauses should control except in unusual cases." Id.  But ultimately, the trial court has broad discretion to adjudicate a motion to transfer.  See Jones v. GNC Franchising, Inc., 211 F.3d 495, 498 (9th Cir. 2000).

### B.    Discussion

Despite the consensus that the SRA's forum selection clause is valid, the parties agree on little else.  Gafita first argues that the forum selection clauses in the two contract amendments—which designate California as the exclusive forum—conflict with the one in the SRA, so the Court should ignore all the clauses.  MTT Opp'n at 4.  He then asserts that the interests weigh against transfer.  Id. at 5.  Nucs disagrees on both points.  See MTT Reply at 3–6.  The Court addresses each argument in turn.

The forum selection clauses do not conflict.  Gafita attempts to muddy the water between the clauses by pointing out how they are factually intertwined.  See MTT Opp'n at 4.  He argues that the initial stock purchase agreement—and its two subsequent amendments with forum selection clauses—control the issuance of shares that are related to the SRA.  Id.  Even his complaint combines all the contracts under one breach of contract claim.  See Compl. ¶¶ 53–62.  But as Nucs explains, the contracts being factually related do not make them enmeshed.  See MTT Reply at 3.  Breach of the SRA can be brought separately from the amendments to the stock purchase agreement.  Accordingly, the forum selection clauses do not somehow cancel each other out.

The Court does agree, however, that the public interest factors weigh against transfer.[2]  Public interest factors include issues such as "the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; [and] the interest in having the trial of a diversity case in a forum that is at home with the law."  Atl. Marine, 571 U.S. at 62 n.6 (internation quotation omitted).  Nucs

---

[2] The Court notes that Gafita mostly discusses private interest factors in his opposition.  See MTT Opp'n at 5–7.  The Court omits these from its analysis as only public interest factors are relevant here, where there is a forum selection clause.  See Atl. Marine, 571 U.S. at 64.

discusses four factors: (1) local interest; (2) familiarity with applicable law; (3) burden on unrelated forums; and (4) contractual predictability. MTT at 7–9. Gafita only addresses familiarity with applicable law as a factor but does broadly address judicial resources as an issue. MTT Opp'n at 6–8. The Court analyzes the factors below.

### 1.    Local Interest

Nucs asserts that "this Court has no localized interest in resolving a contract dispute . . . between a Delaware corporation and an individual who voluntarily agreed to litigate in Delaware." MTT at 8. Not so. Gafita alleges that Nucs had its principal place of business in San Francisco during the relevant time period, even if it now is in New York. Compl. ¶ 9. That is sufficient to convey a local interest in favor of denying transfer.

### 2.    Familiarity with Applicable Law

Nucs argues that the claim should be transferred because the District of Delaware is more familiar with the applicable Delaware contract law. MTT at 8. "[B]ut federal courts routinely apply the laws of other states." Falkenstein v. Shipco Transp., Inc., No. 13-CV-03605-WHO, 2013 WL 5770380, at *4 (N.D. Cal. Oct. 24, 2013). Therefore, this factor is neutral.

### 3.    Burden

Nucs contends that this Court would be burdened by keeping the SRA claim. MTT Reply at 6; see also MTT at 8 ("This Court has no meaningful connection to the breach of contract claim."). While, as discussed above, the Court does have an interest in the entirety of the action, the Court agrees that there would be a slight, additional burden in keeping the claim at issue. Accordingly, this factor weighs slightly in favor of transfer.

### 4.    Contractual Predictability

Nucs posits that there is a general public interest in "predictability and efficiency in commercial transactions." MTT at 9. The Court agrees. It is why the Supreme Court has said that forum selection clauses should be enforced in all except "unusual cases." Atl. Marine, 571 U.S. at 64. But that is the reason courts evaluate the public interest factors for forum selection clauses in the first instance. Nevertheless, this "factor" favors transfer,

7

even if not part of the traditional evaluation of public interest factors.

### 5.    Judicial Resources

Gafita does not discuss judicial resources as a public interest factor, but he brings them up as a reason not "to split claims between jurisdictions" and cause "piecemeal litigation." MTT Opp'n at 7–8. Nucs, on the other hand, merely insists that transfer "conserves judicial resources" without explanation beyond the minimal relief the Court gains from splitting and transferring one claim. MTT Reply at 6. The Court agrees with Gafita. Courts in this District have denied transfer despite valid forum selection clauses when they would result in split claims and piecemeal litigation. See, e.g., Bronstein v. U.S. Customs & Border Prot., No. 15-CV-02399-JST, 2016 WL 861102, at *6 (N.D. Cal. Mar. 7, 2016) ("Splitting the claims would not promote efficient resolution of this controversy."); In re TFT-LCD (Flat Panel) Antitrust Litig., No. C 13-3349 SI, 2014 WL 1477748, at *2 (N.D. Cal. Apr. 14, 2014) (same).

Gafita's claims—even for breach of the SRA—arise out of the "same transaction, occurrence, or series of transactions or occurrences." Fed. R. Civ. P. 20(a). "[Q]uestions of law or fact common to all defendants will arise in the action." Id. Severing and transferring a single claim is contrary to the federal policy in favor of "efficient resolution of controversies." See Frigate Ltd. v. Damia, No. C 06–04734 CRB, 2007 WL 127996, at *3 (N.D.Cal. Jan. 12, 2007). Having another court handle the same basic controversy in parallel proceedings would be "needlessly inconvenient and burdensome [and] plainly contrary to the policy of the federal judiciary of promoting the consistent and complete adjudication of disputes." Id. The Court concludes that this factor heavily disfavors transfer.

In sum, the Court finds that the public interest factors weigh significantly against transfer and the Court **DENIES** Nucs' motion to transfer. The Court does, however, **GRANT** Nucs' request, in the alternative, that Gafita amend his complaint to separate his first cause of action for breach of contract by each pertinent agreement. Federal Rule of Civil Procedure 10(b) requires each claim "founded on a separate transaction or

occurrence" to be "stated in a separate count" if doing so "would promote clarity."  The initial stock agreement, its two amendments, and the SRA are all separate transactions— even if they are factually related—and must be listed separately to clarify what issues are pertinent to each contract.  See Compl. ¶¶53–62.  For example, the SRA has a "cause" requirement that is not present in the other contracts.  Compare Compl., Ex. D with Compl., Exs. A–C.

### III.    MOTION TO DISMISS

The Court denies Nucs' motion as to Gafita's unjust enrichment claim but grants it as to his claims for declaratory judgment and fraud in the inducement.

#### A.    Legal Standard

Federal courts sitting in diversity apply state substantive law and federal procedural law.  Feldman v. Allstate Ins. Co., 322 F.3d 660, 666 (9th Cir. 2003) (citing Erie R.R. v. Tompkins, 304 U.S. 64, 78 (1938)).  Federal procedural law governs the standard for a motion to dismiss; thus, the standard set forth in Federal Rule of Civil Procedure 12(b)(6) governs Nucs' motion. See id.

A court should grant a motion to dismiss for failure to state a claim under Rule 12(b)(6) if the complaint does not proffer "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.  In considering a motion to dismiss, the court accepts the material facts alleged in the complaint, together with all reasonable inferences to be drawn from those facts, as true. Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001).  But "the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  Courts will dismiss a claim when it is not based on a cognizable legal theory or the plaintiff has not pleaded sufficient facts to support that theory. Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990).

In addition, fraud-based claims are subject to a heightened pleading standard under Federal Rule of Civil Procedure 9(b).  This heightened standard applies when evaluating a Rule 12(b)(6) motion to dismiss.  Semegen v. Weidner, 780 F.2d 727, 731 (9th Cir. 1985).  Fraud allegations must be specific enough to give the defendant notice of the particular misconduct alleged to constitute the fraud so that the defendant may defend against the charge.  Id.  In general, allegations sounding in fraud must contain "an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations."  Swartz v. KPMG LLP, 476 F.3d 756, 765 (9th Cir. 2007).  On the other hand, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).

**B.     Discussion**

Nucs moves to dismiss three of Gafita's claims.  MTD at 8.  Nucs argues that Gafita's unjust enrichment claim fails because he already alleges breaches of valid contracts as distinct claims.  Id. at 13–14.  In a similar vein, Nucs asserts that Gafita's claim for declaratory judgment is derivative of his first breach of contract claim.  Id. at 14–15.  Nucs also contends that Gafita's fraud in the inducement claim does not meet the heightened pleading standard for fraud and fails as a matter of law.  Id. at 15–22.  The Court addresses each argument in turn.[3]

**1.     Unjust Enrichment**

Both Federal Rule of Civil Procedure 8 and Rule 8 of the Delaware Superior Court Rules of Civil Procedure permit a party to "state as many separate claims or defenses . . . regardless of consistency."  "No matter how many theories or alternative claims a plaintiff advances at the pleading stage, a plaintiff can recover only a single judgment, and a plaintiff cannot recover duplicative remedies."  Garfield on behalf of ODP Corp. v. Allen, 277 A.3d 296, 360 (Del. Ch. 2022).  Where claims "arise from a common

---

[3] The Court, sitting in diversity, applies Delaware law in accordance with the parties and the choice of law provisions of the underlying contracts.  See MTD at 12–13; see also MTD Opp'n (dkt. 26) at 5.

United States District Court
Northern District of California

nucleus of operative fact," there is "no benefit to be gained at [the pleading] stage from delving into the alternative theories to assess how they may interact." Id. at 362. Accordingly, the Court **DENIES** Nucs' motion as to the unjust enrichment claim. And it is of no consequence that Gafita does not specify this claim as an alternative one—even though he does so for his fraud claim—because such talismanic words are not required for claims to be considered alternatives. See id. (denying motion to dismiss unjust enrichment claim not specifically pleaded as an alternative claim).

### 2. Declaratory Judgment

Gafita's declaratory judgment claim is duplicative of his first breach of contract claim. He seeks a declaration that "he is the owner of 4,700,000 fully vested shares of Nucs AI common stock," (Compl. ¶ 83), while the contract claim alleges the breach is the failure "to issue 4,700,000 fully vested shares of Nucs AI common stock" to him, (id. ¶ 60). Gafita argues that the Federal Declaratory Judgment Act permits declaratory relief even if there is other relief available. MTD Opp'n at 7. True enough. But "courts generally deny declaratory relief if another remedy is found to be more appropriate." Rodriguez v. Bank of Am., No. C 11-3839-PSG, 2011 WL 5864108, at *4 (N.D. Cal. Nov. 22, 2011). And in Delaware, "a declaratory judgment claim that merely 'repackages' an affirmative count is duplicative" and should be dismissed. Columbus US Inc. v. Enavate SMB, LLC, 2024 WL 5274569, at *17 (Del. Super. Ct. Dec. 23, 2024). The Court **GRANTS** Nucs' motion as to the declaratory judgment claim as it is duplicative of Gafita's contract claim and the less appropriate remedy.

### 3. Fraud in the Inducement

Nucs argues that Gafita's fraud in the inducement claim fails as a matter of law and does not meet the Rule 9(b) heightened pleading standard. Nucs addresses each of the four statements alleged as false in Gafita's complaint. MTD at 15–22. The Court discusses each in turn.

#### a. Statement 1

The first false representation is "Ahmadov's statement to Gafita in or around July

11

2024 that revesting his shares was necessary to facilitate outside investment in Nucs AI." Compl. ¶ 86. Nucs asserts that the statement is a nonactionable opinion, immaterial, and that Gafita does not allege how it is false. MTD at 16. Gafita responds that the statement is of an existing fact, materially induced him into giving up his shares, and that there are allegations of circumstantial evidence for falsity. MTD Opp'n at 11–15.

"Fraudulent statements generally involve assertions of fact." In re P3 Health Grp. Holdings, LLC, 2022 WL 15035833, at *5 (Del. Ch. Oct. 26, 2022), as corrected (Oct. 28, 2022). And an opinion or projection "can be actionable if it is sufficiently specific." Id. Here, Ahmadov's statement that revesting Gafita's shares was necessary for outside investment is sufficiently specific to be actionable, even if it can be construed as an opinion. And as to materiality, Gafita plainly alleges that the statement had materially influenced him into signing the vesting contracts. See Compl. ¶¶ 25–27. It also does not matter that the representation was also included in Gafita's contracts. See MTD at 17–18 ("contradictory pleading" to say a representation was fraud while included in contracts Gafita seeks to enforce). As discussed, claims can be contradictory and Gafita explicitly alleges that his fraud in the inducement claim is in the alternative. See Compl. ¶¶ 84–93.

The Court does agree, however, with Nucs that Gafita fails to plead falsity under Rule 9(b). Gafita's complaint merely concludes that the statement was "pretextual and false" and "part of a fraudulent scheme" to steal Gafita's ideas without fair compensation. Rule 9(b), however, requires more. Plaintiffs must "plead facts explaining why the statement was false when it was made." United States ex rel. Krawitt v. Infosys Techs. Ltd., Inc., 342 F. Supp. 3d 958, 963 (N.D. Cal. 2018). Gafita fails to do so. Instead, he argues there is "ample circumstantial evidence" that "only Gafita's vesting schedule was altered" and that revesting "enabled" Nucs to fully divest Gafita on termination rather than getting additional funding. MTD Opp'n at 15. But Gafita concedes that only Gafita's schedule could have been altered because Ahmadov's and Yagubbayli's shares (less than Gafita's even when combined) were already on the vesting schedule that Gafita ended up with. Compl. ¶¶ 20, 21, 29. Moreover, the allegation that Ahmadov's statement later

United States District Court
Northern District of California

enabled Nucs to divest Gafita's shares does not explain why the <u>representation itself</u> was false when made. Gafita's allegations of an overarching "fraudulent scheme" do not absolve him of the requirement to explain falsity.

The Court **GRANTS** Nucs' motion as to this statement.

####       b.       Statement 2

The second false representation is "[t]reating and describing Gafita as a co-founder, internally and to outside investors, while omitting Gafita as a co-founder in company documentation and later denying his co-founder status." Compl. ¶ 86. Nucs contends that these representations are not material, do not demonstrate reliance as related to the vesting contracts, and are not specific enough. MTD at 18. Gafita asserts that the representations made him believe he would be fairly compensated and could safely revest. MTD Opp'n at 8, 12 n.4. But the attempted explanation in Gafita's brief is wholly absent from his complaint. Indeed, this representation only shows up under his fraud in the inducement claim. See Compl. ¶ 86. He does not provide any other detail about these statements throughout the complaint. Accordingly, the Court **GRANTS** Nucs' motion as to this representation.

####       c.       Statement 3

The third false statement encompasses "Ahmadov's statements to Gafita in or around March 2024 and April 2025 that Gafita would be given a seat on Nucs AI's Board of Directors." Compl. ¶ 86. Nucs argues that Gafita fails to allege reliance on both statements because of when they were made. MTD at 19. According to Nucs, the March statement is not sufficiently tied to any of the vesting contracts and was made months before the initial stock agreement was executed. Id. at 20. Likewise, Nucs notes that the April statement was made after the execution of all the vesting agreements and could not have contributed to reliance. Id. Gafita asserts that the representations created a "false expectation" that he relied on when signing the contracts. MTD Opp'n at 10–11. For the April statement, specifically, Gafita states that representations made after a "fraudulently induced transaction may still be relevant to the elements of fraud." Id. at 10 n.2. The

13

Court agrees with Nucs.

Gafita fails to allege reliance for the March statement. Despite Gafita's conclusory assertions in his opposition, his complaint does not explain how a promise of a board seat convinced him to later agree to contracts about vesting his shares. Indeed, Gafita only alleges reliance on that promise—based on the April statement—about a separate verbal agreement to return to his original vesting schedule, which took place after he signed the contracts at issue. Compl. ¶¶ 39–40.

Additionally, Gafita cannot allege reliance based on the April statement. It is well-settled that a "plaintiff cannot rely on a misrepresentation made after the parties executed an agreement for a fraudulent inducement claim." Optical Air Data Sys., LLC v. L-3 Commc'ns Corp., 2019 WL 328429, at *6 (Del. Super. Ct. Jan. 23, 2019). Gafita concedes that the April statement post-dates the contracts at issue, so it is non-actionable. And even if such a statement may be relevant to the elements of fraud, it says nothing about reliance.

The Court **GRANTS** Nucs' motion as to Gafita's third statement.

#### d.    Statement 4

The fourth false statement covers "Ahmadov and Yagubbayli's statements to Gafita beginning in or around March 2024 and continuing through May 2025 that he would be fairly compensated for his contribution of ideas and intellectual property and that they viewed him as a co-founder of Nucs AI." Compl. ¶ 86. Nucs contends that the statement is a non-actionable opinion and fails to provide details with sufficient particularity. MTD at 20. Gafita counters that the statement was not an opinion about the future and that he provides enough detail to satisfy Rule 9(b). MTD Opp'n at 12–15.

The Court agrees with Gafita that the statement is not alleged as an opinion. Nucs hinges its argument on the word "fair." See MTD at 21. And the Court understands that fairness can subjective. But the complaint centers on the "compensation" part of the statement. "A misrepresentation is a falsehood or untruth made with the intent to deceive." FinClusive Cap., Inc. v. Q2 Software, Inc., 2021 WL 5225860, at *11 (Del. Super. Ct. Oct. 28, 2021). Here, Gafita alleges that the statement was a falsehood because the defendants

14

schemed to <u>deny</u> him compensation by having him vest his shares in a way that would enable them to pretextually strip the shares from him later. <u>See</u> Compl. ¶¶ 5, 26. That is the opposite of the representation to Gafita. Moreover, an opinion can still be actionable as fraud if "the speaker either did not hold that opinion or did not have a good-faith basis for it." <u>Foley v. Session Corp.</u>, 345 A.3d 537, 555 (Del. Ch. 2025). And Gafita alleges that the defendants never intended to be fair. <u>See</u> Compl. ¶ 26 (defendants had a "fraudulent scheme" to deny Gafita compensation).

The Court, however, agrees that Gafita's allegations fail to satisfy the heightened pleading standard. Gafita "does not provide the time and place of the statements" and also "fails to identify the specific speaker who made the statements, instead grouping multiple speakers together." <u>Lynwood Invs. Cy Ltd. v. Konovalov</u>, No. 20-CV-03778-LHK, 2021 WL 1164838, at *13 (N.D. Cal. Mar. 25, 2021) (granting motion to dismiss based on Rule 9(b)). He simply alleges that the statements were made in a period of over a year and does not disentangle statements purportedly made by Ahmadov and Yagubbayli. <u>See</u> Compl. ¶ 86.

Consequently, the Court **GRANTS** Nucs' motion to dismiss as to this statement.

## IV. CONCLUSION

For the foregoing reasons, the Court **DENIES** Nucs' motion to transfer and **GRANTS** in part Nucs' motion to dismiss. The Court does so with leave to amend as amendment would not be futile. <u>Leadsinger, Inc. v. BMG Music Pub.</u>, 512 F.3d 522, 532 (9th Cir. 2008).

**IT IS SO ORDERED.**

Dated: May 14, 2026

_____

CHARLES R. BREYER
United States District Judge