RAJIV DHARNIDHARKA, CA Bar No. 234756
rajiv.dharnidharka@foley.com
MATTHEW D. CAPLAN, CA Bar No. 260388
matt.caplan@foley.com
**FOLEY & LARDNER LLP**
ONE MARKET PLAZA
55 SPEAR STREET TOWER, SUITE 1900
SAN FRANCISCO, CA 94105
TELEPHONE: 415.434.4507
FACSIMILE: 415.434.4484

JOHN P. RILEY, CA Bar No. 356477
jp.riley@foley.com
**FOLEY & LARDNER LLP**
11988 EL CAMINO REAL, SUITE 400
SAN DIEGO, CA 92130-2594
TELEPHONE: 858.847.6700
FACSIMILE: 858.792.6773

Attorneys for Defendants
NUCS AI, INC. and NIJAT AHMADOV

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DR. ANDREI GAFITA, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>NUCS AI, INC., a Delaware corporation, NIJAT AHMADOV, an individual, and FARID YAGUBBAYLI, an individual,<br><br>Defendants. | Case No. 3:25-cv-10757-CRB<br><br>**DEFENDANT NIJAT AHMADOV'S ANSWER TO AMENDED COMPLAINT AND COUNTERCLAIMS**<br><br>Complaint Filed: December 17, 2025<br>Judge: Hon. Charles R. Breyer |

Plaintiff Dr. Andrei Gafita ("Gafita") brings this action against Defendants Nucs AI, Inc. ("Nucs AI"), Nijat Ahmadov ("Ahmadov"), and Farid Yagubbayli ("Yagubbayli") and alleges as follows:

## INTRODUCTION

1. Dr. Andrei Gafita brings this action against Nucs AI to enforce his entitlement to the substantial equity stake he was promised in exchange for his highly valuable ideas and intellectual property that constitute the core technology underlying Nucs AI's products, his business plan, and access to his professional network.

**ANSWER**:

Ahmadov denies the allegations of Paragraph 1.

2. Gafita is a respected and accomplished doctor and medical researcher currently practicing at Johns Hopkins Medicine. In 2023, Gafita developed the seed of a new technology that could revolutionize the diagnosis and treatment of prostate cancer using artificial intelligence.

**ANSWER**:

Ahmadov lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 2 and therefore denies them.

3. Gafita agreed to work with Farid Yagubbayli to develop his ideas into a marketable product. Yagubbayli introduced Gafita to his friend Nijat Ahmadov, and together the three agreed to start Nucs AI.

**ANSWER**:

Ahmadov admits Gafita worked with Yagubbayli and Ahmadov to form Nucs AI. Ahmadov denies the remaining allegations of Paragraph 3.

4. In recognition of his substantial contributions at the enterprise's outset—without which Nucs AI could never have existed—Ahmadov and Yagubbayli agreed to issue Gafita 4,700,000 shares of common stock in the new company. Unlike Ahmadov and Yagubbayli's own shares, Gafita's shares would not be subject to vesting but would be issued in full upon Nucs AI's formation.

**ANSWER**:

Ahmadov admits that Ahmadov and Yagubbayli agreed to issue Gafita 4,700,000 shares of common stock in the new company. Ahmadov denies the remaining allegations of Paragraph 4.

5. But no sooner had Gafita received his shares than Ahmadov and Yagubbayli began scheming to take them away. At first claiming it was necessary to secure initial investment, then claiming it reflected the limited hours Gafita could contribute to daily operations at Nucs AI, and then again that it was necessary to secure additional investment, Ahmadov and Yagubbayli coerced Gafita into signing amendments to his stock purchase agreement that resulted in his shares first partially and then fully revesting. All this time, Ahmadov and Yagubbayli assured Gafita that he was a critical member of the Nucs AI team and would be compensated for his contributions, including with a seat on the Board of Directors. These reassurances were all false and intended to convince Gafita to revest his shares so that Ahmadov and Yagubbayli could then fire Gafita and take them away.

**ANSWER**:

Ahmadov denies the allegations of Paragraph 5.

6. When Gafita confronted Ahmadov about the unfairness of his revesting agreements, Ahmadov and Yagubbayli began engineering a pretextual scheme to remove Gafita from the company. Ahmadov told Gafita that the Board of Directors was determined to terminate his consulting agreement immediately, and offered him the choice to either step down and relinquish most of his shares, or agree to a reduced role and vastly reduced equity share. But, unfortunately for defendants, Gafita and Nucs AI had a written agreement that if Gafita was terminated without cause his shares would immediately vest in full. To avoid this outcome, Ahmadov and Yagubbayli constructed a set of false and pretextual bases to terminate Gafita for "cause," which would allow Nucs AI to repurchase Gafita's shares for a fraction of their value.

**ANSWER**:

Ahmadov denies the allegations of Paragraph 6.

7. Upon the termination of his consulting agreement, the defendants did not convey Gafita's 4,700,000 fully vested shares of Nucs AI common stock and have stated that they will not do so. Ahmadov and Yagubbayli directly benefit from Gafita's loss of ownership interest in Nucs AI because such a loss increases their own proportional ownership interest in the company and therefore enhances the value of their shares.

///

**ANSWER**:

Ahmadov admits that upon the termination of Gafita's consulting agreement, Nucs AI did not convey 4,700,000 fully vested shares of Nucs AI common stock to Gafita and stated that it would not do so. Ahmadov denies the remaining allegations of Paragraph 7.

## PARTIES

8. Gafita is an individual and a resident of Baltimore, Maryland. Gafita is a medical doctor specializing in prostate cancer theranostics at Johns Hopkins Medicine.

**ANSWER**:

Ahmadov lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 8 and therefore denies them.

9. Nucs AI is a corporation organized under the laws of the State of Delaware. Gafita is informed and believes that Nucs AI has a principal place of business at 368 9th Avenue, New York, New York, 10001, but at all times pertinent to the acts described in this Complaint had a principal place of business at 535 Mission Street, San Francisco, California, 94105. Nucs AI is a developer of AI tools for healthcare professionals to use in the detection, staging, and treatment of prostate cancer.

**ANSWER**:

Ahmadov admits that Nucs AI is a corporation organized under the laws of the State of Delaware. Ahmadov admits that Nucs AI's principal place of business is at 368 9th Avenue, New York, New York 10001. Ahmadov admits Nucs AI is a developer of AI tools for healthcare professionals to use in the detection, staging, and treatment of prostate cancer. Ahmadov denies the remaining allegations of Paragraph 9.

10. Ahmadov is an individual and a resident of Germany. Ahmadov is a Director, CEO, and Co-Founder of Nucs AI. Ahmadov has a business background.

**ANSWER**:

Ahmadov admits the allegations of Paragraph 10.

11. Yagubbayli is an individual and a resident of Germany. Yagubbayli is a Director, CTO, and Co-Founder of Nucs AI. Yagubbayli is a software engineer.

///

**ANSWER**:

Ahmadov admits the allegations of Paragraph 11.

## JURISDICTION

12. This Court has original jurisdiction over this action under 28 U.S.C. § 1332 because the amount in controversy exceeds the value of $75,000 and because this dispute is between Gafita, a citizen of Maryland, Nucs AI, a citizen of Delaware and/or California or New York, and Ahmadov and Yagubbayli, both foreign citizens.

**ANSWER**:

Ahmadov denies that Nucs AI is a citizen of California for purposes of subject matter jurisdiction. Ahmadov admits the remaining allegations of Paragraph 12.

13. Defendant Nucs AI is subject to personal jurisdiction in the State of California because it submitted and consented to the exclusive jurisdiction of the state of California in the First and Second Amendments to the Common Stock Purchase Agreement between Gafita and Nucs AI, attached as **Exhibit B** and **Exhibit C** to this Complaint, and agreed that any litigation arising from said agreements shall be conducted only in the courts of California or the federal courts of the United States located in California and no other courts.

**ANSWER**:

Ahmadov admits that Nucs AI is subject to the personal jurisdiction of this Court for the purposes of this case. Ahmadov denies the remaining allegations of Paragraph 13.

14. Defendants Ahmadov and Yagubbayli are subject to personal jurisdiction in the State of California because they purposely availed themselves of California, and San Francisco specifically, by representing Nucs AI as having a presence in San Francisco on its website and LinkedIn profile, and by including a San Francisco mailing address on their Nucs AI email signature blocks. Ahmadov and Yagubbayli invoked the status and prestige of a San Francisco address for a technology start-up company to raise the profile of Nucs AI and themselves, and the majority of acts alleged in this complaint occurred while Nucs AI, Ahmadov, and Yagubbayli were deliberately creating an impression that they were present in the State of California and the City of San Francisco. Gafita's claims against Ahmadov and Yagubbayli arise out of his contacts with the forum state, namely, the fraudulent

representations they made to Gafita were intended to induce his continued contracting and provision of services for a California entity, and Ahmadov and Yagubbayli were holding themselves out as situated in California at the time they made the fraudulent representations. Personal jurisdiction over Ahmadov is additionally appropriate because Ahmadov was personally served while inside the state on March 27, 2026.

**ANSWER**:

Ahmadov admits that Ahmadov is subject to the personal jurisdiction of this Court for the purposes of this case because Ahmadov was personally served in California on March 27, 2026. Ahmadov denies the remaining allegations of Paragraph 14.

## VENUE

15. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and (c) because Nucs AI consented to a California forum and its primary place of business is or was within this district. Furthermore, a substantial part of the breach of the contract and tortious conduct alleged occurred in this district. Venue is also proper over Defendant Ahmadov and Yagubbayli pursuant to 28 U.S.C. § 1391(c)(3).

**ANSWER**:

Ahmadov admits that venue is proper in this district pursuant to the Court's order denying in part Defendant Nucs AI, Inc.'s Motion to Transfer. Ahmadov denies the remaining allegations of Paragraph 15.

## INTRADISTRICT ASSIGNMENT

16. Assignment to this division is proper because Nucs AI has or had its primary place of business in San Francisco.

**ANSWER**:

Ahmadov admits that assignment to this division is proper pursuant to the Court's order denying in part Defendant Nucs AI, Inc.'s Motion to Transfer. Ahmadov denies the remaining allegations of Paragraph 16.

///

///

## BACKGROUND

**A. Gafita develops the core technology and business plan and founds Nucs AI with Ahmadov and Yagubbayli.**

17. Starting in or around early 2023, Gafita began developing AI technology to be used in the diagnosis and treatment of prostate cancer. In support of these efforts, Gafita spent $7,000 of his own money on a powerful GPU-equipped computer to facilitate his development efforts. Gafita also developed a business plan based on the technology he had developed.

**ANSWER**:

Ahmadov admits the allegations in the first sentence of Paragraph 17. Ahmadov lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second and third sentences of Paragraph 17 and therefore denies them.

18. Later in 2023, Gafita described his new technology to Yagubbayli, a software engineer with whom he previously collaborated at Technical University Munich in Germany. Gafita and Yagubbayli realized that Gafita's technology had commercial potential and began considering formation of a company to develop and commercialize it. In early 2024, Yagubbayli introduced Gafita to Ahmadov, a friend of Yagubbayli's who had business experience in e-commerce but no healthcare background. Ahmadov pitched Gafita and Yagubbayli to make him CEO of their contemplated company, and Gafita and Yagubbayli agreed. Gafita, Ahmadov, and Yagubbayli founded Nucs AI and incorporated it as a Delaware corporation in March 2024.

**ANSWER**:

Ahmadov admits the allegations of Paragraph 18.

19. Ahmadov and Yagubbayli appointed themselves directors of the new corporation and promised Gafita a seat on the Board in the future. On May 15, 2024, the Board of Directors of Nucs AI, by unanimous written consent (the "Board Consent"), authorized the issuance of 9,000,000 shares of common stock at a price of $0.0001 per share.

**ANSWER**:

Ahmadov admits that he and Yagubbayli were directors of Nucs AI. Ahmadov denies the remaining allegations of Paragraph 19.

20. Exhibit A to the Board Consent identified three recipients of shares. The Board approved an issuance of 1,850,000 shares to Ahmadov and 2,450,000 shares to Yagubbayli. The Board resolved that 100% of the shares issued to Ahmadov and Yagubbayli were subject to vesting, with the vesting start date of March 15, 2024. The Board resolved that 1/48th of Ahmadov and Yagubbayli's shares would vest after 12 months of service, on March 15, 2025, and 1/48th of their shares would vest each month of their continued service for the next 4-year period.

**ANSWER**:

Ahmadov admits the allegations of Paragraph 20.

21. The Board took a different approach to Gafita's shares. Recognizing that Gafita had developed the vision for the company, the business plan, and the technology at the core of Nucs AI's products, and that the new company could not have existed without him, the Board agreed to issue Gafita 4,700,000 shares—more than Ahmadov and Yagubbayli combined—which would vest immediately.

**ANSWER**:

Ahmadov admits that the Board agreed to issue Gafita 4,700,000 shares. Ahmadov denies the remaining allegations of Paragraph 21.

**B. Nucs AI issues shares to Gafita but quickly begins a scheme to prevent him from retaining them.**

22. On or around May 17, 2024, Nucs AI and Gafita entered into a Common Stock Purchase Agreement. A true and correct copy of this Agreement is attached to this Complaint as **Exhibit A**. As authorized by the Board Consent, the Common Stock Purchase Agreement provided for the issuance of 4,700,000 shares of Nucs AI common stock to Gafita at a total purchase price of $470.00, of which $47 would be paid in cash and $423 in the form of IP assets assigned to Nucs AI by Gafita. The shares were not subject to vesting.

**ANSWER**:

Ahmadov admits the allegations of Paragraph 22.

23. Only two months later, however, Ahmadov presented Gafita with an Amendment to the Common Stock Purchase Agreement ("First Amendment"). A true and correct copy of the First

Amendment is attached to this Complaint as **Exhibit B**. The First Amendment deleted the section of the Common Stock Purchase Agreement providing Gafita with 4,700,000 shares free and clear and replaced it with a vesting schedule commencing on May 17, 2024 (the date of the original Agreement), with 25% of the shares to vest on June 17, 2024, and the remaining 75% vesting over the next three years at 1/48th per month. Ahmadov explained that the 25% vesting in June 2024 was intended to compensate Gafita for his substantial contributions to Nucs AI both before and in the first months of its incorporation.

**ANSWER**:

Ahmadov admits Exhibit B is a copy of the First Amendment to the Common Stock Purchase Agreement, and that the terms of the First Amendment speak for themselves. Ahmadov denies the remaining allegations of Paragraph 23.

24. The First Amendment added another requirement that Gafita enter into a written consulting agreement with Nucs AI by February 28, 2025, or Nucs AI would have the right to repurchase Gafita's shares. It also required Gafita to enter into a Confidential Information and Invention Assignment Agreement.

**ANSWER**:

Ahmadov admits Exhibit B is a copy of the First Amendment to the Common Stock Purchase Agreement, and that the terms of the First Amendment speak for themselves. Ahmadov denies the remaining allegations of Paragraph 24.

25. Ahmadov and Yagubbayli made a number of representations to Gafita in the time around when they presented him with the First Amendment to induce him to sign it. These representations were calculated to convince Gafita that signing the First Amendment and converting a significant portion of his vested shares to unvested shares was safe and would not put him at risk of losing a significant part of his ownership interest in the company. Ahmadov and Yagubbayli repeatedly assured Gafita that they viewed him as an integral co-founder of the company and intended to add him to the Board of Directors in recognition of his importance to the company's governance and direction. On June 5, 2024, Ahmadov and Yagubbayli invited Gafita to attend a meeting of the Board of Directors. Gafita was sent a Google Calendar invite titled "Board meeting," the only attendees of which were Gafita, Ahmadov, and Yagubbayli. Gafita attended this board meeting and was treated as a de facto member of the board.

**ANSWER**:

Pursuant to the Court's August 4, 2026 order dismissing Gafita's fifth cause of action related to the First Amendment, no response is required.

26. On multiple occasions between April 2024 and June 2024, Ahmadov and Yagubbayli showed Gafita documents in which he was identified as a co-founder of Nucs AI, and Ahmadov and Yagubbayli made multiple statements to him that they recognized he was a co-founder of the company, that he was an essential member of the Nucs AI team, and that he would be added to the Board of Directors. For example, Ahmadov created and shared with Gafita a pitch deck in April 2024 in which Gafita was identified as a co-founder. Ahmadov sent a Slack message to Gafita and Yagubbayli attaching a draft of the pitch deck, in which he wrote, "Good night, my co-founders!" On June 12, 2024, Ahmadov sent Nucs AI's co-founder Code of Conduct to Gafita for his signature.

**ANSWER**:

Pursuant to the Court's August 4, 2026 order dismissing Gafita's fifth cause of action related to the First Amendment, no response is required.

27. Ahmadov and Yagubbayli made other representations to Gafita on or around May 5, 2024, when Gafita traveled to Baku, Azerbaijan to meet with Ahmadov, Yagubbayli, and a potential investor in Nucs AI. Ahmadov and Yagubbayli represented that Gafita was a co-founder and key member of the Nucs AI team during that investor meeting. Although these statements were purportedly made to the investor, they were made in Gafita's presence and he was one of the intended targets of the representations.

**ANSWER**:

Pursuant to the Court's August 4, 2026 order dismissing Gafita's fifth cause of action related to the First Amendment, no response is required.

28. Ahmadov also made other representations to Gafita to make him believe that he would be treated fairly and would receive compensation for his ideas, sweat equity, and access to his professional network. For example, in May 2024, Ahmadov sent a WhatsApp message to Gafita stating: "I have full belie[f] for you and I'm gonna do whatever it takes to make your ideas commercial. Btw I'm sooo happy that you're back." This representation, and similar ones made around the same time, made Gafita

believe that he was viewed by Ahmadov and Yagubbayli as a key member of the Nucs AI team who would be compensated fairly for his contributions.

**ANSWER**:

Pursuant to the Court's August 4, 2026 order dismissing Gafita's claim arising out of the allegation of Ahmadov's statements that he would treat Gafita "fairly," no response to those allegations is required. Ahmadov lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 28 and therefore denies them.

29. These representations made Gafita feel comfortable that revesting his shares was safe and that he would eventually be fully compensated. Ahmadov and Yagubbayli also told Gafita that revesting his shares was necessary to facilitate outside investment. However, Ahmadov and Yagubbayli did not change the vesting schedule for their own shares.

**ANSWER**:

Ahmadov lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 29 and therefore denies them. Ahmadov admits that the vesting schedule for Ahmadov's and Yagubbayli's shares has not changed. Ahmadov denies the remaining allegations of Paragraph 29.

30. As a result of these representations, Gafita believed that Ahmadov and Yagubbayli viewed him as a core member of the Nucs AI team and that his status as a co-founder and eventual membership on the Board of Directors would protect his interest in Nucs AI, to which he had contributed valuable IP and sweat equity. In reasonable reliance on these representations, and on Ahmadov's insistence that revesting was necessary to secure outside investment, Gafita agreed to sign the First Amendment.

**ANSWER**:

Pursuant to the Court's August 4, 2026 order dismissing Gafita's fifth cause of action related to the First Amendment, no response is required.

31. Unfortunately, these representations were false. Ahmadov and Yagubbayli had no intent of ever making Gafita a member of the Board of Directors and did not intend to honor their promises to treat him as a core member of the Nucs AI team and compensate him fairly. From the beginning,

Ahmadov and Yagubbayli intended to obtain the benefit of Gafita's intellectual property, sweat equity, and professional network without compensating him fairly, and the First Amendment was the initial step in their plan to divest Gafita of his shares.

**ANSWER**:

Ahmadov denies the allegations of Paragraph 31.

32. Gafita continued providing valuable services to Nucs AI through development of the AI technologies, contribution to the company's patent applications, development of clinical studies, engagement with the FDA and reimbursement specialists, and development of clinical workflows, while also introducing the company to leading medical institutions and key opinion leaders and generally serving as Nucs AI's primary medical expert as the company got off the ground.

**ANSWER**:

Ahmadov denies the allegations of Paragraph 32.

33. On or around October 24, 2024, at a meeting in Berlin, Germany at Nucs AI's European office, Ahmadov assured Gafita that "I'm a fair guy, I'll treat you fairly," and promised Gafita that he would be provided with fair compensation for his contributions to Nucs AI, including contributions of intellectual property, his sweat equity, and access to his professional network.

**ANSWER**:

Pursuant to the Court's August 4, 2026 order dismissing Gafita's claim arising out of the allegation "I'm a fair guy, I'll treat you fairly," no response to those allegations is required. Ahmadov denies the remaining allegations of Paragraph 33.

34. On or around November 23, 2024, at a meeting in Brussels, Belgium, at Hotel Steigenberger Wiltcher's, Ahmadov and Gafita discussed Gafita's proposed consulting agreement, and during these conversations Ahmadov told Gafita that further revesting of his shares was necessary to secure outside investment for Nucs AI. Ahmadov made additional statements to Gafita during that meeting, including "This will be so good for the company"—meaning his revesting—and "You won't need to work again after we make it." These statements were intended to make Gafita believe that further revesting of his shares was safe and that he would be treated fairly and compensated for his contributions to Nucs AI. Ahmadov and Yagubbayli did not disclose that they never intended to provide

Gafita with vested shares or any other compensation for his intellectual property and other contributions.

**ANSWER**:

Pursuant to the Court's August 4, 2026 order dismissing Gafita's claim arising out of the allegations "This will be so good for the company" and "You won't need to work again after we make it," no response is required. Ahmadov denies the remaining allegations of Paragraph 34.

35. In December 2024, Ahmadov presented Gafita with a Second Amendment to Common Stock Purchase Agreement (the "Second Amendment"), a true and correct copy of which is attached to this Complaint as **Exhibit C**. The Second Amendment recites: "The Company and Stockholder recognize that, in order to provide the Company with an enhanced opportunity to raise additional capital for the benefit of all holders of capital stock of the Company, including Stockholder, it is necessary and appropriate for Stockholder to agree to subject the Shares to certain restrictions as set forth in this Agreement." Ahmadov reiterated that this amendment was necessary for additional fundraising.

**ANSWER**:

Ahmadov admits the allegations in the first sentence of Paragraph 35. Ahmadov admits that the Second Amendment contains the language quoted in Paragraph 35. Ahmadov denies the remaining allegations of Paragraph 35.

36. Ahmadov also reassured Gafita that revesting was safe because he would be treated fairly and compensated for his essential contributions to Nucs AI. Gafita, relying on Ahmadov's statements in October and November 2024 that he would be treated fairly and "won't need to work again after we make it," in conjunction with Ahmadov and Yagubbayli's earlier statements that they viewed Gafita as a co-founder and an essential member of the team, and that they would soon add him to the Board of Directors, agreed to sign the Second Amendment on January 10, 2025, and further compromise his equity position at the company.

**ANSWER**:

Pursuant to the Court's August 4, 2026 order dismissing Gafita's claim arising out of the allegations "I'm a fair guy, I'll treat you fairly" and "You won't need to work again after we make it," no response to those allegations is required. Pursuant to the Court's August 4, 2026 order dismissing Gafita's claim arising out of statements related to co-founder status and board membership, no response

to those allegations is required. Ahmadov lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 36 and therefore denies them.

37. Ahmadov and Nucs AI's statements in November and December 2024 that further revesting of Gafita's shares was necessary to secure additional fundraising were false at the time they were made. Nucs AI did not engage in any fundraising efforts between October 2024 and Gafita's departure from the company in August 2025. Ahmadov and Yagubbayli wanted Gafita to fully revest his shares to facilitate their plan to divest Gafita of his stake in Nucs AI. Had Gafita known that Ahmadov and Yagubbayli had no intention of ever allowing him to receive his shares, or to be fairly compensated for his contributions to Nucs AI, he would not have agreed to sign the Second Amendment.

**<u>ANSWER</u>**:

Ahmadov denies the allegations in the first three sentences of Paragraph 37. Ahmadov lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the fourth sentence of Paragraph 37 and therefore denies them.

38. The Second Amendment, which was effective as of January 10, 2025, subjected all Gafita's shares to total revesting. It undid the 25% backdated vesting of the First Amendment and provided that all Gafita's 4,700,000 shares would vest 1/48th per month beginning February 1, 2025. As such, Gafita went from having 4,700,000 fully vested shares to having zero vested shares and a four-year timeframe in which to receive them. Ahmadov and Yagubbayli's vesting schedules remained unchanged.

**<u>ANSWER</u>**:

Ahmadov admits that the Second Amendment was effective January 10, 2025. Ahmadov admits that the Second Amendment "provided that all Gafita's 4,700,000 shares would vest 1/48th per month beginning February 1, 2025." Ahmadov admits that Ahmadov's and Yagubbayli's vesting schedules have not changed. Ahmadov lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 38 and therefore denies them.

39. When Gafita questioned the fairness of this new schedule in light of Ahmadov and Yagubbayli's earlier representations to Gafita that he would be compensated for his substantial

contributions to Nucs AI at the time of its formation, Ahmadov told him that because Gafita could only commit 15 hours weekly to Nucs AI in his contemplated consulting agreement, he was not entitled to faster vesting. But Gafita, a full-time employee of Johns Hopkins Medicine, had always been clear with Ahmadov and Yagubbayli about the limitations imposed by his primary employer and always understood his deal with Nucs AI to be substantial equity in exchange for his critical ideas and technology that formed the core of the company's products. In practice, Gafita typically dedicated at least 30 hours per week to Nucs AI.

**ANSWER**:

Ahmadov denies the allegations in the first sentence of Paragraph 39. Ahmadov lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 39 and therefore denies them.

40. These reasons for additional revesting, too, were pretextual and false, and were part of a fraudulent scheme by Ahmadov and Yagubbayli to obtain Gafita's ideas, business plan, and intellectual property without compensating him fairly. Nevertheless, reasonably relying on Ahmadov's representations that execution of the Second Amendment was essential to Nucs AI's ability to fundraise, Gafita signed it.

**ANSWER**:

Ahmadov denies the allegations in the first sentence of Paragraph 40. Ahmadov admits that Gafita signed the Second Amendment. Ahmadov lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 40 and therefore denies them.

41. At the same time as he executed the Second Amendment, Gafita also signed a Stock Restriction Agreement. A true and correct copy of the Stock Restriction Agreement is attached to this Complaint as **Exhibit D**. The Stock Restriction Agreement granted to Nucs AI a repurchase option to, should Gafita quit or be terminated for cause, acquire all his unvested shares at their original purchase price of $0.001.

**ANSWER**:

Ahmadov admits that Gafita signed the Stock Restriction Agreement. Ahmadov admits that the Stock Restriction Agreement granted to Nucs AI a repurchase option to, should Gafita quit or be

terminated for cause, acquire all of Gafita's unvested shares. Ahmadov denies the remaining allegations of Paragraph 41.

42. However, the Stock Restriction Agreement also provided that if Gafita was terminated *without* cause, then vesting of his unvested shares would accelerate and Nucs AI would lose its right to repurchase them.

**ANSWER**:

Ahmadov admits the allegations of Paragraph 42.

43. "Cause" is defined in the Stock Restriction Agreement as follows:

> (I) Stockholder's willful and continued failure to substantially perform Stockholder's duties to the Company after there has been delivered to Stockholder by the Company's Board of Directors a written demand for substantial performance and opportunity to cure which sets forth in detail the specific respects in which the Company's Board of Directors believes that Stockholder has not substantially performed Stockholder's duties; (II) Stockholder having committed willful fraud, willful misconduct, dishonesty or other intentional action in any such case which is materially injurious to the Company; (III) Stockholder's having been convicted of, or having plead guilty or nolo contendere to, any crime that results in, or is reasonably expected to result in material harm to the business or reputation of the Company; or (IV) Stockholder's material breach of any material written agreement between Stockholder and the Company (including without limitation Stockholder's Confidential Information and Invention Assignment Agreement with the Company) and Stockholder's failure to cure such breach within 30 days after receiving written notice thereof.

**ANSWER**:

Ahmadov admits the allegations of Paragraph 43.

44. Gafita and Nucs AI also executed a Consulting Agreement and Confidential Information and Invention Assignment Agreement as required by the Second Amendment, both of which took effect in January 2025. The Consulting Agreement provided for compensation to Gafita of $2,000 per month in addition to his shares. Gafita has never received any payment from Nucs AI for his consulting work.

A true and correct copy of the Consulting Agreement is attached as **Exhibit E**.

**ANSWER**:

Ahmadov admits the allegations in the first two sentences of Paragraph 44. Ahmadov admits that Nucs AI never paid Gafita under the Consulting Agreement. Ahmadov admits the allegations in the fourth sentence of Paragraph 44. Ahmadov denies the remaining allegations of Paragraph 44.

45. The Consulting Agreement also contained an accelerated vesting provision. Section 3 of the Consulting Agreement states:

> Notwithstanding the above, either party may terminate this Agreement at any time upon ten (10) business days' written notice. In the event of such termination, Consultant shall be paid for any portion of the Services that have been performed prior to the termination. However, if the Company terminates this Agreement at any time without Cause (as defined in the Stock Restriction Agreement to be entered into with the Consultant), the vesting of the unvested Shares shall accelerate, and such unvested Shares shall immediately vest at 100%.

**ANSWER**:

Ahmadov admits that Section 3 of the Consulting Agreement includes the quoted language in Paragraph 45. Ahmadov denies the remaining allegations of Paragraph 45.

**C. Nucs AI terminates Gafita without cause and attempts to manufacture a pretextual justification to avoid acceleration of Gafita's unvested shares.**

46. Having induced Gafita, through successive revesting agreements purportedly for the good of Nucs AI, to substantially reduce his quantity of vested shares, Ahmadov, Yagubbayli and Nucs AI put into action their final plan to wipe out Gafita's now-unvested equity entirely.

**ANSWER**:

Ahmadov denies the allegations of Paragraph 46.

47. In early April 2025, after obtaining legal review of the amendments to the Common Stock Purchase Agreement, Gafita expressed concerns to Ahmadov about how his shares had been revested, and in particular the Second Amendment, which served to even take away the 25% of shares vested under the First Amendment and subjected Gafita's shares to complete revesting.

**ANSWER**:

Ahmadov lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 47 and therefore denies them.

48. Gafita expressed that he did not believe this arrangement was equitable and asked that vesting return to the original schedule in the First Amendment. Gafita's expressed concerns regarding the fairness of these terms caused a breakdown of the relationship between himself and Ahmadov and Yagubbayli.

**ANSWER**:

Ahmadov lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 48 and therefore denies them.

49. At a meeting in Baltimore, Maryland, in April 2025, Ahmadov and Gafita reached a verbal agreement to revert his vesting schedule to its original schedule and provide him with 25% vesting on November 15, 2024, and 1/48th monthly vesting thereafter. Ahmadov also agreed to give Gafita his long-promised Board seat.

**ANSWER**:

Ahmadov denies the allegations of Paragraph 49.

50. Only one week later, Ahmadov reneged on his agreement, saying the offer of the Board seat was a "joke," and that he would only agree to the original vesting schedule if Gafita also agreed to substantially reduce his equity stake in the company by 33%. Gafita, who transferred valuable IP to Nucs AI in return for equity, was unwilling to do so.

**ANSWER**:

Ahmadov denies the allegations in the first sentence of Paragraph 50. Ahmadov lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 50 and therefore denies them.

51. Despite the dispute about his shares, Gafita continued providing valuable services to Nucs AI as its chief medical advisor throughout this time period.

**ANSWER**:

Ahmadov denies the allegations of Paragraph 51.

52. In late May 2025, Gafita made an additional inquiry of Ahmadov as to the status of updating his vesting schedule. Ahmadov replied, "I don't know what you are talking about." Around this same time, Yagubbayli confirmed to Gafita that reverting the vesting schedule to its original terms was contingent on his agreement to a 33% reduction of his equity stake in Nucs AI, and said, "We are talking about a package and either take or leave it." Gafita expressed his concerns regarding his unfair treatment in light of his essential contributions in taking the company off the ground.

**ANSWER**:

Ahmadov denies the allegations of Paragraph 52.

53. Shortly thereafter, on May 23, 2025, Ahmadov told Gafita that the Board of Directors had decided to terminate Gafita's Consulting Agreement "as soon as possible." Prior to this announcement, none of Nucs AI, Ahmadov, or Yagubbayli had issued any prior warnings, complaints, performance reviews, or notice of breach of the Consulting Agreement with an opportunity to cure.

**ANSWER**:

Ahmadov admits that on or around May 23, 2025, Ahmadov told Gafita that the Board of Directors had decided to terminate Gafita's Consulting Agreement. Ahmadov denies the remaining allegations of Paragraph 53.

54. Nucs AI offered Gafita two options: (1) step down from his role at the company and retain his vested shares (which at that point amounted to fewer than 500,000 shares); or (2) agree to a reduced role at Nucs AI as a scientific advisor with a reduction in his equity by 50% to 2,350,000 shares which would vest on the current schedule. Ahmadov told Gafita that if he did not elect one option or the other then Nucs AI would terminate the Consulting Agreement.

**ANSWER**:

Ahmadov denies the allegations of Paragraph 54.

55. But Nucs AI apparently subsequently realized that notifying Gafita of its intent to terminate him unless he stepped down or voluntarily surrendered equity was improvident because terminating Gafita's Consulting Agreement without cause would trigger the acceleration provision and cause all his shares to vest. Gafita did not agree to either step down or reduce his equity, yet Nucs AI did not immediately terminate him as threatened. Instead, it asked him to stop all "non-essential" work.

Ahmadov and Yagubbayli needed this pause to give them time to determine how to steal the rest of Gafita's shares.

**ANSWER**:

Ahmadov denies the allegations in the first sentence of Paragraph 55. Ahmadov lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 55 and therefore denies them. Ahmadov admits that Nucs AI asked Gafita to stop all non-essential work. Ahmadov denies the remaining allegations of Paragraph 55.

56. On June 20, 2025, Ahmadov sent Gafita a letter styled "Notice of Breach and Demand for Cure" ("Breach Notice") stating that Gafita was in breach of the Consulting Agreement and purporting to commence the 30-day cure period provided by the Agreement. The purported grounds for breach were fabricated and/or so vague as to be impossible to "cure" in any meaningful way. And because the Nucs AI Board of Directors had already made the decision to terminate the Consulting Agreement in May 2025, the Breach Notice functioned solely as a pretextual attempt to manufacture "Cause" and avoid Gafita's accelerated vesting provision.

**ANSWER**:

Ahmadov admits the allegations in the first sentence of Paragraph 56. Ahmadov denies the remaining allegations of Paragraph 56.

57. On June 27, 2025, Gafita sent a letter to Nucs AI reiterating his willingness to participate in a company investigation regarding his performance or conduct. Gafita requested additional information and documentation underlying the accusations listed in the Breach Notice so that he could respond to them. Nucs AI never responded to Gafita's letter, foreclosing any ability for him to cure any purported breach.

**ANSWER**:

Ahmadov admits that Nucs AI received a letter on or around June 27, 2025 from Gafita. Ahmadov admits that Nucs AI did not respond to this letter. Ahmadov denies the remaining allegations of Paragraph 57.

58. Nucs AI terminated Gafita's access to the company's computer systems on June 27, 2025, including email and Google Drive, and requested that he return the workstation used for company-

related activities, rendering it impossible for Gafita to perform his duties for the company. When he asked Ahmadov to restore his access, Ahmadov responded that all external contractors, advisors, and collaborators had temporarily had their access limited for security reasons, but that he still expected Gafita to provide services to Nucs AI, and he asked that Gafita provide a list of what he was currently working on. This justification was false and pretextual, and was intended to create "Cause" for termination of the Consulting Agreement.

**ANSWER**:

Ahmadov admits that on or around June 27, 2025, Nucs AI terminated Gafita's access to Nucs AI's computer systems. Ahmadov denies the remaining allegations of Paragraph 58.

59. Gafita provided a list of his ongoing activities. Yet Nucs AI still refused to restore his access to the company's online resources that Gafita required. Instead, Ahmadov sent another email requesting extensive details of everything Gafita had done or was doing for Nucs AI, again reiterating that he would not restore Gafita's access, but that locking Gafita out of all Nucs AI resources "does not absolve you from your obligations or to deliver the work you initiated." Gafita perceived this email as a clear attempt to manufacture "Cause" to support a pretextual termination of the Consulting Agreement, and so he did not respond.

**ANSWER**:

Ahmadov denies the allegations of Paragraph 59, except that Ahmadov lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the last sentence of Paragraph 59 and therefore denies them.

60. Gafita, through counsel, sent a letter to Nucs AI on July 15, 2025, seeking assurance that Nucs AI would honor its agreement to provide him with his ownership rights and demanding full and immediate vesting should Nucs AI terminate Gafita without cause, as Gafita believed it was preparing to do.

**ANSWER**:

Ahmadov admits that Nucs AI received a letter from Gafita's counsel on or around July 15, 2025. Ahmadov lacks knowledge or information sufficient to form a belief as to the truth of the allegation "as Gafita believed it was preparing to do" and therefore denies it. Ahmadov therefore denies

the remaining allegations of Paragraph 60.

61. Gafita received a letter styled "Termination of Consulting Agreement" ("Termination Letter") signed by Ahmadov dated August 11, 2025. The letter purported to terminate Gafita for Cause, as defined in the Stock Restriction Agreement. The Termination Letter enumerated several false and pretextual bases that it purported to constitute Cause, including:

- Gafita's meeting on April 11, 2025, with an officer of an alleged competitor of the company, where he allegedly disclosed confidential Nucs AI information. Gafita in fact met with this officer with the full knowledge and approval of Ahmadov and did not share any confidential information with him. Nucs AI never produced any evidence or specifics regarding Gafita's supposed disclosures.
- A "sustained pattern" of conduct reflecting a "lack of professionalism, judgment, and loyalty, including: Repeated underperformance including failure to advance key medical initiatives, disengagement and lack of collaboration with team members and executive leadership, disrespectful behavior towards the leadership team of the Company including the Company's Chief Executive Officer (the 'CEO'); and on several occasions, undermined the CEO in internal communications and team meetings which has interfered with executive operations." These accusations were all untrue, pretextual, and unsupported by any evidence. They also, even if true, would not satisfy the definition of "Cause" in the Stock Restriction Agreement.

**ANSWER**:

Ahmadov admits that Nucs AI terminated Gafita's Consulting Agreement and communicated the reasons for the termination to Gafita. Ahmadov denies the remaining allegations of Paragraph 61.

62. Nucs AI has refused to convey Gafita's 4,700,000 shares that vested immediately upon his termination without Cause under the Stock Restriction Agreement and have indicated that they do not intend to do so.

**ANSWER**:

Ahmadov admits that Nucs AI has not conveyed 4,700,000 shares to Gafita. Ahmadov denies the remaining allegations of Paragraph 62.

## FIRST CAUSE OF ACTION

**Breach of Contract – Common Stock Purchase Agreement**
**(Against Nucs AI)**

63. Gafita incorporates by reference each of the allegations in paragraphs 1–62 of this Complaint as though fully set forth here.

**ANSWER**:

This cause of action is not alleged against Ahmadov; therefore, a response is not required.

64. Gafita and Nucs AI entered into a series of contracts including the Common Stock Purchase Agreement, the First Amendment, and the Second Amendment.

**ANSWER**:

This cause of action is not alleged against Ahmadov; therefore, a response is not required.

65. The Common Stock Purchase Agreement, the First Amendment, and the Second Amendment are binding and enforceable contracts that Nucs AI entered into knowingly and voluntarily.

**ANSWER**:

This cause of action is not alleged against Ahmadov; therefore, a response is not required.

66. The Common Stock Purchase Agreement, as amended, obligated Nucs AI to issue Gafita 4,700,000 shares of Nucs AI common stock, subject to a vesting schedule. The Stock Restriction Agreement provided that, in the event the Consulting Agreement was terminated without Cause, as defined in the Stock Restriction Agreement, then all unvested shares of the 4,700,000 shares issued to Gafita under the Common Stock Purchase Agreement would vest immediately. The Consulting Agreement also provided that if it was terminated without Cause, as defined in the Stock Restriction Agreement, then all unvested shares of the 4,700,000 shares issued to Gafita under the Common Stock Purchase Agreement would vest immediately.

**ANSWER**:

This cause of action is not alleged against Ahmadov; therefore, a response is not required.

67. On August 11, 2025, Nucs AI terminated the Consulting Agreement without Cause, as defined in the Stock Restriction Agreement.

///

**ANSWER**:

This cause of action is not alleged against Ahmadov; therefore, a response is not required.

68. The bases for Cause provided by Nucs AI were all false, pretextual, vague, and/or do not constitute bases for Cause as defined by the Stock Restriction Agreement. Gafita did not commit any act that would constitute Cause as defined by the Stock Restriction Agreement.

**ANSWER**:

This cause of action is not alleged against Ahmadov; therefore, a response is not required.

69. Gafita demanded all 4,700,000 shares of Nucs AI common stock be immediately issued to him under the Common Stock Purchase Agreement, as amended. Nucs AI refused to issue and/or deliver Gafita's shares of Nucs AI common stock.

**ANSWER**:

This cause of action is not alleged against Ahmadov; therefore, a response is not required.

70. Nucs AI has breached the Common Stock Purchase Agreement, as amended, by failing to issue 4,700,000 fully vested shares of Nucs AI common stock to Gafita.

**ANSWER**:

This cause of action is not alleged against Ahmadov; therefore, a response is not required.

71. Gafita has performed all obligations he owed to Nucs AI under the Common Stock Purchase Agreement, as amended, or his obligations have been terminated or excused.

**ANSWER**:

This cause of action is not alleged against Ahmadov; therefore, a response is not required.

72. As a result of Nucs AI's breach, Gafita has been harmed in an amount to be determined at trial but in excess of $75,000.

**ANSWER**:

This cause of action is not alleged against Ahmadov; therefore, a response is not required.

///

///

///

///

## SECOND CAUSE OF ACTION

**Breach of Contract – Stock Restriction Agreement**
**(Against Nucs AI)**

73. Gafita incorporates by reference each of the allegations in paragraphs 1–72 of this Complaint as though fully set forth here.

**ANSWER**:

This cause of action is not alleged against Ahmadov; therefore, a response is not required.

74. Gafita and Nucs AI entered into the Stock Restriction Agreement.

**ANSWER**:

This cause of action is not alleged against Ahmadov; therefore, a response is not required.

75. The Stock Restriction Agreement is a binding and enforceable contract that Nucs AI entered into knowingly and voluntarily.

**ANSWER**:

This cause of action is not alleged against Ahmadov; therefore, a response is not required.

76. The Stock Restriction Agreement provided that, in the event the Consulting Agreement was terminated without Cause, as defined in the Stock Restriction Agreement, then all unvested shares of the 4,700,000 shares issued to Gafita under the Common Stock Purchase Agreement would vest immediately.

**ANSWER**:

This cause of action is not alleged against Ahmadov; therefore, a response is not required.

77. On August 11, 2025, Nucs AI terminated the Consulting Agreement without Cause, as defined in the Stock Restriction Agreement.

**ANSWER**:

This cause of action is not alleged against Ahmadov; therefore, a response is not required.

///

///

///

///

78. The bases for Cause provided by Nucs AI were all false, pretextual, vague, and/or do not constitute bases for Cause as defined by the Stock Restriction Agreement. Gafita did not commit any act that would constitute Cause as defined by the Stock Restriction Agreement.

**ANSWER**:

This cause of action is not alleged against Ahmadov; therefore, a response is not required.

79. Gafita demanded all 4,700,000 shares of Nucs AI common stock be immediately issued to him. Nucs AI refused to issue and/or deliver Gafita's shares of Nucs AI common stock.

**ANSWER**:

This cause of action is not alleged against Ahmadov; therefore, a response is not required.

80. Nucs AI has breached the Stock Restriction Agreement by failing to issue 4,700,000 fully vested shares of Nucs AI common stock to Gafita.

**ANSWER**:

This cause of action is not alleged against Ahmadov; therefore, a response is not required.

81. Gafita has performed all obligations he owed to Nucs AI under the Stock Restriction Agreement, or his obligations have been terminated or excused.

**ANSWER**:

This cause of action is not alleged against Ahmadov; therefore, a response is not required.

82. As a result of Nucs AI's breach, Gafita has been harmed in an amount to be determined at trial but in excess of $75,000.

**ANSWER**:

This cause of action is not alleged against Ahmadov; therefore, a response is not required.

## THIRD CAUSE OF ACTION

**Breach of Contract – Consulting Agreement**
**(Against Nucs AI)**

83. Gafita incorporates by reference each of the allegations in paragraphs 1–82 of this Complaint as though fully set forth here.

**ANSWER**:

This cause of action is not alleged against Ahmadov; therefore, a response is not required.

84. Gafita and Nucs AI entered into the Consulting Agreement on or around January 10, 2025.

**ANSWER**:

This cause of action is not alleged against Ahmadov; therefore, a response is not required.

85. The Consulting Agreement is a binding and enforceable contract that both parties entered into knowingly and voluntarily.

**ANSWER**:

This cause of action is not alleged against Ahmadov; therefore, a response is not required.

86. Under the terms of the Consulting Agreement, Nucs AI was obligated to pay Gafita $2,000 per month in exchange for Gafita's provision of Services, as defined in the Agreement, related to medical operations of Nucs AI.

**ANSWER**:

This cause of action is not alleged against Ahmadov; therefore, a response is not required.

87. Under the terms of the Consulting Agreement, if Nucs AI terminated the Consulting Agreement without Cause, as defined in the Stock Restriction Agreement, then the vesting of Gafita's unvested shares would accelerate, and such unvested shares would immediately vest at 100%.

**ANSWER**:

This cause of action is not alleged against Ahmadov; therefore, a response is not required.

88. Gafita performed all obligations required of him under the Consulting Agreement, including the provision of all required Services, or his obligation to perform was excused or terminated.

**ANSWER**:

This cause of action is not alleged against Ahmadov; therefore, a response is not required.

89. Nucs AI terminated the Consulting Agreement without Cause, as defined in the Stock Restriction Agreement, on August 11, 2025.

**ANSWER**:

This cause of action is not alleged against Ahmadov; therefore, a response is not required.

90. In breach of the Consulting Agreement, Nucs AI has never tendered payment to Gafita for Services provided pursuant to the Consulting Agreement in any amount.

**ANSWER**:

This cause of action is not alleged against Ahmadov; therefore, a response is not required.

91. In breach of the Consulting Agreement, Nucs AI has refused to acknowledge the vesting provision in the Consulting Agreement and has refused to convey 4,700,000 fully vested shares of Nucs AI common stock to Gafita.

**ANSWER**:

This cause of action is not alleged against Ahmadov; therefore, a response is not required.

92. In total, Nucs AI failed to pay at least $16,000 in fees to Gafita for work performed under the Consulting Agreement.

**ANSWER**:

This cause of action is not alleged against Ahmadov; therefore, a response is not required.

93. As a result of Nucs AI's breach, Gafita has been harmed in the amount of the outstanding $16,000 in fees as well as interest in an amount to be determined at trial, and further amounts to be determined at trial for failure to convey his common stock that are believed to be in excess of $75,000.

**ANSWER**:

This cause of action is not alleged against Ahmadov; therefore, a response is not required.

**FOURTH CAUSE OF ACTION**

**Unjust Enrichment**
**(Against Nucs AI)**

94. Gafita incorporates by reference each of the allegations in paragraphs 1–93 of this Complaint as though fully set forth here.

**ANSWER**:

This cause of action is not alleged against Ahmadov; therefore, a response is not required.

95. Nucs AI has been enriched through (a) Gafita's contribution of his ideas, business plan, and intellectual property to Nucs AI, as well as access to his professional network; and (b) Gafita's efforts and services provided to Nucs AI through his role as medical advisor to Nucs AI. Absent Gafita's contribution of intellectual property, ideas, know-how, and services, Nucs AI would have been unable to launch its business, raise funds, hire employees, develop products, or establish strategic

partnerships with key opinion leaders, hospitals, and pharmaceutical companies.

**ANSWER**:

This cause of action is not alleged against Ahmadov; therefore, a response is not required.

96. Gafita has suffered an impoverishment in that Nucs AI has refused to provide him fair compensation for his contributions, in the form of equity or cash, and Gafita has exchanged his valuable ideas, intellectual property, and services for a small fraction of the equity shares he was promised, which represent a value far below the fair value of his contributions to Nucs AI.

**ANSWER**:

This cause of action is not alleged against Ahmadov; therefore, a response is not required.

97. Gafita's impoverishment is directly related to Nucs AI's enrichment in that Nucs AI has obtained Gafita's valuable ideas, business plan, intellectual property, professional network, and services in exchange for shares representing a value far below the fair value of Gafita's contributions.

**ANSWER**:

This cause of action is not alleged against Ahmadov; therefore, a response is not required.

98. Nucs AI's acts were not justified but represent a deliberate bad faith course of dealing by Nucs AI to obtain the benefit of Gafita's ideas, intellectual property, and services without providing fair compensation.

**ANSWER**:

This cause of action is not alleged against Ahmadov; therefore, a response is not required.

99. Gafita has been and continues to be damaged by Nucs AI's unjust enrichment.

**ANSWER**:

This cause of action is not alleged against Ahmadov; therefore, a response is not required.

100. Nucs AI [*sic*] is entitled to judgment in an amount to be proven at trial and imposition of a constructive trust over his vested but undelivered shares of Nucs AI common stock.

**ANSWER**:

This cause of action is not alleged against Ahmadov; therefore, a response is not required.

///

///

**FIFTH CAUSE OF ACTION**

**In the Alternative – Fraud in the Inducement – First Amendment**
**(Against Nucs AI, Ahmadov, and Yagubbayli)**

101. Gafita incorporates by reference each of the allegations in paragraphs 1–100 of this Complaint as though fully set forth here.

**ANSWER**:

Pursuant to the Court's August 4, 2026 order dismissing this cause of action, no response is required.

102. Nucs AI, Ahmadov, and Yagubbayli induced Gafita to enter into the First Amendment to the Common Stock Purchase Agreement, which subjected his 4,700,000 shares of Nucs AI common stock, which were fully vested under the original Common Stock Purchase Agreement, to partial revesting.

**ANSWER**:

Pursuant to the Court's August 4, 2026 order dismissing this cause of action, no response is required.

103. Ahmadov and Yagubbayli, as directors and officers of Nucs AI, owed fiduciary duties to Gafita, as a shareholder of Nucs AI. These fiduciary duties included a heightened duty of candor and an obligation to disclose to Gafita material facts around their request that he execute the First Amendment, which subjected his fully-vested Nucs AI shares to partial revesting and made it easier for Ahmadov and Yagubbayli to subsequently divest him of his entire interest in Nucs AI.

**ANSWER**:

Pursuant to the Court's August 4, 2026 order dismissing this cause of action, no response is required.

104. Nucs AI, Ahmadov, and Yagubbayli made numerous false statements and representations to Gafita to induce him to execute the First Amendment, including:

- Numerous representations, including during a meeting with an investor in Baku, Azerbaijan, in May 2024, and in various company documents and materials, including pitch decks and other investor materials, that Gafita was a co-founder and a key member

of the Nucs AI team;

- Ahmadov created a WhatsApp group titled "Co-founders" which included only himself, Yagubbayli, and Gafita;
- Representations made via Slack in April 2024 wherein Ahmadov referred to Gafita and Yagubbayli as "my co-founders";
- Representations made in connection with the sharing of the Co-Founders Code of Conduct document on June 12, 2024, that Nucs AI viewed Gafita as a co-founder and core member of the team; and
- Numerous representations, beginning in May 2024 and continuing through June 2024, by Ahmadov and Yagubbayli, that Gafita would be made a member of the Board of Directors of Nucs AI, including on or around June 5, 2024, when Gafita was invited to a board meeting attended by Ahmadov and Yagubbayli and treated as a board member.

Each of these statements was false at the time it was made, and Ahmadov and Yagubbayli knew they were false. Ahmadov and Yagubbayli had no intention of making Gafita a member of the Board of Directors and did not intend to treat him as a co-founder or to provide him with fair compensation for his contributions to the company.

**ANSWER**:

Pursuant to the Court's August 4, 2026 order dismissing this cause of action, no response is required.

105. On information and belief, the reasons Nucs AI, Ahmadov, and Yagubbayli gave to Gafita for the First Amendment were false and pretextual. Nucs AI, Ahmadov, and Yagubbayli omitted their actual motivation in obtaining his signature on the First Amendment: to weaken his equity position as a first step in eventually divesting him of his shares, obtaining the benefit of his valuable intellectual property, sweat equity, and professional network without compensating him.

**ANSWER**:

Pursuant to the Court's August 4, 2026 order dismissing this cause of action, no response is required.

///

106. Nucs AI, Ahmadov, and Yagubbayli made these false statements and omissions under a fraudulent scheme to obtain Gafita's ideas, business plan, intellectual property, professional network, and services without paying him adequate compensation. Nucs AI, Ahmadov, and Yagubbayli never intended to provide Gafita with 4,700,000 shares of Nucs AI common stock and induced him to execute the First Amendment in furtherance of that fraudulent scheme.

**ANSWER**:

Pursuant to the Court's August 4, 2026 order dismissing this cause of action, no response is required.

107. Gafita relied on defendants' false statements and omissions, and this reliance was reasonable. Because Nucs AI, Ahmadov, and Yagubbayli made representations to him to make him believe that he was a co-founder of the company, a key member of the Nucs AI team, and that they would make him a director of the company, Gafita was willing to weaken his interest in his Nucs AI shares through revesting. Gafita was told, and reasonably believed, that such revesting was necessary to secure outside investment.

**ANSWER**:

Pursuant to the Court's August 4, 2026 order dismissing this cause of action, no response is required.

108. Had Gafita known that Nucs AI, Ahmadov, and Yagubbayli never intended to provide him with 4,700,000 shares of Nucs AI common stock, never intended to provide him with a seat on the Board, and instead planned to weaken his equity position in furtherance of a scheme to divest him of his shares and secure the benefit of his intellectual property, sweat equity, and professional network without giving him fair compensation, he would not have agreed to execute the First Amendment and would have retained his 4,700,000 fully vested shares of Nucs AI common stock.

**ANSWER**:

Pursuant to the Court's August 4, 2026 order dismissing this cause of action, no response is required.

///

///

109. Gafita has been injured by the fraudulent conduct of Nucs AI, Ahmadov, and Yagubbayli because instead of 4,700,000 fully vested shares of Nucs AI common stock, Nucs AI only admits to Gafita's ownership of 685,417 vested shares of Nucs AI common stock.

**ANSWER**:

Pursuant to the Court's August 4, 2026 order dismissing this cause of action, no response is required.

110. Gafita is entitled to rescission of the First Amendment and a declaration that he is the owner of 4,700,000 fully vested shares of Nucs AI common stock as authorized by the Common Stock Purchase Agreement. Gafita is willing to tender the return of any consideration received pursuant to the First Amendment and gives notice of his intent to seek rescission.

**ANSWER**:

Pursuant to the Court's August 4, 2026 order dismissing this cause of action, no response is required.

## SIXTH CAUSE OF ACTION

### In the Alternative – Fraud in the Inducement – Second Amendment (Against Nucs AI, Ahmadov, and Yagubbayli)

111. Gafita incorporates by reference each of the allegations in paragraphs 1–110 of this Complaint as though fully set forth here.

**ANSWER**:

Ahmadov incorporates by reference his responses to Paragraphs 1 through 110 of this Answer as though fully set forth herein.

112. Nucs AI, Ahmadov, and Yagubbayli induced Gafita to enter into the Second Amendment to the Common Stock Purchase Agreement which fully revested his 4,700,000 shares of Nucs AI common stock, which were fully vested under the original Common Stock Purchase Agreement and partially vested under the First Amendment.

**ANSWER**:

Ahmadov denies the allegations of Paragraph 112.

///

113. Ahmadov and Yagubbayli, as directors and officers of Nucs AI, owed fiduciary duties to Gafita, as a shareholder of Nucs AI. These fiduciary duties included a heightened duty of candor and an obligation to disclose to Gafita material facts around their request that he execute the Second Amendment, which weakened his equity position.

**ANSWER**:

Pursuant to the Court's August 4, 2026 order dismissing Gafita's claim of fraud by omission, no response is required.

114. Nucs AI, Ahmadov, and Yagubbayli made numerous false statements and representations to Gafita to induce him to execute the Second Amendment, including:

- Ahmadov's statement to Gafita in or around October 24, 2024 in Berlin, Germany at the company's office that "I'm a fair guy, I'll treat you fairly," and his promises to Gafita that he would be provided with fair compensation for his contributions to Nucs AI, including his intellectual property, his sweat equity, and access to his professional network; and
- Representations made by Ahmadov in or around November 23, 2024, in Brussels, Belgium, at Hotel Steigenberger Wiltcher's, and reiterated in the preamble to the Second Amendment, that Gafita's revesting was necessary to secure outside investment for Nucs AI. Ahmadov made additional statements to Gafita at that time, including "This will be so good for the company"—meaning his revesting—and "You won't need to work again after we make it."

Each of these statements was false at the time it was made, and Ahmadov knew they were false. Nucs AI was not engaged in fundraising between October 2024 and at least August 2025, did not raise funds in the aftermath of Gafita's revesting, and Gafita's revesting was not necessary for fundraising in November 2024 through January 2025. Nucs AI, Ahmadov, and Yagubbayli wanted Gafita to fully revest his shares as a step in their scheme to divest him entirely through his pretextual termination for "Cause," which they put into action shortly after he executed the Second Amendment.

///

///

**ANSWER**:

Pursuant to the Court's August 4, 2026 order dismissing Gafita's claim arising out of the allegations "I'm a fair guy, I'll treat you fairly," "This will be so good for the company," and "You won't need to work again after we make it," no response to those allegations is required. Ahmadov denies the remaining allegations of Paragraph 114.

115. On information and belief, the reasons Nucs AI, Ahmadov, and Yagubbayli gave to Gafita for the Second Amendment were false and pretextual. Nucs AI, Ahmadov, and Yagubbayli omitted their actual motivation in obtaining his signature on the Second Amendment: to fully revest Gafita's Nucs AI shares at the same time he was asked to execute the Stock Restriction Agreement, which granted Nucs AI the right to repurchase his shares upon his termination for "Cause." At the time Nucs AI, Ahmadov, and Yagubbayli made the statements intended to induce Gafita to sign the Second Amendment, they had already developed their plan to pretextually terminate Gafita for "Cause," divesting him of his shares, obtaining the benefit of his valuable intellectual property, sweat equity, and professional network without providing Gafita fair—or any—compensation.

**ANSWER**:

Ahmadov denies the allegations of Paragraph 115.

116. Nucs AI, Ahmadov, and Yagubbayli made these false statements and omissions under a fraudulent scheme to obtain Gafita's ideas, business plan, intellectual property, professional network, and services without paying him compensation. Nucs AI, Ahmadov, and Yagubbayli never intended to provide Gafita with 4,700,000 shares of Nucs AI common stock and induced him to execute the Second Amendment in furtherance of that fraudulent scheme.

**ANSWER**:

Pursuant to the Court's August 4, 2026 order dismissing Gafita's claim of fraud by omission, no response to those allegations is required. Ahmadov denies the remaining allegations of Paragraph 116.

117. Gafita relied on the defendants' false statements and omissions, and this reliance was reasonable. Gafita had had a prior relationship with Yagubbayli, and Yagubbayli had introduced Ahmadov as a credible and trustworthy person to join the enterprise as co-founder. Ahmadov and Yagubbayli had led Gafita to believe that the three of them were co-equal co-founders and Gafita placed

his trust in them. Moreover, as directors and officers of Nucs AI, Ahmadov and Yagubbayli owed Gafita fiduciary duties of loyalty and good faith in his capacity as a shareholder.

**ANSWER**:

Pursuant to the Court's August 4, 2026 order dismissing Gafita's claim of fraud by omission, no response to those allegations is required. Ahmadov lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 117 regarding Gafita's reliance and therefore denies them. Ahmadov admits that Gafita had a prior relationship with Yagubbayli and that Yagubbayli introduced Gafita to Ahmadov. Ahmadov denies the remaining allegations of Paragraph 117.

118. Furthermore, Gafita was specifically induced to enter into the Second Amendment by Ahmadov's assurances that he would be treated "fairly" in or around November 2024. Gafita reasonably understood Ahmadov's promise of treating him and compensating him "fairly" to mean that he would eventually receive his promised stock compensation, and that his revesting was necessary to ensure the success of the company. In fact, Ahmadov, Yagubbayli, and Nucs AI had no intention of ever providing Gafita with his shares, and Nucs AI did not need him to revest his shares to secure additional outside investment, which they were not seeking and had no plans to seek at the time Gafita was induced to sign the Second Amendment.

**ANSWER**:

Pursuant to the Court's August 4, 2026 order dismissing Gafita's claim arising out of the allegation of Ahmadov's statements that he would treat Gafita "fairly," no response to those allegations is required. Ahmadov lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 118 and therefore denies them. Ahmadov denies the allegations in the third sentence of Paragraph 118.

119. Had Gafita known that Nucs AI, Ahmadov, and Yagubbayli never intended to provide him with 4,700,000 shares of Nucs AI common stock, never intended to provide him with a seat on the Board, did not intend to compensate him fairly, and instead planned to revest his shares in furtherance of a scheme to divest him of his shares and secure the benefit of his intellectual property, sweat equity, and professional network without giving him fair compensation, he would not have agreed to execute the

Second Amendment.

**ANSWER**:

Ahmadov lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 119 and therefore denies them.

120. Gafita has been injured by the fraudulent conduct of Nucs AI, Ahmadov, and Yagubbayli because instead of 4,700,000 fully vested shares of Nucs AI common stock, Nucs AI only admits to Gafita's ownership of 685,417 vested shares of Nucs AI common stock.

**ANSWER**:

Ahmadov denies the allegations of Paragraph 120.

121. Gafita is entitled to rescission of the Second Amendment and a declaration that he is the owner of 4,700,000 fully vested shares of Nucs AI common stock as authorized by the Common Stock Purchase Agreement. Gafita is willing to tender the return of any consideration received pursuant to the First Amendment and gives notice of his intent to seek rescission.

**ANSWER**:

Ahmadov denies the allegations in the first sentence of Paragraph 121. Ahmadov lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the last sentence of Paragraph 121 and therefore denies them.

## AFFIRMATIVE DEFENSES

## FIRST AFFIRMATIVE DEFENSE

### Unclean Hands

Ahmadov asserts that Gafita's claims are barred, in whole or in part, under the doctrine of unclean hands as a result of Gafita's own conduct.

///

///

///

///

///

///

Dated: October 9, 2026

**FOLEY & LARDNER LLP**
Rajiv Dharnidharka
Matthew D. Caplan
John P. Riley

By: /s/ *Matthew Caplan*
MATTHEW D. CAPLAN
Attorneys for Defendants
NUCS AI, INC. and NIJAT AHMADOV