RAJIV DHARNIDHARKA, CA Bar No. 234756
rajiv.dharnidharka@foley.com
MATTHEW D. CAPLAN, CA Bar No. 260388
matt.caplan@foley.com
**FOLEY & LARDNER LLP**
ONE MARKET PLAZA
55 SPEAR STREET TOWER, SUITE 1900
SAN FRANCISCO, CA 94105
TELEPHONE: 415.434.4507
FACSIMILE: 415.434.4484

JOHN P. RILEY, CA Bar No. 356477
jp.riley@foley.com
**FOLEY & LARDNER LLP**
11988 EL CAMINO REAL, SUITE 400
SAN DIEGO, CA 92130-2594
TELEPHONE: 858.847.6700
FACSIMILE: 858.792.6773

Attorneys for Defendants
NUCS AI, INC. and NIJAT AHMADOV

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DR. ANDREI GAFITA, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>NUCS AI, INC., a Delaware corporation, NIJAT AHMADOV, an individual, and FARID YAGUBBAYLI, an individual,<br><br>Defendants. | Case No. 3:25-cv-10757-CRB<br><br>**DEFENDANT NUCS AI, INC.'S ANSWER TO AMENDED COMPLAINT AND COUNTERCLAIMS**<br><br>Complaint Filed: December 17, 2025<br>Judge: Hon. Charles R. Breyer |

Plaintiff Dr. Andrei Gafita ("Gafita") brings this action against Defendants Nucs AI, Inc. ("Nucs AI"), Nijat Ahmadov ("Ahmadov"), and Farid Yagubbayli ("Yagubbayli") and alleges as follows:

**INTRODUCTION**

1. Dr. Andrei Gafita brings this action against Nucs AI to enforce his entitlement to the substantial equity stake he was promised in exchange for his highly valuable ideas and intellectual property that constitute the core technology underlying Nucs AI's products, his business plan, and access to his professional network.

**ANSWER**:

Nucs AI denies the allegations of Paragraph 1.

2. Gafita is a respected and accomplished doctor and medical researcher currently practicing at Johns Hopkins Medicine. In 2023, Gafita developed the seed of a new technology that could revolutionize the diagnosis and treatment of prostate cancer using artificial intelligence.

**ANSWER**:

Nucs AI lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 2 and therefore denies them.

3. Gafita agreed to work with Farid Yagubbayli to develop his ideas into a marketable product. Yagubbayli introduced Gafita to his friend Nijat Ahmadov, and together the three agreed to start Nucs AI.

**ANSWER**:

Nucs AI admits that Gafita worked with Yagubbayli and Ahmadov to form Nucs AI. Nucs AI otherwise denies the allegations of Paragraph 3.

4. In recognition of his substantial contributions at the enterprise's outset—without which Nucs AI could never have existed—Ahmadov and Yagubbayli agreed to issue Gafita 4,700,000 shares of common stock in the new company. Unlike Ahmadov and Yagubbayli's own shares, Gafita's shares would not be subject to vesting but would be issued in full upon Nucs AI's formation.

**ANSWER**:

Nucs AI admits that Ahmadov and Yagubbayli agreed to issue Gafita 4,700,000 shares of common stock in the new company. Nucs AI denies the remaining allegations of Paragraph 4.

5. But no sooner had Gafita received his shares than Ahmadov and Yagubbayli began scheming to take them away. At first claiming it was necessary to secure initial investment, then claiming it reflected the limited hours Gafita could contribute to daily operations at Nucs AI, and then again that it was necessary to secure additional investment, Ahmadov and Yagubbayli coerced Gafita into signing amendments to his stock purchase agreement that resulted in his shares first partially and then fully revesting. All this time, Ahmadov and Yagubbayli assured Gafita that he was a critical member of the Nucs AI team and would be compensated for his contributions, including with a seat on the Board of Directors. These reassurances were all false and intended to convince Gafita to revest his shares so that Ahmadov and Yagubbayli could then fire Gafita and take them away.

**ANSWER**:

Nucs AI denies the allegations of Paragraph 5.

6. When Gafita confronted Ahmadov about the unfairness of his revesting agreements, Ahmadov and Yagubbayli began engineering a pretextual scheme to remove Gafita from the company. Ahmadov told Gafita that the Board of Directors was determined to terminate his consulting agreement immediately, and offered him the choice to either step down and relinquish most of his shares, or agree to a reduced role and vastly reduced equity share. But, unfortunately for defendants, Gafita and Nucs AI had a written agreement that if Gafita was terminated without cause his shares would immediately vest in full. To avoid this outcome, Ahmadov and Yagubbayli constructed a set of false and pretextual bases to terminate Gafita for "cause," which would allow Nucs AI to repurchase Gafita's shares for a fraction of their value.

**ANSWER**:

Nucs AI denies the allegations of Paragraph 6.

7. Upon the termination of his consulting agreement, the defendants did not convey Gafita's 4,700,000 fully vested shares of Nucs AI common stock and have stated that they will not do so. Ahmadov and Yagubbayli directly benefit from Gafita's loss of ownership interest in Nucs AI because such a loss increases their own proportional ownership interest in the company and therefore enhances the value of their shares.

///

**ANSWER**:

Nucs AI admits that upon the termination of Gafita's consulting agreement, Nucs AI did not convey 4,700,000 fully vested shares of Nucs AI common stock to Gafita and stated that it would not do so. Nucs AI denies the remaining allegations of Paragraph 7.

**PARTIES**

8. Gafita is an individual and a resident of Baltimore, Maryland. Gafita is a medical doctor specializing in prostate cancer theranostics at Johns Hopkins Medicine.

**ANSWER**:

Nucs AI lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 8 and therefore denies them.

9. Nucs AI is a corporation organized under the laws of the State of Delaware. Gafita is informed and believes that Nucs AI has a principal place of business at 368 9th Avenue, New York, New York, 10001, but at all times pertinent to the acts described in this Complaint had a principal place of business at 535 Mission Street, San Francisco, California, 94105. Nucs AI is a developer of AI tools for healthcare professionals to use in the detection, staging, and treatment of prostate cancer.

**ANSWER**:

Nucs AI admits it is a corporation organized under the laws of the State of Delaware. Nucs AI admits that its principal place of business is at 368 9th Avenue, New York, New York 10001. Nucs AI admits it is a developer of AI tools for healthcare professionals to use in the detection, staging, and treatment of prostate cancer. Nucs AI denies the remainder of the allegations in Paragraph 9.

10. Ahmadov is an individual and a resident of Germany. Ahmadov is a Director, CEO, and Co-Founder of Nucs AI. Ahmadov has a business background.

**ANSWER**:

Nucs AI admits the allegations of Paragraph 10.

11. Yagubbayli is an individual and a resident of Germany. Yagubbayli is a Director, CTO, and Co-Founder of Nucs AI. Yagubbayli is a software engineer.

**ANSWER**:

Nucs AI admits the allegations of Paragraph 11.

## JURISDICTION

12. This Court has original jurisdiction over this action under 28 U.S.C. § 1332 because the amount in controversy exceeds the value of $75,000 and because this dispute is between Gafita, a citizen of Maryland, Nucs AI, a citizen of Delaware and/or California or New York, and Ahmadov and Yagubbayli, both foreign citizens.

**ANSWER**:

Nucs AI denies that it is a citizen of California for purposes of subject matter jurisdiction. Nucs AI admits the remaining allegations of Paragraph 12.

13. Defendant Nucs AI is subject to personal jurisdiction in the State of California because it submitted and consented to the exclusive jurisdiction of the state of California in the First and Second Amendments to the Common Stock Purchase Agreement between Gafita and Nucs AI, attached as **Exhibit B** and **Exhibit C** to this Complaint, and agreed that any litigation arising from said agreements shall be conducted only in the courts of California or the federal courts of the United States located in California and no other courts.

**ANSWER**:

Nucs AI admits that it is subject to the personal jurisdiction of this Court for the purposes of this case. Nucs AI denies the remaining allegations of Paragraph 13.

14. Defendants Ahmadov and Yagubbayli are subject to personal jurisdiction in the State of California because they purposely availed themselves of California, and San Francisco specifically, by representing Nucs AI as having a presence in San Francisco on its website and LinkedIn profile, and by including a San Francisco mailing address on their Nucs AI email signature blocks. Ahmadov and Yagubbayli invoked the status and prestige of a San Francisco address for a technology start-up company to raise the profile of Nucs AI and themselves, and the majority of acts alleged in this complaint occurred while Nucs AI, Ahmadov, and Yagubbayli were deliberately creating an impression that they were present in the State of California and the City of San Francisco. Gafita's claims against Ahmadov and Yagubbayli arise out of his contacts with the forum state, namely, the fraudulent representations they made to Gafita were intended to induce his continued contracting and provision of services for a California entity, and Ahmadov and Yagubbayli were holding themselves out as situated

in California at the time they made the fraudulent representations. Personal jurisdiction over Ahmadov is additionally appropriate because Ahmadov was personally served while inside the state on March 27, 2026.

**ANSWER**:

Nucs AI admits that Ahmadov is subject to the personal jurisdiction of this Court for the purposes of this case because Ahmadov was personally served in California on March 27, 2026. Nucs AI denies the remaining allegations of Paragraph 14.

## VENUE

15. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and (c) because Nucs AI consented to a California forum and its primary place of business is or was within this district. Furthermore, a substantial part of the breach of the contract and tortious conduct alleged occurred in this district. Venue is also proper over Defendant Ahmadov and Yagubbayli pursuant to 28 U.S.C. § 1391(c)(3).

**ANSWER**:

Nucs AI admits that venue is proper in this district pursuant to the Court's order denying in part Defendant Nucs AI, Inc.'s Motion to Transfer. Nucs AI denies the remaining allegations of Paragraph 15.

## INTRADISTRICT ASSIGNMENT

16. Assignment to this division is proper because Nucs AI has or had its primary place of business in San Francisco.

**ANSWER**:

Nucs AI admits that assignment to this division is proper pursuant to the Court's order denying in part Defendant Nucs AI, Inc.'s Motion to Transfer. Nucs AI denies the remaining allegations of Paragraph 16.

///

///

///

///

## BACKGROUND

**A. Gafita develops the core technology and business plan and founds Nucs AI with Ahmadov and Yagubbayli.**

17. Starting in or around early 2023, Gafita began developing AI technology to be used in the diagnosis and treatment of prostate cancer. In support of these efforts, Gafita spent $7,000 of his own money on a powerful GPU-equipped computer to facilitate his development efforts. Gafita also developed a business plan based on the technology he had developed.

**ANSWER**:

Nucs AI admits the allegations in the first sentence of Paragraph 17. Nucs AI lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second and third sentences of Paragraph 17 and therefore denies them.

18. Later in 2023, Gafita described his new technology to Yagubbayli, a software engineer with whom he previously collaborated at Technical University Munich in Germany. Gafita and Yagubbayli realized that Gafita's technology had commercial potential and began considering formation of a company to develop and commercialize it. In early 2024, Yagubbayli introduced Gafita to Ahmadov, a friend of Yagubbayli's who had business experience in e-commerce but no healthcare background. Ahmadov pitched Gafita and Yagubbayli to make him CEO of their contemplated company, and Gafita and Yagubbayli agreed. Gafita, Ahmadov, and Yagubbayli founded Nucs AI and incorporated it as a Delaware corporation in March 2024.

**ANSWER**:

Nucs AI admits the allegations of Paragraph 18.

19. Ahmadov and Yagubbayli appointed themselves directors of the new corporation and promised Gafita a seat on the Board in the future. On May 15, 2024, the Board of Directors of Nucs AI, by unanimous written consent (the "Board Consent"), authorized the issuance of 9,000,000 shares of common stock at a price of $0.0001 per share.

**ANSWER**:

Nucs AI admits that Ahmadov and Yagubbayli were directors of Nucs AI, Inc. Nucs AI denies the remaining allegations of Paragraph 19.

20. Exhibit A to the Board Consent identified three recipients of shares. The Board approved an issuance of 1,850,000 shares to Ahmadov and 2,450,000 shares to Yagubbayli. The Board resolved that 100% of the shares issued to Ahmadov and Yagubbayli were subject to vesting, with the vesting start date of March 15, 2024. The Board resolved that 1/48th of Ahmadov and Yagubbayli's shares would vest after 12 months of service, on March 15, 2025, and 1/48th of their shares would vest each month of their continued service for the next 4-year period.

**ANSWER**:

Nucs AI admits the allegations of Paragraph 20.

21. The Board took a different approach to Gafita's shares. Recognizing that Gafita had developed the vision for the company, the business plan, and the technology at the core of Nucs AI's products, and that the new company could not have existed without him, the Board agreed to issue Gafita 4,700,000 shares—more than Ahmadov and Yagubbayli combined—which would vest immediately.

**ANSWER**:

Nucs AI admits that the Board agreed to issue Gafita 4,700,000 shares. Nucs AI denies the remaining allegations of Paragraph 21.

**B. Nucs AI issues shares to Gafita but quickly begins a scheme to prevent him from retaining them.**

22. On or around May 17, 2024, Nucs AI and Gafita entered into a Common Stock Purchase Agreement. A true and correct copy of this Agreement is attached to this Complaint as **Exhibit A**. As authorized by the Board Consent, the Common Stock Purchase Agreement provided for the issuance of 4,700,000 shares of Nucs AI common stock to Gafita at a total purchase price of $470.00, of which $47 would be paid in cash and $423 in the form of IP assets assigned to Nucs AI by Gafita. The shares were not subject to vesting.

**ANSWER**:

Nucs AI admits the allegations of Paragraph 22.

23. Only two months later, however, Ahmadov presented Gafita with an Amendment to the Common Stock Purchase Agreement ("First Amendment"). A true and correct copy of the First

Amendment is attached to this Complaint as **Exhibit B**. The First Amendment deleted the section of the Common Stock Purchase Agreement providing Gafita with 4,700,000 shares free and clear and replaced it with a vesting schedule commencing on May 17, 2024 (the date of the original Agreement), with 25% of the shares to vest on June 17, 2024, and the remaining 75% vesting over the next three years at 1/48th per month. Ahmadov explained that the 25% vesting in June 2024 was intended to compensate Gafita for his substantial contributions to Nucs AI both before and in the first months of its incorporation.

**ANSWER**:

Nucs AI admits that Exhibit B is a copy of the First Amendment to the Common Stock Purchase Agreement, and that the terms of the First Amendment speak for themselves. Nucs AI otherwise denies the allegations of Paragraph 23.

24. The First Amendment added another requirement that Gafita enter into a written consulting agreement with Nucs AI by February 28, 2025, or Nucs AI would have the right to repurchase Gafita's shares. It also required Gafita to enter into a Confidential Information and Invention Assignment Agreement.

**ANSWER**:

Nucs AI admits that Exhibit B is a copy of the First Amendment to the Common Stock Purchase Agreement, and that the terms of the First Amendment speak for themselves. Nucs AI otherwise denies the allegations of Paragraph 24.

25. Ahmadov and Yagubbayli made a number of representations to Gafita in the time around when they presented him with the First Amendment to induce him to sign it. These representations were calculated to convince Gafita that signing the First Amendment and converting a significant portion of his vested shares to unvested shares was safe and would not put him at risk of losing a significant part of his ownership interest in the company. Ahmadov and Yagubbayli repeatedly assured Gafita that they viewed him as an integral co-founder of the company and intended to add him to the Board of Directors in recognition of his importance to the company's governance and direction. On June 5, 2024, Ahmadov and Yagubbayli invited Gafita to attend a meeting of the Board of Directors. Gafita was sent a Google Calendar invite titled "Board meeting," the only attendees of which were Gafita, Ahmadov, and Yagubbayli. Gafita attended this board meeting and was treated as a de facto member of the board.

**ANSWER**:

Pursuant to the Court's August 4, 2026 order dismissing Gafita's fifth cause of action related to the First Amendment, no response is required.

26. On multiple occasions between April 2024 and June 2024, Ahmadov and Yagubbayli showed Gafita documents in which he was identified as a co-founder of Nucs AI, and Ahmadov and Yagubbayli made multiple statements to him that they recognized he was a co-founder of the company, that he was an essential member of the Nucs AI team, and that he would be added to the Board of Directors. For example, Ahmadov created and shared with Gafita a pitch deck in April 2024 in which Gafita was identified as a co-founder. Ahmadov sent a Slack message to Gafita and Yagubbayli attaching a draft of the pitch deck, in which he wrote, "Good night, my co-founders!" On June 12, 2024, Ahmadov sent Nucs AI's co-founder Code of Conduct to Gafita for his signature.

**ANSWER**:

Pursuant to the Court's August 4, 2026 order dismissing Gafita's fifth cause of action related to the First Amendment, no response is required.

27. Ahmadov and Yagubbayli made other representations to Gafita on or around May 5, 2024, when Gafita traveled to Baku, Azerbaijan to meet with Ahmadov, Yagubbayli, and a potential investor in Nucs AI. Ahmadov and Yagubbayli represented that Gafita was a co-founder and key member of the Nucs AI team during that investor meeting. Although these statements were purportedly made to the investor, they were made in Gafita's presence and he was one of the intended targets of the representations.

**ANSWER**:

Pursuant to the Court's August 4, 2026 order dismissing Gafita's fifth cause of action related to the First Amendment, no response is required.

28. Ahmadov also made other representations to Gafita to make him believe that he would be treated fairly and would receive compensation for his ideas, sweat equity, and access to his professional network. For example, in May 2024, Ahmadov sent a WhatsApp message to Gafita stating: "I have full belie[f] for you and I'm gonna do whatever it takes to make your ideas commercial. Btw I'm sooo happy that you're back." This representation, and similar ones made around the same time, made Gafita

believe that he was viewed by Ahmadov and Yagubbayli as a key member of the Nucs AI team who would be compensated fairly for his contributions.

**ANSWER**:

Pursuant to the Court's August 4, 2026 order dismissing Gafita's claim arising out of the allegation of Ahmadov's statements that he would treat Gafita "fairly," no response to those allegations is required. Nucs AI lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 28 and therefore denies them.

29. These representations made Gafita feel comfortable that revesting his shares was safe and that he would eventually be fully compensated. Ahmadov and Yagubbayli also told Gafita that revesting his shares was necessary to facilitate outside investment. However, Ahmadov and Yagubbayli did not change the vesting schedule for their own shares.

**ANSWER**:

Nucs AI lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 29 and therefore denies them. Nucs AI admits that the vesting schedule for Ahmadov's and Yagubbayli's shares has not changed. Nucs AI denies the remaining allegations of Paragraph 29.

30. As a result of these representations, Gafita believed that Ahmadov and Yagubbayli viewed him as a core member of the Nucs AI team and that his status as a co-founder and eventual membership on the Board of Directors would protect his interest in Nucs AI, to which he had contributed valuable IP and sweat equity. In reasonable reliance on these representations, and on Ahmadov's insistence that revesting was necessary to secure outside investment, Gafita agreed to sign the First Amendment.

**ANSWER**:

Pursuant to the Court's August 4, 2026 order dismissing Gafita's fifth cause of action related to the First Amendment, no response is required.

31. Unfortunately, these representations were false. Ahmadov and Yagubbayli had no intent of ever making Gafita a member of the Board of Directors and did not intend to honor their promises to treat him as a core member of the Nucs AI team and compensate him fairly. From the beginning,

Ahmadov and Yagubbayli intended to obtain the benefit of Gafita's intellectual property, sweat equity, and professional network without compensating him fairly, and the First Amendment was the initial step in their plan to divest Gafita of his shares.

**ANSWER**:

Nucs AI denies the allegations of Paragraph 31.

32. Gafita continued providing valuable services to Nucs AI through development of the AI technologies, contribution to the company's patent applications, development of clinical studies, engagement with the FDA and reimbursement specialists, and development of clinical workflows, while also introducing the company to leading medical institutions and key opinion leaders and generally serving as Nucs AI's primary medical expert as the company got off the ground.

**ANSWER**:

Nucs AI denies the allegations of Paragraph 32.

33. On or around October 24, 2024, at a meeting in Berlin, Germany at Nucs AI's European office, Ahmadov assured Gafita that "I'm a fair guy, I'll treat you fairly," and promised Gafita that he would be provided with fair compensation for his contributions to Nucs AI, including contributions of intellectual property, his sweat equity, and access to his professional network.

**ANSWER**:

Pursuant to the Court's August 4, 2026 order dismissing Gafita's claim arising out of the allegation "I'm a fair guy, I'll treat you fairly," no response to those allegations is required. Nucs AI denies the remaining allegations of Paragraph 33.

34. On or around November 23, 2024, at a meeting in Brussels, Belgium, at Hotel Steigenberger Wiltcher's, Ahmadov and Gafita discussed Gafita's proposed consulting agreement, and during these conversations Ahmadov told Gafita that further revesting of his shares was necessary to secure outside investment for Nucs AI. Ahmadov made additional statements to Gafita during that meeting, including "This will be so good for the company"—meaning his revesting—and "You won't need to work again after we make it." These statements were intended to make Gafita believe that further revesting of his shares was safe and that he would be treated fairly and compensated for his contributions to Nucs AI. Ahmadov and Yagubbayli did not disclose that they never intended to provide

Gafita with vested shares or any other compensation for his intellectual property and other contributions.

**ANSWER**:

Pursuant to the Court's August 4, 2026 order dismissing Gafita's claim arising out of the allegations "This will be so good for the company" and "You won't need to work again after we make it," no response is required. Nucs AI denies the remaining allegations of Paragraph 34.

35. In December 2024, Ahmadov presented Gafita with a Second Amendment to Common Stock Purchase Agreement (the "Second Amendment"), a true and correct copy of which is attached to this Complaint as **Exhibit C**. The Second Amendment recites: "The Company and Stockholder recognize that, in order to provide the Company with an enhanced opportunity to raise additional capital for the benefit of all holders of capital stock of the Company, including Stockholder, it is necessary and appropriate for Stockholder to agree to subject the Shares to certain restrictions as set forth in this Agreement." Ahmadov reiterated that this amendment was necessary for additional fundraising.

**ANSWER**:

Nucs AI admits the allegations in the first sentence of Paragraph 35. Nucs AI admits that the Second Amendment contains the language quoted in Paragraph 35. Nucs AI denies the remaining allegations of Paragraph 35.

36. Ahmadov also reassured Gafita that revesting was safe because he would be treated fairly and compensated for his essential contributions to Nucs AI. Gafita, relying on Ahmadov's statements in October and November 2024 that he would be treated fairly and "won't need to work again after we make it," in conjunction with Ahmadov and Yagubbayli's earlier statements that they viewed Gafita as a co-founder and an essential member of the team, and that they would soon add him to the Board of Directors, agreed to sign the Second Amendment on January 10, 2025, and further compromise his equity position at the company.

**ANSWER**:

Pursuant to the Court's August 4, 2026 order dismissing Gafita's claim arising out of the allegations "I'm a fair guy, I'll treat you fairly" and "You won't need to work again after we make it," no response to those allegations is required. Pursuant to the Court's August 4, 2026 order dismissing Gafita's claim arising out of statements related to co-founder status and board membership, no response

to those allegations is required. Nucs AI lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 36 and therefore denies them.

37. Ahmadov and Nucs AI's statements in November and December 2024 that further revesting of Gafita's shares was necessary to secure additional fundraising were false at the time they were made. Nucs AI did not engage in any fundraising efforts between October 2024 and Gafita's departure from the company in August 2025. Ahmadov and Yagubbayli wanted Gafita to fully revest his shares to facilitate their plan to divest Gafita of his stake in Nucs AI. Had Gafita known that Ahmadov and Yagubbayli had no intention of ever allowing him to receive his shares, or to be fairly compensated for his contributions to Nucs AI, he would not have agreed to sign the Second Amendment.

**ANSWER**:

Nucs AI denies the allegations in the first three sentences of Paragraph 37. Nucs AI lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the fourth sentence of Paragraph 37 and therefore denies them.

38. The Second Amendment, which was effective as of January 10, 2025, subjected all Gafita's shares to total revesting. It undid the 25% backdated vesting of the First Amendment and provided that all Gafita's 4,700,000 shares would vest 1/48th per month beginning February 1, 2025. As such, Gafita went from having 4,700,000 fully vested shares to having zero vested shares and a four-year timeframe in which to receive them. Ahmadov and Yagubbayli's vesting schedules remained unchanged.

**ANSWER**:

Nucs AI admits that the Second Amendment was effective January 10, 2025. Nucs AI admits that the Second Amendment "provided that all Gafita's 4,700,000 shares would vest 1/48th per month beginning February 1, 2025." Nucs AI admits that Ahmadov's and Yagubbayli's vesting schedules have not changed. Nucs AI lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 38 and therefore denies them.

39. When Gafita questioned the fairness of this new schedule in light of Ahmadov and Yagubbayli's earlier representations to Gafita that he would be compensated for his substantial

contributions to Nucs AI at the time of its formation, Ahmadov told him that because Gafita could only commit 15 hours weekly to Nucs AI in his contemplated consulting agreement, he was not entitled to faster vesting. But Gafita, a full-time employee of Johns Hopkins Medicine, had always been clear with Ahmadov and Yagubbayli about the limitations imposed by his primary employer and always understood his deal with Nucs AI to be substantial equity in exchange for his critical ideas and technology that formed the core of the company's products. In practice, Gafita typically dedicated at least 30 hours per week to Nucs AI.

**ANSWER**:

Nucs AI denies the allegations in the first sentence of Paragraph 39. Nucs AI lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 39 and therefore denies them.

40. These reasons for additional revesting, too, were pretextual and false, and were part of a fraudulent scheme by Ahmadov and Yagubbayli to obtain Gafita's ideas, business plan, and intellectual property without compensating him fairly. Nevertheless, reasonably relying on Ahmadov's representations that execution of the Second Amendment was essential to Nucs AI's ability to fundraise, Gafita signed it.

**ANSWER**:

Nucs AI denies the allegations in the first sentence of Paragraph 40. Nucs AI admits that Gafita signed the Second Amendment. Nucs AI lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 40 and therefore denies them.

41. At the same time as he executed the Second Amendment, Gafita also signed a Stock Restriction Agreement. A true and correct copy of the Stock Restriction Agreement is attached to this Complaint as **Exhibit D**. The Stock Restriction Agreement granted to Nucs AI a repurchase option to, should Gafita quit or be terminated for cause, acquire all his unvested shares at their original purchase price of $0.001.

**ANSWER**:

Nucs AI admits that Gafita signed the Stock Restriction Agreement. Nucs AI admits that the Stock Restriction Agreement granted to Nucs AI a repurchase option to, should Gafita quit or be

terminated for cause, acquire all of Gafita's unvested shares. Nucs AI denies the remaining allegations of Paragraph 41.

42. However, the Stock Restriction Agreement also provided that if Gafita was terminated *without* cause, then vesting of his unvested shares would accelerate and Nucs AI would lose its right to repurchase them.

**ANSWER**:

Nucs AI admits the allegations of Paragraph 42.

43. "Cause" is defined in the Stock Restriction Agreement as follows:

> (I) Stockholder's willful and continued failure to substantially perform Stockholder's duties to the Company after there has been delivered to Stockholder by the Company's Board of Directors a written demand for substantial performance and opportunity to cure which sets forth in detail the specific respects in which the Company's Board of Directors believes that Stockholder has not substantially performed Stockholder's duties; (II) Stockholder having committed willful fraud, willful misconduct, dishonesty or other intentional action in any such case which is materially injurious to the Company; (III) Stockholder's having been convicted of, or having plead guilty or nolo contendere to, any crime that results in, or is reasonably expected to result in material harm to the business or reputation of the Company; or (IV) Stockholder's material breach of any material written agreement between Stockholder and the Company (including without limitation Stockholder's Confidential Information and Invention Assignment Agreement with the Company) and Stockholder's failure to cure such breach within 30 days after receiving written notice thereof.

**ANSWER**:

Nucs AI admits the allegations of Paragraph 43.

44. Gafita and Nucs AI also executed a Consulting Agreement and Confidential Information and Invention Assignment Agreement as required by the Second Amendment, both of which took effect in January 2025. The Consulting Agreement provided for compensation to Gafita of $2,000 per month in addition to his shares. Gafita has never received any payment from Nucs AI for his consulting work.

A true and correct copy of the Consulting Agreement is attached as **Exhibit E**.

**ANSWER**:

Nucs AI admits the allegations in the first two sentences of Paragraph 44. Nucs AI admits that it never paid Gafita under the Consulting Agreement. Nucs AI admits the allegations in the fourth sentence of Paragraph 44. Nucs AI denies the remaining allegations of Paragraph 44.

45. The Consulting Agreement also contained an accelerated vesting provision. Section 3 of the Consulting Agreement states:

> Notwithstanding the above, either party may terminate this Agreement at any time upon ten (10) business days' written notice. In the event of such termination, Consultant shall be paid for any portion of the Services that have been performed prior to the termination. However, if the Company terminates this Agreement at any time without Cause (as defined in the Stock Restriction Agreement to be entered into with the Consultant), the vesting of the unvested Shares shall accelerate, and such unvested Shares shall immediately vest at 100%.

**ANSWER**:

Nucs AI admits that Section 3 of the Consulting Agreement includes the quoted language in Paragraph 45. Nucs AI denies the remaining allegations of Paragraph 45.

**C. Nucs AI terminates Gafita without cause and attempts to manufacture a pretextual justification to avoid acceleration of Gafita's unvested shares.**

46. Having induced Gafita, through successive revesting agreements purportedly for the good of Nucs AI, to substantially reduce his quantity of vested shares, Ahmadov, Yagubbayli and Nucs AI put into action their final plan to wipe out Gafita's now-unvested equity entirely.

**ANSWER**:

Nucs AI denies the allegations of Paragraph 46.

47. In early April 2025, after obtaining legal review of the amendments to the Common Stock Purchase Agreement, Gafita expressed concerns to Ahmadov about how his shares had been revested, and in particular the Second Amendment, which served to even take away the 25% of shares vested under the First Amendment and subjected Gafita's shares to complete revesting.

**ANSWER**:

Nucs AI lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 47 and therefore denies them.

48. Gafita expressed that he did not believe this arrangement was equitable and asked that vesting return to the original schedule in the First Amendment. Gafita's expressed concerns regarding the fairness of these terms caused a breakdown of the relationship between himself and Ahmadov and Yagubbayli.

**ANSWER**:

Nucs AI lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 48 and therefore denies them.

49. At a meeting in Baltimore, Maryland, in April 2025, Ahmadov and Gafita reached a verbal agreement to revert his vesting schedule to its original schedule and provide him with 25% vesting on November 15, 2024, and 1/48th monthly vesting thereafter. Ahmadov also agreed to give Gafita his long-promised Board seat.

**ANSWER**:

Nucs AI denies the allegations of Paragraph 49.

50. Only one week later, Ahmadov reneged on his agreement, saying the offer of the Board seat was a "joke," and that he would only agree to the original vesting schedule if Gafita also agreed to substantially reduce his equity stake in the company by 33%. Gafita, who transferred valuable IP to Nucs AI in return for equity, was unwilling to do so.

**ANSWER**:

Nucs AI denies the allegations in the first sentence of Paragraph 50. Nucs AI lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 50 and therefore denies them.

51. Despite the dispute about his shares, Gafita continued providing valuable services to Nucs AI as its chief medical advisor throughout this time period.

**ANSWER**:

Nucs AI denies the allegations of Paragraph 51.

52. In late May 2025, Gafita made an additional inquiry of Ahmadov as to the status of updating his vesting schedule. Ahmadov replied, "I don't know what you are talking about." Around this same time, Yagubbayli confirmed to Gafita that reverting the vesting schedule to its original terms was contingent on his agreement to a 33% reduction of his equity stake in Nucs AI, and said, "We are talking about a package and either take or leave it." Gafita expressed his concerns regarding his unfair treatment in light of his essential contributions in taking the company off the ground.

**ANSWER**:

Nucs AI denies the allegations of Paragraph 52.

53. Shortly thereafter, on May 23, 2025, Ahmadov told Gafita that the Board of Directors had decided to terminate Gafita's Consulting Agreement "as soon as possible." Prior to this announcement, none of Nucs AI, Ahmadov, or Yagubbayli had issued any prior warnings, complaints, performance reviews, or notice of breach of the Consulting Agreement with an opportunity to cure.

**ANSWER**:

Nucs AI admits that on or around May 23, 2025, Ahmadov told Gafita that the Board of Directors had decided to terminate Gafita's Consulting Agreement. Nucs AI denies the remaining allegations of Paragraph 53.

54. Nucs AI offered Gafita two options: (1) step down from his role at the company and retain his vested shares (which at that point amounted to fewer than 500,000 shares); or (2) agree to a reduced role at Nucs AI as a scientific advisor with a reduction in his equity by 50% to 2,350,000 shares which would vest on the current schedule. Ahmadov told Gafita that if he did not elect one option or the other then Nucs AI would terminate the Consulting Agreement.

**ANSWER**:

Nucs AI denies the allegations of Paragraph 54.

55. But Nucs AI apparently subsequently realized that notifying Gafita of its intent to terminate him unless he stepped down or voluntarily surrendered equity was improvident because terminating Gafita's Consulting Agreement without cause would trigger the acceleration provision and cause all his shares to vest. Gafita did not agree to either step down or reduce his equity, yet Nucs AI did not immediately terminate him as threatened. Instead, it asked him to stop all "non-essential" work.

Ahmadov and Yagubbayli needed this pause to give them time to determine how to steal the rest of Gafita's shares.

**ANSWER**:

Nucs AI denies the allegations in the first sentence of Paragraph 55. Nucs AI lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 55 and therefore denies them. Nucs AI admits that it asked Gafita to stop all non-essential work. Nucs AI denies the remaining allegations of Paragraph 55.

56. On June 20, 2025, Ahmadov sent Gafita a letter styled "Notice of Breach and Demand for Cure" ("Breach Notice") stating that Gafita was in breach of the Consulting Agreement and purporting to commence the 30-day cure period provided by the Agreement. The purported grounds for breach were fabricated and/or so vague as to be impossible to "cure" in any meaningful way. And because the Nucs AI Board of Directors had already made the decision to terminate the Consulting Agreement in May 2025, the Breach Notice functioned solely as a pretextual attempt to manufacture "Cause" and avoid Gafita's accelerated vesting provision.

**ANSWER**:

Nucs AI admits the allegations in the first sentence of Paragraph 56. Nucs AI denies the remaining allegations of Paragraph 56.

57. On June 27, 2025, Gafita sent a letter to Nucs AI reiterating his willingness to participate in a company investigation regarding his performance or conduct. Gafita requested additional information and documentation underlying the accusations listed in the Breach Notice so that he could respond to them. Nucs AI never responded to Gafita's letter, foreclosing any ability for him to cure any purported breach.

**ANSWER**:

Nucs AI admits that it received a letter on or around June 27, 2025 from Gafita. Nucs AI admits that it did not respond to this letter. Nucs AI denies the remaining allegations of Paragraph 57.

58. Nucs AI terminated Gafita's access to the company's computer systems on June 27, 2025, including email and Google Drive, and requested that he return the workstation used for company-related activities, rendering it impossible for Gafita to perform his duties for the company. When he

asked Ahmadov to restore his access, Ahmadov responded that all external contractors, advisors, and collaborators had temporarily had their access limited for security reasons, but that he still expected Gafita to provide services to Nucs AI, and he asked that Gafita provide a list of what he was currently working on. This justification was false and pretextual, and was intended to create "Cause" for termination of the Consulting Agreement.

**ANSWER**:

Nucs AI admits that on or around June 27, 2025, it terminated Gafita's access to Nucs AI's computer systems. Nucs AI denies the remaining allegations of Paragraph 58.

59. Gafita provided a list of his ongoing activities. Yet Nucs AI still refused to restore his access to the company's online resources that Gafita required. Instead, Ahmadov sent another email requesting extensive details of everything Gafita had done or was doing for Nucs AI, again reiterating that he would not restore Gafita's access, but that locking Gafita out of all Nucs AI resources "does not absolve you from your obligations or to deliver the work you initiated." Gafita perceived this email as a clear attempt to manufacture "Cause" to support a pretextual termination of the Consulting Agreement, and so he did not respond.

**ANSWER**:

Nucs AI denies the allegations of Paragraph 59, except that Nucs AI lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the last sentence of Paragraph 59 and therefore denies them.

60. Gafita, through counsel, sent a letter to Nucs AI on July 15, 2025, seeking assurance that Nucs AI would honor its agreement to provide him with his ownership rights and demanding full and immediate vesting should Nucs AI terminate Gafita without cause, as Gafita believed it was preparing to do.

**ANSWER**:

Nucs AI admits that it received a letter from Gafita's counsel on or around July 15, 2025. Nucs AI lacks knowledge or information sufficient to form a belief as to the truth of the allegation "as Gafita believed it was preparing to do" and therefore denies it.

///

61. Gafita received a letter styled "Termination of Consulting Agreement" ("Termination Letter") signed by Ahmadov dated August 11, 2025. The letter purported to terminate Gafita for Cause, as defined in the Stock Restriction Agreement. The Termination Letter enumerated several false and pretextual bases that it purported to constitute Cause, including:

- Gafita's meeting on April 11, 2025, with an officer of an alleged competitor of the company, where he allegedly disclosed confidential Nucs AI information. Gafita in fact met with this officer with the full knowledge and approval of Ahmadov and did not share any confidential information with him. Nucs AI never produced any evidence or specifics regarding Gafita's supposed disclosures.
- A "sustained pattern" of conduct reflecting a "lack of professionalism, judgment, and loyalty, including: Repeated underperformance including failure to advance key medical initiatives, disengagement and lack of collaboration with team members and executive leadership, disrespectful behavior towards the leadership team of the Company including the Company's Chief Executive Officer (the 'CEO'); and on several occasions, undermined the CEO in internal communications and team meetings which has interfered with executive operations." These accusations were all untrue, pretextual, and unsupported by any evidence. They also, even if true, would not satisfy the definition of "Cause" in the Stock Restriction Agreement.

**ANSWER**:

Nucs AI admits that it terminated Gafita's Consulting Agreement and that it communicated the reasons for the termination to Gafita. Nucs AI otherwise denies the allegations of Paragraph 61.

62. Nucs AI has refused to convey Gafita's 4,700,000 shares that vested immediately upon his termination without Cause under the Stock Restriction Agreement and have indicated that they do not intend to do so.

**ANSWER**:

Nucs AI admits that it has not conveyed 4,700,000 shares to Gafita. Nucs AI denies the remaining allegations of Paragraph 62.

///

## FIRST CAUSE OF ACTION

### Breach of Contract – Common Stock Purchase Agreement (Against Nucs AI)

63. Gafita incorporates by reference each of the allegations in paragraphs 1–62 of this Complaint as though fully set forth here.

**ANSWER**:

Nucs AI incorporates by reference its responses to Paragraphs 1 through 62 of this Answer as though fully set forth herein.

64. Gafita and Nucs AI entered into a series of contracts including the Common Stock Purchase Agreement, the First Amendment, and the Second Amendment.

**ANSWER**:

Nucs AI admits the allegations of Paragraph 64.

65. The Common Stock Purchase Agreement, the First Amendment, and the Second Amendment are binding and enforceable contracts that Nucs AI entered into knowingly and voluntarily.

**ANSWER**:

Nucs AI admits the allegations of Paragraph 65.

66. The Common Stock Purchase Agreement, as amended, obligated Nucs AI to issue Gafita 4,700,000 shares of Nucs AI common stock, subject to a vesting schedule. The Stock Restriction Agreement provided that, in the event the Consulting Agreement was terminated without Cause, as defined in the Stock Restriction Agreement, then all unvested shares of the 4,700,000 shares issued to Gafita under the Common Stock Purchase Agreement would vest immediately. The Consulting Agreement also provided that if it was terminated without Cause, as defined in the Stock Restriction Agreement, then all unvested shares of the 4,700,000 shares issued to Gafita under the Common Stock Purchase Agreement would vest immediately.

**ANSWER**:

The terms of the referenced agreements speak for themselves and Nucs AI does not adopt Gafita's characterization thereof.

///

67. On August 11, 2025, Nucs AI terminated the Consulting Agreement without Cause, as defined in the Stock Restriction Agreement.

**ANSWER**:

Nucs AI denies the allegations of Paragraph 67.

68. The bases for Cause provided by Nucs AI were all false, pretextual, vague, and/or do not constitute bases for Cause as defined by the Stock Restriction Agreement. Gafita did not commit any act that would constitute Cause as defined by the Stock Restriction Agreement.

**ANSWER**:

Nucs AI denies the allegations of Paragraph 68.

69. Gafita demanded all 4,700,000 shares of Nucs AI common stock be immediately issued to him under the Common Stock Purchase Agreement, as amended. Nucs AI refused to issue and/or deliver Gafita's shares of Nucs AI common stock.

**ANSWER**:

Nucs AI admits the allegations of Paragraph 69.

70. Nucs AI has breached the Common Stock Purchase Agreement, as amended, by failing to issue 4,700,000 fully vested shares of Nucs AI common stock to Gafita.

**ANSWER**:

Nucs AI denies the allegations of Paragraph 70.

71. Gafita has performed all obligations he owed to Nucs AI under the Common Stock Purchase Agreement, as amended, or his obligations have been terminated or excused.

**ANSWER**:

Nucs AI denies the allegations of Paragraph 71.

72. As a result of Nucs AI's breach, Gafita has been harmed in an amount to be determined at trial but in excess of $75,000.

**ANSWER**:

Nucs AI denies the allegations of Paragraph 72.

///

///

**SECOND CAUSE OF ACTION**

**Breach of Contract – Stock Restriction Agreement**
**(Against Nucs AI)**

73. Gafita incorporates by reference each of the allegations in paragraphs 1–72 of this Complaint as though fully set forth here.

**ANSWER**:

Nucs AI incorporates by reference its responses to Paragraphs 1 through 72 of this Answer as though fully set forth herein.

74. Gafita and Nucs AI entered into the Stock Restriction Agreement.

**ANSWER**:

Nucs AI admits the allegations of Paragraph 74.

75. The Stock Restriction Agreement is a binding and enforceable contract that Nucs AI entered into knowingly and voluntarily.

**ANSWER**:

Nucs AI admits the allegations of Paragraph 75.

76. The Stock Restriction Agreement provided that, in the event the Consulting Agreement was terminated without Cause, as defined in the Stock Restriction Agreement, then all unvested shares of the 4,700,000 shares issued to Gafita under the Common Stock Purchase Agreement would vest immediately.

**ANSWER**:

The terms of the referenced agreements speak for themselves and Nucs AI does not adopt Gafita's characterization thereof.

77. On August 11, 2025, Nucs AI terminated the Consulting Agreement without Cause, as defined in the Stock Restriction Agreement.

**ANSWER**:

Nucs AI denies the allegations of Paragraph 77.

///

///

78. The bases for Cause provided by Nucs AI were all false, pretextual, vague, and/or do not constitute bases for Cause as defined by the Stock Restriction Agreement. Gafita did not commit any act that would constitute Cause as defined by the Stock Restriction Agreement.

**ANSWER**:

Nucs AI denies the allegations of Paragraph 78.

79. Gafita demanded all 4,700,000 shares of Nucs AI common stock be immediately issued to him. Nucs AI refused to issue and/or deliver Gafita's shares of Nucs AI common stock.

**ANSWER**:

Nucs AI admits the allegations of Paragraph 79.

80. Nucs AI has breached the Stock Restriction Agreement by failing to issue 4,700,000 fully vested shares of Nucs AI common stock to Gafita.

**ANSWER**:

Nucs AI denies the allegations of Paragraph 80.

81. Gafita has performed all obligations he owed to Nucs AI under the Stock Restriction Agreement, or his obligations have been terminated or excused.

**ANSWER**:

Nucs AI denies the allegations of Paragraph 81.

82. As a result of Nucs AI's breach, Gafita has been harmed in an amount to be determined at trial but in excess of $75,000.

**ANSWER**:

Nucs AI denies the allegations of Paragraph 82.

## THIRD CAUSE OF ACTION

### Breach of Contract – Consulting Agreement
### (Against Nucs AI)

83. Gafita incorporates by reference each of the allegations in paragraphs 1–82 of this Complaint as though fully set forth here.

///

///

**ANSWER**:

Nucs AI incorporates by reference its responses to Paragraphs 1 through 82 of this Answer as though fully set forth herein.

84. Gafita and Nucs AI entered into the Consulting Agreement on or around January 10, 2025.

**ANSWER**:

Nucs AI admits the allegations of Paragraph 84.

85. The Consulting Agreement is a binding and enforceable contract that both parties entered into knowingly and voluntarily.

**ANSWER**:

Nucs AI admits the allegations of Paragraph 85.

86. Under the terms of the Consulting Agreement, Nucs AI was obligated to pay Gafita $2,000 per month in exchange for Gafita's provision of Services, as defined in the Agreement, related to medical operations of Nucs AI.

**ANSWER**:

The terms of the referenced agreement speak for themselves and Nucs AI does not adopt Gafita's characterization thereof.

87. Under the terms of the Consulting Agreement, if Nucs AI terminated the Consulting Agreement without Cause, as defined in the Stock Restriction Agreement, then the vesting of Gafita's unvested shares would accelerate, and such unvested shares would immediately vest at 100%.

**ANSWER**:

The terms of the referenced agreements speak for themselves and Nucs AI does not adopt Gafita's characterization thereof.

88. Gafita performed all obligations required of him under the Consulting Agreement, including the provision of all required Services, or his obligation to perform was excused or terminated.

**ANSWER**:

Nucs AI denies the allegations of Paragraph 88.

///

89. Nucs AI terminated the Consulting Agreement without Cause, as defined in the Stock Restriction Agreement, on August 11, 2025.

**ANSWER**:

Nucs AI denies the allegations of Paragraph 89.

90. In breach of the Consulting Agreement, Nucs AI has never tendered payment to Gafita for Services provided pursuant to the Consulting Agreement in any amount.

**ANSWER**:

Nucs AI admits the allegations of Paragraph 90.

91. In breach of the Consulting Agreement, Nucs AI has refused to acknowledge the vesting provision in the Consulting Agreement and has refused to convey 4,700,000 fully vested shares of Nucs AI common stock to Gafita.

**ANSWER**:

Nucs AI denies the allegations of Paragraph 91.

92. In total, Nucs AI failed to pay at least $16,000 in fees to Gafita for work performed under the Consulting Agreement.

**ANSWER**:

Nucs AI denies the allegations of Paragraph 92.

93. As a result of Nucs AI's breach, Gafita has been harmed in the amount of the outstanding $16,000 in fees as well as interest in an amount to be determined at trial, and further amounts to be determined at trial for failure to convey his common stock that are believed to be in excess of $75,000.

**ANSWER**:

Nucs AI denies the allegations of Paragraph 93.

## FOURTH CAUSE OF ACTION

**Unjust Enrichment**
**(Against Nucs AI)**

94. Gafita incorporates by reference each of the allegations in paragraphs 1–93 of this Complaint as though fully set forth here.

///

**ANSWER**:

Nucs AI incorporates by reference its responses to Paragraphs 1 through 93 of this Answer as though fully set forth herein.

95. Nucs AI has been enriched through (a) Gafita's contribution of his ideas, business plan, and intellectual property to Nucs AI, as well as access to his professional network; and (b) Gafita's efforts and services provided to Nucs AI through his role as medical advisor to Nucs AI. Absent Gafita's contribution of intellectual property, ideas, know-how, and services, Nucs AI would have been unable to launch its business, raise funds, hire employees, develop products, or establish strategic partnerships with key opinion leaders, hospitals, and pharmaceutical companies.

**ANSWER**:

Nucs AI denies the allegations of Paragraph 95.

96. Gafita has suffered an impoverishment in that Nucs AI has refused to provide him fair compensation for his contributions, in the form of equity or cash, and Gafita has exchanged his valuable ideas, intellectual property, and services for a small fraction of the equity shares he was promised, which represent a value far below the fair value of his contributions to Nucs AI.

**ANSWER**:

Nucs AI denies the allegations of Paragraph 96.

97. Gafita's impoverishment is directly related to Nucs AI's enrichment in that Nucs AI has obtained Gafita's valuable ideas, business plan, intellectual property, professional network, and services in exchange for shares representing a value far below the fair value of Gafita's contributions.

**ANSWER**:

Nucs AI denies the allegations of Paragraph 97.

98. Nucs AI's acts were not justified but represent a deliberate bad faith course of dealing by Nucs AI to obtain the benefit of Gafita's ideas, intellectual property, and services without providing fair compensation.

**ANSWER**:

Nucs AI denies the allegations of Paragraph 98.

99. Gafita has been and continues to be damaged by Nucs AI's unjust enrichment.

**ANSWER**:

Nucs AI denies the allegations of Paragraph 99.

100. Nucs AI [*sic*] is entitled to judgment in an amount to be proven at trial and imposition of a constructive trust over his vested but undelivered shares of Nucs AI common stock.

**ANSWER**:

Nucs AI denies the allegations of Paragraph 100.

**FIFTH CAUSE OF ACTION**

**In the Alternative – Fraud in the Inducement – First Amendment**
**(Against Nucs AI, Ahmadov, and Yagubbayli)**

101. Gafita incorporates by reference each of the allegations in paragraphs 1–100 of this Complaint as though fully set forth here.

**ANSWER**:

Pursuant to the Court's August 4, 2026 order dismissing this cause of action, no response is required.

102. Nucs AI, Ahmadov, and Yagubbayli induced Gafita to enter into the First Amendment to the Common Stock Purchase Agreement, which subjected his 4,700,000 shares of Nucs AI common stock, which were fully vested under the original Common Stock Purchase Agreement, to partial revesting.

**ANSWER**:

Pursuant to the Court's August 4, 2026 order dismissing this cause of action, no response is required.

103. Ahmadov and Yagubbayli, as directors and officers of Nucs AI, owed fiduciary duties to Gafita, as a shareholder of Nucs AI. These fiduciary duties included a heightened duty of candor and an obligation to disclose to Gafita material facts around their request that he execute the First Amendment, which subjected his fully-vested Nucs AI shares to partial revesting and made it easier for Ahmadov and Yagubbayli to subsequently divest him of his entire interest in Nucs AI.

///

///

**ANSWER**:

Pursuant to the Court's August 4, 2026 order dismissing this cause of action, no response is required.

104. Nucs AI, Ahmadov, and Yagubbayli made numerous false statements and representations to Gafita to induce him to execute the First Amendment, including:

- Numerous representations, including during a meeting with an investor in Baku, Azerbaijan, in May 2024, and in various company documents and materials, including pitch decks and other investor materials, that Gafita was a co-founder and a key member of the Nucs AI team;
- Ahmadov created a WhatsApp group titled "Co-founders" which included only himself, Yagubbayli, and Gafita;
- Representations made via Slack in April 2024 wherein Ahmadov referred to Gafita and Yagubbayli as "my co-founders";
- Representations made in connection with the sharing of the Co-Founders Code of Conduct document on June 12, 2024, that Nucs AI viewed Gafita as a co-founder and core member of the team; and
- Numerous representations, beginning in May 2024 and continuing through June 2024, by Ahmadov and Yagubbayli, that Gafita would be made a member of the Board of Directors of Nucs AI, including on or around June 5, 2024, when Gafita was invited to a board meeting attended by Ahmadov and Yagubbayli and treated as a board member.

Each of these statements was false at the time it was made, and Ahmadov and Yagubbayli knew they were false. Ahmadov and Yagubbayli had no intention of making Gafita a member of the Board of Directors and did not intend to treat him as a co-founder or to provide him with fair compensation for his contributions to the company.

**ANSWER**:

Pursuant to the Court's August 4, 2026 order dismissing this cause of action, no response is required.

///

105. On information and belief, the reasons Nucs AI, Ahmadov, and Yagubbayli gave to Gafita for the First Amendment were false and pretextual. Nucs AI, Ahmadov, and Yagubbayli omitted their actual motivation in obtaining his signature on the First Amendment: to weaken his equity position as a first step in eventually divesting him of his shares, obtaining the benefit of his valuable intellectual property, sweat equity, and professional network without compensating him.

**ANSWER**:

Pursuant to the Court's August 4, 2026 order dismissing this cause of action, no response is required.

106. Nucs AI, Ahmadov, and Yagubbayli made these false statements and omissions under a fraudulent scheme to obtain Gafita's ideas, business plan, intellectual property, professional network, and services without paying him adequate compensation. Nucs AI, Ahmadov, and Yagubbayli never intended to provide Gafita with 4,700,000 shares of Nucs AI common stock and induced him to execute the First Amendment in furtherance of that fraudulent scheme.

**ANSWER**:

Pursuant to the Court's August 4, 2026 order dismissing this cause of action, no response is required.

107. Gafita relied on defendants' false statements and omissions, and this reliance was reasonable. Because Nucs AI, Ahmadov, and Yagubbayli made representations to him to make him believe that he was a co-founder of the company, a key member of the Nucs AI team, and that they would make him a director of the company, Gafita was willing to weaken his interest in his Nucs AI shares through revesting. Gafita was told, and reasonably believed, that such revesting was necessary to secure outside investment.

**ANSWER**:

Pursuant to the Court's August 4, 2026 order dismissing this cause of action, no response is required.

108. Had Gafita known that Nucs AI, Ahmadov, and Yagubbayli never intended to provide him with 4,700,000 shares of Nucs AI common stock, never intended to provide him with a seat on the Board, and instead planned to weaken his equity position in furtherance of a scheme to divest him of his

shares and secure the benefit of his intellectual property, sweat equity, and professional network without giving him fair compensation, he would not have agreed to execute the First Amendment and would have retained his 4,700,000 fully vested shares of Nucs AI common stock.

**ANSWER**:

Pursuant to the Court's August 4, 2026 order dismissing this cause of action, no response is required.

109. Gafita has been injured by the fraudulent conduct of Nucs AI, Ahmadov, and Yagubbayli because instead of 4,700,000 fully vested shares of Nucs AI common stock, Nucs AI only admits to Gafita's ownership of 685,417 vested shares of Nucs AI common stock.

**ANSWER**:

Pursuant to the Court's August 4, 2026 order dismissing this cause of action, no response is required.

110. Gafita is entitled to rescission of the First Amendment and a declaration that he is the owner of 4,700,000 fully vested shares of Nucs AI common stock as authorized by the Common Stock Purchase Agreement. Gafita is willing to tender the return of any consideration received pursuant to the First Amendment and gives notice of his intent to seek rescission.

**ANSWER**:

Pursuant to the Court's August 4, 2026 order dismissing this cause of action, no response is required.

## SIXTH CAUSE OF ACTION

### In the Alternative – Fraud in the Inducement – Second Amendment
### (Against Nucs AI, Ahmadov, and Yagubbayli)

111. Gafita incorporates by reference each of the allegations in paragraphs 1–110 of this Complaint as though fully set forth here.

**ANSWER**:

Nucs AI incorporates by reference its responses to Paragraphs 1 through 110 of this Answer as though fully set forth herein.

///

112. Nucs AI, Ahmadov, and Yagubbayli induced Gafita to enter into the Second Amendment to the Common Stock Purchase Agreement which fully revested his 4,700,000 shares of Nucs AI common stock, which were fully vested under the original Common Stock Purchase Agreement and partially vested under the First Amendment.

**ANSWER**:

Nucs AI denies the allegations of Paragraph 112.

113. Ahmadov and Yagubbayli, as directors and officers of Nucs AI, owed fiduciary duties to Gafita, as a shareholder of Nucs AI. These fiduciary duties included a heightened duty of candor and an obligation to disclose to Gafita material facts around their request that he execute the Second Amendment, which weakened his equity position.

**ANSWER**:

Pursuant to the Court's August 4, 2026 order dismissing Gafita's claim of fraud by omission, no response is required.

114. Nucs AI, Ahmadov, and Yagubbayli made numerous false statements and representations to Gafita to induce him to execute the Second Amendment, including:

- Ahmadov's statement to Gafita in or around October 24, 2024 in Berlin, Germany at the company's office that "I'm a fair guy, I'll treat you fairly," and his promises to Gafita that he would be provided with fair compensation for his contributions to Nucs AI, including his intellectual property, his sweat equity, and access to his professional network; and
- Representations made by Ahmadov in or around November 23, 2024, in Brussels, Belgium, at Hotel Steigenberger Wiltcher's, and reiterated in the preamble to the Second Amendment, that Gafita's revesting was necessary to secure outside investment for Nucs AI. Ahmadov made additional statements to Gafita at that time, including "This will be so good for the company"—meaning his revesting—and "You won't need to work again after we make it."

Each of these statements was false at the time it was made, and Ahmadov knew they were false. Nucs AI was not engaged in fundraising between October 2024 and at least August 2025, did not raise funds

in the aftermath of Gafita's revesting, and Gafita's revesting was not necessary for fundraising in November 2024 through January 2025. Nucs AI, Ahmadov, and Yagubbayli wanted Gafita to fully revest his shares as a step in their scheme to divest him entirely through his pretextual termination for "Cause," which they put into action shortly after he executed the Second Amendment.

**ANSWER**:

Pursuant to the Court's August 4, 2026 order dismissing Gafita's claim arising out of the allegations "I'm a fair guy, I'll treat you fairly," "This will be so good for the company," and "You won't need to work again after we make it," no response to those allegations is required. Nucs AI denies the remaining allegations of Paragraph 114.

115. On information and belief, the reasons Nucs AI, Ahmadov, and Yagubbayli gave to Gafita for the Second Amendment were false and pretextual. Nucs AI, Ahmadov, and Yagubbayli omitted their actual motivation in obtaining his signature on the Second Amendment: to fully revest Gafita's Nucs AI shares at the same time he was asked to execute the Stock Restriction Agreement, which granted Nucs AI the right to repurchase his shares upon his termination for "Cause." At the time Nucs AI, Ahmadov, and Yagubbayli made the statements intended to induce Gafita to sign the Second Amendment, they had already developed their plan to pretextually terminate Gafita for "Cause," divesting him of his shares, obtaining the benefit of his valuable intellectual property, sweat equity, and professional network without providing Gafita fair—or any—compensation.

**ANSWER**:

Nucs AI denies the allegations of Paragraph 115.

116. Nucs AI, Ahmadov, and Yagubbayli made these false statements and omissions under a fraudulent scheme to obtain Gafita's ideas, business plan, intellectual property, professional network, and services without paying him compensation. Nucs AI, Ahmadov, and Yagubbayli never intended to provide Gafita with 4,700,000 shares of Nucs AI common stock and induced him to execute the Second Amendment in furtherance of that fraudulent scheme.

**ANSWER**:

Pursuant to the Court's August 4, 2026 order dismissing Gafita's claim of fraud by omission, no response to those allegations is required. Nucs AI denies the remaining allegations of Paragraph 116.

117. Gafita relied on the defendants' false statements and omissions, and this reliance was reasonable. Gafita had had a prior relationship with Yagubbayli, and Yagubbayli had introduced Ahmadov as a credible and trustworthy person to join the enterprise as co-founder. Ahmadov and Yagubbayli had led Gafita to believe that the three of them were co-equal co-founders and Gafita placed his trust in them. Moreover, as directors and officers of Nucs AI, Ahmadov and Yagubbayli owed Gafita fiduciary duties of loyalty and good faith in his capacity as a shareholder.

**<u>ANSWER</u>**:

Pursuant to the Court's August 4, 2026 order dismissing Gafita's claim of fraud by omission, no response to those allegations is required. Nucs AI lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 117 regarding Gafita's reliance and therefore denies them. Nucs AI admits that Gafita had a prior relationship with Yagubbayli and that Yagubbayli introduced Gafita to Ahmadov. Nucs AI denies the remaining allegations of Paragraph 117.

118. Furthermore, Gafita was specifically induced to enter into the Second Amendment by Ahmadov's assurances that he would be treated "fairly" in or around November 2024. Gafita reasonably understood Ahmadov's promise of treating him and compensating him "fairly" to mean that he would eventually receive his promised stock compensation, and that his revesting was necessary to ensure the success of the company. In fact, Ahmadov, Yagubbayli, and Nucs AI had no intention of ever providing Gafita with his shares, and Nucs AI did not need him to revest his shares to secure additional outside investment, which they were not seeking and had no plans to seek at the time Gafita was induced to sign the Second Amendment.

**<u>ANSWER</u>**:

Pursuant to the Court's August 4, 2026 order dismissing Gafita's claim arising out of the allegation of Ahmadov's statements that he would treat Gafita "fairly," no response to those allegations is required. Nucs AI lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 118 and therefore denies them. Nucs AI denies the allegations in the third sentence of Paragraph 118.

119. Had Gafita known that Nucs AI, Ahmadov, and Yagubbayli never intended to provide him with 4,700,000 shares of Nucs AI common stock, never intended to provide him with a seat on the

Board, did not intend to compensate him fairly, and instead planned to revest his shares in furtherance of a scheme to divest him of his shares and secure the benefit of his intellectual property, sweat equity, and professional network without giving him fair compensation, he would not have agreed to execute the Second Amendment.

**ANSWER**:

Nucs AI lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 119 and therefore denies them.

120. Gafita has been injured by the fraudulent conduct of Nucs AI, Ahmadov, and Yagubbayli because instead of 4,700,000 fully vested shares of Nucs AI common stock, Nucs AI only admits to Gafita's ownership of 685,417 vested shares of Nucs AI common stock.

**ANSWER**:

Nucs AI denies the allegations of Paragraph 120.

121. Gafita is entitled to rescission of the Second Amendment and a declaration that he is the owner of 4,700,000 fully vested shares of Nucs AI common stock as authorized by the Common Stock Purchase Agreement. Gafita is willing to tender the return of any consideration received pursuant to the First Amendment and gives notice of his intent to seek rescission.

**ANSWER**:

Nucs AI denies the allegations in the first sentence of Paragraph 121. Nucs AI lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the last sentence of Paragraph 121 and therefore denies them.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

### Breach of Contract by Plaintiff

Nucs AI asserts that Gafita materially breached the agreements at issue by failing to perform his obligations thereunder. Specifically, Gafita failed to comply with the terms of the agreements in a manner that was material and went to the essence of the agreements. As a direct and proximate result of Gafita's prior material breach, Nucs AI was excused from any further performance under the agreements. Accordingly, Gafita's claims are barred, in whole or in part, to the extent they are

predicated on any alleged non-performance by Nucs AI that was excused by Gafita's own prior material breach.

**SECOND AFFIRMATIVE DEFENSE**

**No Breach by Defendant Nucs AI**

Nucs AI asserts that it fully performed all duties and obligations owed under the agreements at issue, or, alternatively, that any duties not performed were prevented, waived, or otherwise excused by the conduct of Gafita, by operation of law, or by other circumstances beyond Nucs AI's control. Therefore, Gafita's claims for breach of contract fail for lack of any actionable breach.

**THIRD AFFIRMATIVE DEFENSE**

**Unjust Enrichment**

Nucs AI asserts that Gafita's claims are barred, in whole or in part, because permitting Gafita to recover under the circumstances alleged would result in the unjust enrichment of Gafita. Specifically, Nucs AI conferred a benefit upon Gafita, which Gafita knowingly accepted and retained. Under the circumstances, it would be inequitable for Gafita to retain such benefit without providing fair compensation to Nucs AI. Accordingly, to the extent Gafita seeks to recover damages or other relief that would result in Gafita's unjust enrichment, such claims are barred.

**FOURTH AFFIRMATIVE DEFENSE**

**Unclean Hands**

Nucs AI asserts that Gafita's claims are barred, in whole or in part, under the doctrine of unclean hands as a result of Gafita's own conduct.

**COUNTERCLAIMS**

1. Defendant NUCS AI, INC. ("Nucs AI") asserts the following counterclaims against Plaintiff DR. ANDREI GAFITA ("Gafita"):

**PARTIES**

2. Nucs AI is a Delaware corporation with its principal place of business in New York. Nucs AI develops artificial intelligence tools for healthcare professionals to use in the detection, staging, and treatment of prostate cancer.

3. Gafita is an individual and a citizen of Maryland.

**BACKGROUND: NUCS AI'S FORMATION AND THE HISTORY OF THE RELATIONSHIP BETWEEN NUCS AI AND GAFITA**

1. Nucs AI develops technology in a field in which Gafita has conducted, and continues to conduct, research, and Nucs AI sought to collaborate with him. At the outset of that collaboration, Gafita told Nucs AI that his immigration status in the United States prevented him from signing an agreement with Nucs AI. He stated that he would resolve the issue with his then-employer, Johns Hopkins Medicine, and would inform Nucs AI when he was able to sign a formal agreement.

2. In or around May 2024, in connection with the formation of Nucs AI, Nucs AI and Gafita entered into a Common Stock Purchase Agreement under which Nucs AI issued shares directly to Gafita. Gafita asked that the shares be issued to a third party instead of to him. Nucs AI refused.

3. Shortly afterward, Nucs AI began seeking investors. Prospective investors advised Nucs AI that early contributors, including Gafita, should be subject to a vesting schedule, and that the level of equity granted to Gafita required his full commitment to the company.

4. Gafita told Nucs AI that he could not commit to direct involvement for several months, but that he could do so later. He also asked to continue his involvement with his academic and hospital employer.

5. In or around July 2024, Nucs AI and Gafita entered into the First Amendment to the Common Stock Purchase Agreement (the "First Amendment"). Nucs AI agreed to Gafita's request on the condition that his full engagement and a vesting schedule would begin by approximately February 2025. The First Amendment provides that a consulting agreement and vesting schedule would be put in place at that later date.

6. Between May 2024 and February 2025, Gafita told Nucs AI that, because of a restriction imposed by Johns Hopkins Medicine, he could contribute only 15 hours per month. Nucs AI responded that 15 hours per month was too limited a contribution to justify the equity granted to him as an early contributor. Gafita agreed orally that he would contribute at the level of a chief medical officer, beyond 15 hours per month, but stated that the written agreement needed to state the 15-hour figure.

7. In November 2024, Gafita attended the annual congress of the European Association of Nuclear Medicine ("EANM") in Germany. He asked Nucs AI to make payments to sponsor the

attendance at EANM of RECIP, an organization with which Gafita is affiliated. Nucs AI agreed to provide approximately $7,000 in sponsorship and to support RECIP's goals at EANM with company time and technical resources. Nucs AI asked that an appropriate written agreement with RECIP be put in place, but none was signed before EANM. Gafita then decided that RECIP would not acknowledge Nucs AI and that his own involvement with Nucs AI should end.

8. On the following day, Gafita and Nucs AI discussed reducing Gafita's shares by 50% in exchange for eliminating any requirement that he be involved in Nucs AI on a day-to-day basis.

9. The next day, Gafita apologized to Nijat Ahmadov ("Ahmadov") and Farid Yagubbayli ("Yagubbayli"), and stated that he still wanted to be directly involved with Nucs AI and was committed to fulfilling his medical leadership responsibilities.

10. After this discussion, Gafita began collaborating constructively, and the relationship improved.

11. Between October and December 2024, Gafita told Nucs AI that, because of a requirement of Johns Hopkins Medicine, the planned consulting agreement and his vesting schedule had to begin on the same date, which he stated had to be in January 2025. He also stated that he did not want to inform Johns Hopkins Medicine of his participation in Nucs AI. Nucs AI refused and required him to disclose his participation and equity stake to Johns Hopkins Medicine, and Nucs AI observed him submit that disclosure.

12. In December 2024, Gafita told Nucs AI that he could begin the consulting agreement in January 2025 and that vesting should begin on that date. To accommodate him, Nucs AI agreed to a vesting schedule without a standard cliff, so that vesting would begin immediately.

13. Upon reviewing the proposed agreements, which used the same form of consulting agreement that Ahmadov and Yagubbayli have with Nucs AI, Gafita requested changes. In particular, he added a provision for accelerated vesting upon termination without cause.

14. Because Nucs AI was considering raising capital and needed the vesting schedule and consulting agreement in place, it needed to finalize the agreements quickly. Nucs AI therefore accepted Gafita's changes and signed the agreements.

///

15. Upon information and belief, Gafita changed his conduct toward Nucs AI in late 2024 to induce Nucs AI to sign agreements containing the accelerated vesting provision, knowing that he did not intend to contribute to Nucs AI's goals.

16. In or about January 2025, Nucs AI and Gafita entered into a Consulting Agreement (the "Consulting Agreement"), pursuant to which Gafita agreed to provide consulting services to Nucs AI. A true and correct copy of the Consulting Agreement is attached as Exhibit E to Gafita's Amended Complaint.

17. Under the Consulting Agreement, Gafita assumed specific responsibilities including, but not limited to: (a) overseeing clinical validation efforts, including investigator-initiated and regulatory studies; and (b) ensuring all medical activities and products adhere to regional and international regulations.

18. In or about January 2025, Nucs AI and Gafita also entered into a Confidential Information and Invention Assignment Agreement (the "CIIAA"), pursuant to which Gafita agreed "to hold in strictest confidence, and not to use, except for the benefit of the Company to the extent necessary to perform the Services, and not to disclose to any person, firm, corporation or other entity, without written authorization from the Company" any Confidential Information of Nucs AI. A true and correct copy of the CIIAA is attached hereto as Exhibit 1.

19. Under the CIIAA, "Confidential Information" is defined to mean "information and physical material not generally known or available outside the Company and information and physical material entrusted to the Company in confidence by third parties."

20. In the CIIAA, Gafita identified BlueEarth Diagnostics, Eli Lilly and Company, and Novartis as existing relationships. He did not identify Lantheus Holdings, Inc. or any of its affiliates.

21. Gafita was personally responsible for building and completing Nucs AI's "Clinical Validation Study" to support the company's product submission to the United States Food and Drug Administration ("FDA").

22. Gafita failed to complete the Clinical Validation Study and repeatedly stalled on this critical initiative, including requesting multiple extensions.

///

23. Gafita also failed to ensure that Nucs AI's medical device product was built in compliance with 21 C.F.R. Part 820, the FDA's Quality System Regulation for medical devices.

24. As a direct and proximate result of Gafita's failures, Nucs AI has been required to initiate substantial remedial quality and regulatory initiatives before the company is able to submit its product to the FDA for approval.

25.

26. In March 2025, Gafita began raising issues with the agreements, in particular objecting to the vesting start date and citing his earlier collaboration with Nucs AI. Gafita himself had proposed that vesting start date.

27. In the first week of April 2025, Ahmadov traveled to Baltimore, Maryland to meet with Gafita. Nucs AI told Gafita that his contributions remained very limited in scope and did not meet Nucs AI's need for medical leadership, and that if he could not commit to greater, full-time involvement, Nucs AI would need to hire other medical leadership and adjust the agreement to reflect his lower level of commitment. Gafita proposed that he hire another physician, reporting to him, to fulfill the medical responsibilities. Nucs AI later hired another physician to add capacity to its medical team.

28. Nucs AI also had concerns about Gafita's conduct, including a material change in his attitude toward company matters, unprofessional comments about team members, unprofessional conduct in external meetings, disparaging comments about the company and its leadership, disclosure of company confidential information in front of third parties, publicly referring to Nucs AI as "his company," and his personal priorities, i.e. Nucs AI versus his personal clinical goals.

29. Nucs AI remained willing to discuss changes to the agreement, provided that any changes reflected both the earlier vesting start date that Gafita sought and the lower level of commitment that he was willing to make.

30. In late April 2025, Nucs AI learned that, in mid-April 2025, Gafita had met with an executive of Lantheus Holdings, Inc. (together with its affiliates, "Lantheus"), a competitor of Nucs AI.

31. In May 2025, during a heated telephone call, Gafita accused Nucs AI of "trying to fuck me over."

///

32. In late May 2025, Ahmadov and Yagubbayli discussed how to proceed, given that Gafita's contributions had declined to almost nothing, that he had been meeting with competitors, and that his conduct had become increasingly combative.

33. Also in late May 2025, Nucs AI decided to restructure its arrangement with Gafita to reflect his level of commitment, along the lines discussed in November 2024: a 50% reduction in his shares in exchange for removing his day-to-day responsibilities. At the same time, Gafita began requesting video calls to "solve this."

34. On a video call, Nucs AI presented the proposed restructuring and the possibility of termination. Gafita proposed alternative arrangements, which Nucs AI did not accept. Gafita asked to postpone a decision.

35. On June 3, 2025, without accepting or rejecting Nucs AI's proposal, Gafita served a demand to inspect Nucs AI's books and records under Section 220 of the Delaware General Corporation Law. Nucs AI responded to the demand and produced the available records.

36. On June 10, 2025, Nucs AI received a "Notice of Potential Patent Infringement" from Lantheus concerning Nucs AI's products. Upon information and belief, Gafita's mid-April 2025 meeting with Lantheus led directly to that notice. Nucs AI devoted substantial time and expense to analyzing the Lantheus claim and preparing its defense.

37. Upon information and belief, Gafita disclosed Nucs AI's Confidential Information to Lantheus, which disclosure led Lantheus to send a Patent Infringement Notice to Nucs AI dated June 10, 2025, and, upon information and belief, to hire at least one former Nucs AI employee.

38. On June 20, 2025, Nucs AI delivered a notice of breach to Gafita, citing his failure to perform and his disclosure of Nucs AI's Confidential Information during his meeting with Lantheus.

39. In late June 2025, Nucs AI discovered that, on June 19 and 20, 2025, PSMA Laboratories LLC, an entity incorporated only days earlier, had filed applications to register Nucs AI's product names as trademarks.

40. Around the same time, on June 15, 2025, a trademark application for RECIP was also filed by "Oncotheranostics." Grellas Shah LLP is the current attorney and correspondence address of record.

41. Upon information and belief, PSMA Laboratories LLC filed those applications at Gafita's direction. To protect its confidential information and trade secrets, Nucs AI removed Gafita's access to its systems.

42. Upon information and belief, Gafita disclosed Nucs AI's Confidential Information to PSMA Laboratories LLC, Robert Vintila, and/or Robin Jones, which disclosure resulted in the filing of trademark applications for "Track PSMA" and "ReportPSMA," trademarks that are confusingly similar to Nucs AI's proprietary technology and products.

43. As a direct and proximate result of Gafita's unauthorized disclosures, Nucs AI has incurred costs responding to the Lantheus Patent Infringement Notice and sending cease and desist correspondence to PSMA Laboratories LLC to seek withdrawal of the trademark applications.

44. Nucs AI devoted substantial time and expense to protecting its trademarks.

45. During the cure period, Gafita asked to meet with Ahmadov. At that meeting, Gafita threatened to make the dispute public in order to damage Nucs AI's ability to raise capital, and said that Nucs AI should make him an offer to resolve it. Nucs AI refused and told Gafita that it expected him to cure his breach.

46. In mid-July 2025, Gafita requested documents from his Nucs AI email account and Google Drive to assist in completing a study. Nucs AI agreed to extract the requested documents for him. Gafita refused and objected to Nucs AI reviewing his email or Google Drive.

47. Throughout the cure period, Nucs AI, Ahmadov, and Yagubbayli hoped to reach a mutually agreeable resolution through the proposed restructuring. Nucs AI allowed approximately 20 days beyond the required cure period before terminating Gafita's Consulting Agreement.

48. Gafita made no attempt to cure his breaches during the cure period.

## FIRST CAUSE OF ACTION

### Breach of Contract - Consulting Agreement

49. Nucs AI realleges and incorporates by reference the allegations in paragraphs 1 through paragraphs 1 through 48 above as though set forth fully herein.

50. Nucs AI and Gafita entered into the Consulting Agreement, which constitutes a valid and enforceable contract.

51. Under the Consulting Agreement, Gafita was obligated, among other things, to: (a) oversee clinical validation efforts, including investigator-initiated and regulatory studies; and (b) ensure all medical activities and products adhere to regional and international regulations.

52. Nucs AI fully performed its obligations under the Consulting Agreement, or its performance was excused.

53. Gafita breached the Consulting Agreement by failing to oversee and complete the Clinical Validation Study necessary to support Nucs AI's FDA product submission.

54. On December 20, 2024, Gafita told Nucs AI and its regulatory consultant that Nucs AI expected to make its FDA submission in late January or early February 2025, with study data expected by the end of January 2025. On April 16, 2025, Gafita reported that the study could not begin before the end of May 2025. On May 12, 2025, Nucs AI directed Gafita to provide a clear timeline and plan for the study. On May 19, 2025, Gafita committed to start the study within two weeks. On June 4, 2025, he reported that "[t]he efforts continue to gather data to reach the target number." On June 19, 2025, he reported that he had not "received any new updates from the collaborators." The study was not completed during Gafita's engagement.

55. Gafita committed that, as part of his responsibility for the Clinical Validation Study and in connection with his substantial compensation, he "would take care of all necessary data and study execution for the FDA validations studies required." Gafita did not fulfill that commitment.

56. Following Gafita's breach and failure to cure, Nucs AI had to obtain the data from an alternative source. On July 10, 2026, after substantial challenges in finding and licensing appropriate data sources, Nucs AI entered into a Data License and Strategic Partnership Agreement with Segmed, Inc., a commercial provider of de-identified medical imaging data, together with a related Simple Agreement for Future Equity (the "SAFE"). To replace the data that Gafita failed to deliver, Nucs AI licensed a dataset of 450 clinical-grade patient studies from Segmed. Under that agreement, the dataset costs $292,500: $135,000 in cash license fees at $300 per patient, plus $157,500 in equity at $350 per patient, which is applied against the principal of the SAFE.

///

///

57. Because Gafita did not complete the Clinical Validation Study, Nucs AI has also had to contract with five additional medical professionals to participate in the study, at an expected cost of at least $58,000.

58. Gafita further breached the Consulting Agreement by failing to ensure that Nucs AI's medical device product was built in compliance with 21 C.F.R. Part 820, the FDA's Quality System Regulation for medical devices.

59. Under 21 C.F.R. Part 820, the Quality Management System Regulation, which incorporates ISO 13485:2016 by reference, and Article 10(9) of the EU Medical Device Regulation (EU) 2017/745, a medical device must be designed and developed within a quality management system ("QMS") that meets their requirements. Nucs AI therefore had to establish a compliant QMS before it could submit its software device to the FDA. Gafita did not implement a QMS at Nucs AI, and the absence of a QMS has prevented Nucs AI from submitting its products for FDA review.

60. To remedy this, Nucs AI undertook a project to design, document, validate, and implement a QMS. The project produced a functioning QMS, including a Quality Manual, a Quality Policy, and eighteen standard operating procedures. The procedures cover document and change control, management responsibility and review, design and development, risk management, supplier management, personnel and training, software development, data management, validation, control of nonconformances, corrective and preventive action, complaint handling, adverse event reporting, clinical validation, research software, and internal audit. In total, the project produced sixty-five controlled documents, which went through 174 recorded drafting and review cycles before release.

61. Nucs AI estimates that the cost of the project exceeds $150,000, including internal labor and subscription fees for the electronic QMS platform.

62. Gafita was the author of the study protocol for the Clinical Validation Study, and the protocol was substantively deficient. Nucs AI retained Innolitics LLC to remediate the study protocol and the statistical analysis plan, at a cost of $9,120.

63. As a direct and proximate result of Gafita's breaches of the Consulting Agreement, Nucs AI has suffered damages, including but not limited to: (a) costs associated with substantial remedial quality and regulatory initiatives required before submitting its product to the FDA; (b) delays in

obtaining FDA approval and bringing its product to market; and (c) other business disruptions and additional costs.

64. As a result of Gafita's breaches, Nucs AI has been damaged in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**

**Breach of Contract - Confidential Information and Invention Assignment Agreement**

65. Nucs AI realleges and incorporates by reference the allegations in paragraphs 1 through paragraphs 1 through 64 above as though set forth fully herein.

66. Nucs AI and Gafita entered into the CIIAA, which constitutes a valid and enforceable contract.

67. Under the CIIAA, Gafita was obligated "to hold in strictest confidence, and not to use, except for the benefit of the Company to the extent necessary to perform the Services, and not to disclose to any person, firm, corporation or other entity, without written authorization from the Company" any Confidential Information of Nucs AI.

68. Nucs AI fully performed its obligations under the CIIAA, or its performance was excused.

69. Gafita breached the CIIAA by disclosing Nucs AI's Confidential Information to PSMA Laboratories LLC, Robert Vintila, and/or Robin Jones without written authorization from Nucs AI. Upon information and belief, this unauthorized disclosure resulted in the filing of trademark applications for "Track PSMA" and "ReportPSMA," trademarks that are confusingly similar to Nucs AI's proprietary technology and products.

70. Gafita further breached the CIIAA by disclosing Nucs AI's Confidential Information to Lantheus without written authorization from Nucs AI. Upon information and belief, this unauthorized disclosure led Lantheus to send a Patent Infringement Notice to Nucs AI dated June 10, 2025, and to hire at least one former Nucs AI employee.

71. The information disclosed by Gafita to PSMA Laboratories LLC, Robert Vintila, Robin Jones, and Lantheus constitutes "Confidential Information" as defined in the CIIAA, as such information was not generally known or available outside Nucs AI.

72. As a direct and proximate result of Gafita's breaches of the CIIAA, Nucs AI has suffered damages, including but not limited to: (a) costs incurred in responding to the Lantheus Patent Infringement Notice; (b) costs incurred in sending cease and desist correspondence to PSMA Laboratories LLC to seek withdrawal of the trademark applications; and (c) other business disruptions and harm to Nucs AI's competitive position.

73. Nucs AI retained outside counsel and incurred legal fees totaling $23,645.00. Foley & Lardner LLP advised Nucs AI on the Patent Infringement Notice that Lantheus sent on June 10, 2025, and invoiced Nucs AI $21,087.50 for patent counseling relating to Lantheus and its affiliate EXINI Diagnostics AB (Invoice No. 51115625, dated July 31, 2025). Inventus Law PC advised Nucs AI on the "Track PSMA" and "ReportPSMA" trademark applications. Between July 7 and July 17, 2025, Inventus drafted a cease and desist notice and sent it to PSMA Laboratories LLC, and invoiced Nucs AI $2,557.50 for that work.

74. To guard against further third-party filings for its product names, Nucs AI also retained Inventus Law PC to file six additional trademark applications, for which Inventus invoiced Nucs AI $6,600.84.

75. As a result of Gafita's breaches, Nucs AI has been damaged in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Counterclaimant Nucs AI, Inc. respectfully prays for judgment against Counterclaim-Defendant Gafita as follows:

1. Compensatory damages in an amount to be proven at trial;

2. Prejudgment and post-judgment interest at the maximum rate allowed by law;

3. Costs of suit and reasonable attorneys' fees to the extent permitted by law or contract; and

4. Such other and further relief as the Court deems just and proper.

///

///

///

Dated: October 9, 2026

**FOLEY & LARDNER LLP**
Rajiv Dharnidharka
Matthew D. Caplan
John P. Riley

By: /s/ *Matthew Caplan*
MATTHEW D. CAPLAN
Attorneys for Defendants
NUCS AI, INC. and NIJAT AHMADOV.